IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DELAWARE  AUDUBON SOCIETY,    )
CENTER FOR FOOD SAFETY, and    )
PUBLIC EMPLOYEES FOR    )
ENVIRONMENTAL RESPONSIBILITY,    )
    )
    Plaintiffs,    )    Case No. 1:06-cv-223
    vs.    )
    )
Secretary, United States Department of the    )
Interior, DALE HALL, Director of    )
United States Fish And Wildlife Service,    )
and UNITED STATES FISH AND WILDLIFE )
SERVICE, an administrative agency    )
of the United States Department of the    )
Interior,    )
    )
    Defendants.    )
_____)

**PLAINTIFFS BRIEF IN SUPPORT**
**OF THEIR MOTION FOR SUMMARY JUDGMENT**

Vivian Houghton, DE Bar #
Houghton, Holly & Gray LLP
800 West Street
Wilmington, DE 19801
(302) 658-0518

William Rostov    Paula Dinerstein
Kevin Golden    Jeffrey Ruch
Center for Food Safety    Public Employees For Environmental Responsibility
2601 Mission Street, Suite 803    2000 P Street, NW; Suite 240
San Francisco, CA 94110    Washington, D.C. 20036
 (415) 826-2770    (202) 265-7337

## TABLE OF CONTENTS

TABLE OF CITATIONS ................................................... 4-6

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ......................... 7

SUMMARY OF ARGUMENT ................................................. 7

STATEMENTS OF FACTS ................................................. 9

ARGUMENT ........................................................... 13

I.  THERE IS NO ISSUE OF MATERIAL FACT THAT THE DEFENDANTS
    ACTED ARBITRARILY AND CAPRICOUSLY BY VIOLATING THE
    NATIONAL WIDLIFE REFUGE SYSTEM ADMINISTRATON ACT WHEN
    THEY ALLOWED FARMING AT THE PRIME HOOK REFUGE WITHOUT
    MAKING REQUIRED COMPATIBILITY DETERMINATIONS .................... 15

    A.  NWRSAA Requires Defendants To Make A Compatibility
        Determination Prior To Allowing Farming On Refuge Land ......... 15

    B.  Defendants Violated The NWRSAA By Failing To Prepare a
        Compatibility Determination Prior To Allowing Farming On Prime
        Hook Refuge Lands ......................................... 18

    C.  Preparation Of A Comprehensive Conservation Plan Does Not Relieve
        Defendants' Duty To Prepare A Compatibility Determination ........ 20

II. THERE IS NO ISSUE OF MATERIAL FACT THAT DEFENDANTS ACTED
    ARBITRARILY AND CAPRICIOUSLY BY VIOLATING THE NATIONAL
    ENVIRONMENTAL POLICY ACT BY ALLOWING THE FARMING
    OF GMOs AT THE PRIME HOOK REFUGE ............................... 21

    A.  NEPA Requires Defendants To Prepare An Environmental Assessment
        And/or Environmental Impact statement Prior To Allowing The Planting
        Of GMOs .................................................. 22

        1.  NEPA Applies to FWS Actions Permitting the GMO Planting at Prime
            Hook Refuge ........................................... 24

        2.  Defendants' Repeated Approval Of An Exception To Its Own GMO
            Prohibition Policy Further Demonstrates That  Permitting GMO Planting
            Constitutes Major Federal Action Requiring NEPA Compliance ......... 27

3.     Defendants Must Comply With NEPA Because None Of Defendants' Actions Are Categorically Excluded From NEPA Review ...........................29

B.     FWS Must Prepare An EIS Because The Planting Of GMOs May Cause Significant Environmental Effects. ...............................................................33

III.     PLAINTIFFS ARE ENTITLED TO PERMANENT INJUNCTIVE RELIEF ...........35

CONCLUSION...................................................................................................................37

## TABLE OF CITATIONS

**Cases**

*Alaska Ctr. for the Envt. v. United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999)....................................................................................................29

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995).........................................................................................35

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)..................36

*California v. Norton*, 311 F.3d 1162 (9th 2002) ........................................29,30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................13

*Center for Food Safety v. Johanns*, 451 F.Supp.2d 1165, 1183- 1186 (D. Hawaii 2006) ..........................................................................9,25,29,30

*Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414 (1971) .....................7,8,14

*Curry v. U.S. Forest Service*, 988 F. Supp. 541, 550 (W.D. Pa. 1997) ............................35

*Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1159 (9th Cir. 2006), *cert. denied*, 127 U.S. 1829 (2007) .............................................................8,14

*Edmonds Inst. v. Babbit*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999)...........................29

*Geertson Seed Farms, et al. v. Johanns*, 2007 WL 518624 *5-10 (N.D. Cal. 2007)...................................................................................34,35,37

*International Center for Technology Assessment v. Johanns*, 473 F. Supp. 2d 9, 29-30 (D.D.C. 2007)......................................................30,33

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)...........................8,14,22

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 390, 371 (1989)........................22

*Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1322-1323 (8th Cir. 1974)...................................................................................9,25

*Morris County Trust For Historic Preservation v. Morris County Trust*, 714 F.2d 271, 274-75 (3rd Cir. 1983)...................................................22,23,26,28

*NAACP v. Medical Ctr., Inc.*, 584 F.2d 619, 630 (3rd Cir. 1978) ........................9,24,25,27

*National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d at 730 ..............................29,36

*New Jersey, Dept. of Env. Protection and Energy v. Long Island Power Auth.*,
30 F.3d 403, 417 (3rd Cir. 1994) ................................................................9,24,27,28

*Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) ........................................24

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)...............8,14,22

*Society Hill Towers Owners' Association v. Rendell*, 210 F.3d 168, 179
(3d Cir. 2000)..............................................................................................7,8,14

*Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985)....................................36

*Wilderness Watch v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) ..........................29


**Books/Manuals**

Mandelker, D., NEPA LAW & LITIG., § 7:10 ..................................................29

FWS Manual, Biological Integrity, Diversity, and Environmental Health,
601 FW 3.15..........................................................................................11,12,26, 27

FWS Refuge Manual § 2.12(A) ...................................................................17


**Statutes/Regulations**

5 U.S.C. § 551 *et seq*..................................................................................7

5 U.S.C. § 706(2)(A)...........................................................................7,8,13,14,27,37,38

16 U.S.C. §668dd et seq................................................................................7,37

16 U.S.C. §668dd(a)(2).................................................................................15

16 U.S.C. §668dd(a)(3)(A) ............................................................................15

16 U.S.C. § 668dd(d)(1)(A) .....................................................................7,16,18,37,38

16 U.S.C. § 668dd(d)(3)(A)(i) ......................................................................20,21

16 U.S.C. § 668dd(d)(3)(B) ..........................................................................8,17

16 U.S.C. § 668dd(d)(3)(B)(vii – ix) ..............................................................17

16 U.S.C. § 668dd(e)(1)(A)(i) .......................................................................20

16 U.S.C. § 668dd(e)(1)(A)(iv) ...................................................................20

28 U.S.C. §2412 ............................................................................................38

40 C.F.R. § 508.18(b)(4) ...................................................................9,23,24,27

40 C.F.R. § 1500.1(a) ....................................................................................22

40 C.F.R. § 1501 ............................................................................................23

40 C.F.R. §§ 1501.3, 1501.4 .............................................8,22,27,37,38

40 C.F.R. § 1508.4 ....................................................................................23,29

40 C.F.R. § 1508.9 ......................................................................................8,23

40 C.F.R. § 1508.11 ....................................................................................8,23

40 C.F.R. § 1508.27 ..................................................................................34,35

40 C.F.R. § 1508.27(a) ..................................................................................34

40 C.F.R. § 1508.27(b) ..................................................................................34

40 C.F.R. § 1508.27(b)(3),(4) ......................................................................34

42 U.S.C § 4321 et seq..............................................................................21, 37

42 U.S.C. § 4331 et seq................................................................................7

42 U.S.C. § 4331(b)(4) ..................................................................................23

42 U.S.C. § 4332 ........................................................................22,23,37,38

42 U.S.C. § 4332(2)(C) ............................................................................23,33

50 C.F.R. § 25.12 ......................................................................................8,16,18

50 C.F.R. 25.21(b) ..............................................................7,16,18,20,37,38

50 C.F.R. § 25.21(c) ......................................................................................16

Fed. R. Civ. P. 56(c) ......................................................................................13

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is an administrative record review case in which Plaintiffs Delaware Audubon Society, Inc., Center for Food Safety, and Public Employees for Environmental Responsibility seek declaratory and injunctive relief against Defendants Dirk Kempthorne, as Secretary of the United States Department of the Interior, Dale Hall, in his official capacity as Director of the United States Fish and Wildlife Service within the Department of the Interior, and the United States Fish and Wildlife Service itself. Plaintiffs' claims arise under and/or are based on the Administrative Procedures Act, 5 U.S.C. § 551 *et seq*. ("APA"), the National Wildlife Refuge System Administration Act, 16 U.S.C. §668dd et seq. ("NWRSAA"), and the National Environmental Policy Act, 42 U.S.C. § 4331 et seq. ("NEPA"). The case is now at the stage of summary judgment proceedings based on the administrative record.

## SUMMARY OF ARGUMENT

*APA Claim Based on Violation of the National Wildlife Refuge System Administration Act*

1.      Under the APA, a "final agency action" should be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414 (1971); *Society Hill Towers Owners' Association v. Rendell*, 210 F.3d 168, 179 (3d Cir. 2000).

2.      The NWRSAA requires that, before allowing a refuge management economic activity like farming on a national wildlife refuge, the Secretary of the Interior (through his or her subordinates in the Fish and Wildlife Service ("FWS")) must determine that the proposed activity is compatible with the refuge's purposes. 16 U.S.C. § 668dd(d)(1)(A); 50 C.F.R. 25.21(b).

3.      Such compatibility determinations must be written and contain specific information and findings and be based on sound professional judgment (that is, be consistent with principles of

sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of the NWRSAA and other applicable laws). 16 U.S.C. § 668dd(d)(3)(B); 50 C.F.R. § 25.12.

4.    The Administrative Record clearly shows that, although farming was allowed to take place on the Prime Hook Refuge via Cooperative Farming Agreements, no compatibility determinations were made in compliance with the NWRSAA and its regulations.

*APA Claim Based on Violation of the National Environmental Policy Act*

1.    Under the APA, a "final agency action" should be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414 (1971); *Society Hill Towers Owners' Association v. Rendell*, 210 F.3d 168, 179 (3d Cir. 2000).

2.    NEPA requires agencies take a "hard look" at the environmental consequences of their actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), which means "considering all foreseeable direct and indirect impacts." *Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1159 (9th Cir. 2006), *cert. denied*, 127 U.S. 1829 (2007).

3.    Under NEPA, federal agencies must prepare an "environmental assessment" ("EA") and/or an "environmental impact statement" ("EIS") before taking an action that may effect the environment, except in limited circumstances.  40 C.F.R. §§ 1501.3, 1501.4.  An EA is "a concise public document" the agency prepares when deciding whether it needs to prepare an EIS. 40 C.F.R. § 1508.9.  An EIS is "a detailed written statement" which comprehensively discloses and analyzes potential environmental impacts of proposed government action.  40 C.F.R. § 1508.11.

4.      Defendants' decision to allow the planting of genetically modified crops ("GMCs") at the Prime Hook Refuge constituted major federal actions for which NEPA compliance was required.  40 C.F.R. § 508.18(b)(4); *New Jersey, Dept. of Env. Protection and Energy v. Long Island Power Auth.*, 30 F.3d 403, 417 (3rd Cir. 1994); *NAACP v. Medical Ctr., Inc*., 584 F.2d 619, 630 (3rd Cir. 1978); *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1322-1323 (8th Cir. 1974)); *Center for Food Safety v. Johanns*, 451 F.Supp.2d 1165, 1183- 1186 (D. Hawaii 2006).

5.      The Administrative Record clearly shows that Defendants allowed farming with GMCs on the Prime Hook Refuge via Cooperative Farming Agreements without the performance of an EA or an EIS as required by NEPA and its regulations.

6.      The Administrative Record clearly shows that Defendants allowed farming with GMCs on the Prime Hook Refuge by issuing an exemption to its own GMC prohibition policy without the performance of an EA or an EIS as required by NEPA and its regulations.

## **STATEMENT OF FACTS**

The Prime Hook National Wildlife Refuge was formed in April 8, 1963 for use as a sanctuary and for the management of migratory birds (Administrative Record ("A.R.") US000271).  It consists of approximately 10,000 acres of land in Sussex County, Delaware (A.R. US000272), and its purposes include providing resting and feeding habitat for migratory birds, particularly waterfowl, as well as providing habitat for a variety of other species such as ducks, the endangered Delmarva squirrel, and the southern bald eagle.  (A.R. US000271).

Since at least the 1970's, part of the Prime Hook Refuge has been used for agriculture. (*see e.g.*, A.R. US000007, noting over 1000 acres in agricultural use).  The Administrative Record reveals that, from 1995 through 2006, 37 Cooperative Farming Agreements ("CFA")

between the Refuge and various farmers were entered.[1]  Under these Agreements, the farmer was allowed to plant a cash crop (either corn or soybeans), and was required to do certain work (usually in the form of tilling and planting a winter cover crop).  At no time prior to the entry of any of these Agreements did the Defendants or their personnel at the Prime Hook Refuge generate written compatibility determinations to see if the agricultural use was "compatible" with the Refuge's purposes (*see* A.R. US000804:  "Prime Hook National Wildlife Refuge does not have a formal, written compatibility determination (CD) on the farming of refuge lands").

In a Biological Profile of the Refuge prepared for FWS Region 5 management (A.R. US000271-281), Prime Hook Refuge staff wrote the following:

> Current agricultural practices are intensively dependent on petroleum based products (pesticides), genetically engineered crops, poor soil conservation practices and do not contribute to achieving refuge objectives.  Currently, food production objectives for migrating and wintering waterfall are fully met with marsh and water level management practices, which also provide more "natural" systems than chemical and GE farming practices . . . Current chemical farming practices generate high rates of soil erosion every spring, detract from the "wildlife first principle," eliminate opportunities to manage for endangered species and species of special concern, and contribute little or nothing to the refuge's purposes.  Service Manual states that the use of intensive chemical farming practices to maintain monocultures of corn or other crops should be used **only if** the annual food production objectives cannot be met in any other way.  Current coop farming practices are on the refuge are also diametrically opposed to Service policy and Manual principles for habitat management practices (620 FW 1) and the Service's policy for biological integrity, diversity and environmental health (601 FW 3).

---

[1]        See A.R.  US000060-66 (1995-Wells); US000067-72 (1995-Walls Enterprises); US000073-80 (1995-Bennett); US000081-89 (1996-Wells); US000090-98 (1996-Wells & Sons); US000099-108 (1996-Bennett); US000109-120 (1997-Wells & Sons); US000121-126 (1997-Walls Enterprises); US000127-136 (1997-Bennett); US000137-145 (1997-Wells); US000146-152 (1998-Wells & Sons); US000153-160 (1998-Bennett); US000161-166 (1998-Wells); US000169-175 (1999-Wells); US000176-184 (1999-Bennett); US000185-194 (1999-Wells & Sons); US000195-204 (1999-Wells & Sons); US000205-212 (2000-Wells & Sons); US000213-219 (2000-Wells Farm); US000220-228 (2000-Bennett); Us000233-239 (2001-Wells & Sons); US000247-252 (2001-Wells Farm); US000253-261 (2001-Bennett); US000302-311 (2002-Bennett); US000312-319 (2002-Wells & Sons); US000320-326 (2002-Wells); US000327-331 (2002-Ockels Farms); US000369-378 (2003-Ockels Farms); US000379-381 (2003-Wells & Sons); US000382-384 (2003-Wells); US000385-387-Bennett); US000442-450 (2004-Wells & Sons); US000451-459 (2004-Bennett); US000576-581 (2005-Wells & Sons); US000582-589 (2005-Bennett); US000840-848 (2006-Bennett); US000849-854 (Wells & Sons).

*See* A.R. US000280-81 (emphasis in original).  When Region 5 reviewed this Biological Profile, it quoted the above language and then stated, "We agree with and support the refuge's position on the cropland management program."  *See* A.R. US000360-61.

In approximately 2001, about 150 acres of agricultural land ("the Study Plot") were taken out of production and allowed to return to a natural vegetative state as part of a grassland breeding bird survey and an inventory of flora and fauna conducted by the State of Delaware. (A.R. US000805).  When the study concluded, the Refuge Manager allowed the acreage to return to agricultural use without determining whether such use was compatible.  *Id.*

Genetically modified crops ("GMCs"), also known as genetically modified organisms ("GMO"), have been available to farmers since 1998.  (A.R. US000167).    On April 16, 2001, FWS adopted a policy that prohibited the use of all genetically modified crops.  FWS Manual, Biological Integrity, Diversity, and Environmental Health, 601 FW 3.15.  The policy states:

> We do not allow refuge uses or management practices that result in the maintenance of non-native plant communities unless we determine there is no feasible alternative for accomplishing refuge purpose(s). … **We do not use genetically modified organisms in refuge management** unless we determine their use is essential to accomplishing refuge purpose(s) and the Director approves the use.

*Id*.  Starting in 2001, the Prime Hook Refuge's stated goal has been the phasing out the use of genetically engineered crops because they "do not contribute to achieving refuge objectives." (Prime Hook National Wildlife Refuge Biological Profile (A.R. US000280)).  As the Prime Hook Biological Profile recognized, "[g]enetically engineered crops disrupt soil micro-food webs, disrupt the natural biological process that shape genomes, organisms, and communities of soil organisms to insects and other wildlife species."  (*Id*. at A.R. US000281).  On February 21, 2003, the Regional Chief of the Refuge System issued a memorandum to all Refuge Managers informing them that if a refuge considers the use of GMCs on their refuge, that they must comply

with this policy, "thoroughly research and justify its use over native or non-engineered strains and send the request to the Regional Office." Memorandum to Region 5 Refuge Managers, February 21, 2003 (A.R. US000390).

Since 2003, FWS has repeatedly made an exception to its policy prohibiting the planting of GMOs on Refuge land. (A.R. US000388, 390, 392, 1282, 810). In 2003, Defendants made a one-year exception to this policy, allowing farmers who had already purchased genetically modified seed for the season to grow GMOs. (A.R. US000388, 390, 392) There was no compliance with the GMO Policy and no NEPA review. When the FWS Director issued the exception, he stated that "the current exception to this policy **applies to this year only** and for only those who have already purchased genetically modified seed, **and that next year the policy will be implemented, without exception**, as stated in Section 601 FW 3.15 C." (A.R. US000388) (emphasis added). Less than one year later, however, FWS allowed this exception again – also with no NEPA review or review under the Refuge's own no GMO policy. (A.R. US0001282). Again in 2006, Defendants issued the same exception without making any essential determination pursuant to the GMO Policy or complying with NEPA. (A.R. US000810).

Also with no environmental review or any essential determination pursuant to the GMO Policy, the Prime Hook Wildlife Refuge authorized Cooperative Farming Agreements in 2004, 2005 and 2006 permitting the planting of genetically engineered Roundup Ready crops. (A.R. US000436, 576, 584, 842, 851). Defendants repeatedly approved the planting of GMO crops despite refuge documents that shows GMCs pose significant environmental risk. In November 2004, for example, a FWS Conservation Biologist circulated a draft GMC delegation policy to FWS Director that enumerated several potential environmental risks, including gene flow (biological contamination), non-target effects, increased weed resistance and the increased use of

certain toxic pesticides. (A.R. US000514-17). Defendants own biologists had informed high level refuge managers that planting GMOs posed significant environmental impacts such as the threat of biological contamination, the development of herbicide resistant weeds, and damage to soils among others. (A.R. US000404, 505, 506).

In response to the FWS Director's 2003 exception to the GMO prohibition policy, a FWS biologist stated, "[b]ased on my professional, biological opinion and experience with the habitat management practices conducted on this refuge for the past 12 years, **I can not condone or justify the use of GMOs (genetifcally modified organisms) in relation to Prime Hook NWRs' farming program**." (A.R. US000426 (emphasis added)). In July 2003, an Assistant Regional Biologist for Prime Hook stated the importance of environmental review for GMO use on the Refuge: "SOMEONE has to be considering the potential risks, at some level. This step can't be skipped simply because it wouldn't be easy to accomplish . . . **analysis of risks for each GMC is very important**." (A.R. US000394). However, FWS never conducted any environmental review or made an essential determination for its exception to the GMO prohibition policy or for the CFAs permitting GMO planting on Refuge land.[2]

## ARGUMENT

A moving party is entitled to summary judgment as a matter of law when no material facts exist that would allow reasonable minds to disagree. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Given that this is a review of actions by the FWS that are captured in an administrative record, the facts are not in dispute, and thus summary judgment is particularly appropriate because the dispute here is legal in nature.

Under the APA, a "final agency action" should be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

---

[2]     The Plaintiffs have standing to bring this action. See Declarations attached to this Memorandum.

706(2)(A); *Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414 (1971); *Society Hill Towers Owners' Association v. Rendell*, 210 F.3d 168, 179 (3d Cir. 2000). NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "A hard look includes 'considering all foreseeable direct and indirect impacts.'" *Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1159 (9th Cir. 2006), *cert. denied*, 127 U.S. 1829 (2007).

In this matter, the final agency action relates to the decision to enter into Cooperative Farming Agreements that allowed farming on the Prime Hook Refuge. Plaintiffs believe that the entry into each such Agreement constitutes a separate final agency action. For purposes of their first claim, the final agency action is the entry into each Cooperative Farming Agreement without first conducting the Compatibility Determination required by the NWRSAA. For purposes of their second claim, the final agency action is the entry into each Cooperative Farming Agreement to allow the planting of GMOs without first performing an Environmental Assessment and Environmental Impact Statement under NEPA. Additionally, each issuance of an exemption to Defendants' GMO Policy constituted an agency action subject to NEPA's procedural requirements. The record makes clear that Defendants' actions allowing the Cooperative Farming Agreements to go forward, and to allow the planting of GMOs without previous review and approval, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that Plaintiffs are therefore entitled to summary judgment on their claims.

I.    **THERE IS NO ISSUE OF MATERIAL FACT THAT THE DEFENDANTS ACTED ARBITRARILY AND CAPRICOUSLY BY VIOLATING THE NATIONAL WIDLIFE REFUGE SYSTEM ADMINISTRATON ACT WHEN THEY ALLOWED FARMING AT THE PRIME HOOK REFUGE WITHOUT MAKING REQUIRED COMPATIBILITY DETERMINATIONS.**

The Defendants are bound by the National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd-668ee ("NWRSAA" or "Act"), to determine that uses of National Wildlife Refuges like the Prime Hook Refuge are compatible with the Refuge's purposes and mission before allowing such uses to occur. The undisputed record in this matter shows that the Defendants did not make any such compatibility determinations before allowing farming on the Prime Hook Refuge from at least 1995 – 2006. These violations of the NWRSAA made Defendants' decisions to allow farming arbitrary, capricious, and contrary to law, and therefore violate the APA.

A.    **NWRSAA Requires Defendants To Make A Compatibility Determination Prior To Allowing Farming On Refuge Land.**

The NWRSAA states that the mission of the National Wildlife Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans," 16 U.S.C. § 668dd(a)(2), and declares the policy of the United States to be that "each refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id*. at § 668dd(a)(3)(A). The Act empowers the Secretary of the Department of the Interior, as part of the administration of the System, to "permit the use of any area within the System for any purpose, including but not limited to hunting, fishing, public recreation and accommodations, and access whenever he determines that such uses are compatible with the major purposes for which such areas were established." *Id*. at §

668dd(d)(1)(A).    Thus, the Act itself requires that the Secretary determine that a use is compatible with the major purposes of the refuge in order to permit that use.

The regulations issued pursuant to the Act spell out the requirements for such compatibility determinations.  In 50 C.F.R. § 25.21(b), the Department of the Interior (through its Fish and Wildlife Service ("FWS")) states that "[w]e may open a national wildlife refuge for any refuge use, or expand, renew, or extend an existing refuge use only after the Refuge Manager determines that it is a compatible use and not inconsistent with any applicable law." The term "refuge use" includes "refuge management economic activity," 50 C.F.R. § 25.12, which the regulations define as follows:

> Refuge management economic activity means a refuge management activity on a national wildlife refuge which results in generation of a commodity which is or can be sold for income or revenue or traded for goods or services. Examples include: Farming, grazing, haying, timber harvesting, and trapping.

*Id.*  The only time a compatibility determination is not required is when a refuge use is "necessary to protect the health and safety of the public or any fish or wildlife population" on a temporary basis.   50 C.F.R. § 25.21(c).

The regulations also enumerate the specific contents of a compatibility determination for a refuge management economic activity such as farming:

> Compatibility determination means a written determination signed and dated by the Refuge Manager and Regional Chief, signifying that a proposed or existing use of a national wildlife refuge is a compatible use or is not a compatible use. The Director makes this delegation through the Regional Director.
> Compatible use means a proposed or existing wildlife-dependent recreational use or any other use of a national wildlife refuge that, based on sound professional judgment, will not materially interfere with or detract from the fulfillment of the National Wildlife Refuge System mission or the purpose(s) of the national wildlife refuge.

50 C.F.R. § 25.12.  In other words, a compatibility determination must (1) be in writing, (2) be signed and dated by both the Refuge Manager and the Chief of the FWS Region in which the

refuge is located, (3) identify the proposed or existing use that the compatibility determination applies to, (4) state that the proposed use is in fact a compatible use, and (5) be based on "sound professional judgment," which the regulations define as follows:

> Sound professional judgment means a finding, determination, or decision that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of the National Wildlife Refuge System Administration Act of 1966, (16 U.S.C. 668dd-668ee), and other applicable laws. Included in this finding, determination, or decision is a refuge manager's field experience and knowledge of the particular refuge's resources.

*Id.* In short, the compatibility determinations required by the Act and the regulations are formal documents involving effort to consult the law, principles of sound fish and wildlife management, available science, and refuge resources. Indeed, FWS' own Compatibility Policy issued November 17, 2000 and set forth in Part 603, Section 2 of the FWS Refuge Manual § 2.12(A) (*see* A.R. US001146-64), specifically states that "all compatibility determinations will include the following information" and lists such things as identifying the use, the name of the refuge, the establishing and acquisition authorities used to establish the refuge, the refuge's purposes, the Wildlife Refuge System's mission, the description of the use, with subparts requiring detailed information about the use, detailed discussion of the availability of refuge resources, and detailed discussion of the anticipated impacts of the use (A.R US 0001156-58). These requirements parallel the language of the Act, *see* 16 U.S.C. § 668dd(d)(3)(B). In order to maintain consistency, the Policy requires that all compatibility determinations be done on a form attached to the Policy. *See* FWS Refuge Manual § 2.12(A) (A.R. US001156, 1164-65). The Policy also requires that the refuge manager "must provide an opportunity for public review and comment on the proposed refuge use(s) before issuing a final compatibility determination," Section 2.12(A)(9) (A.R. US001159)—again tracking the requirements of the Act. 16 U.S.C. § 668dd(d)(3)(B)(vii – ix).

17

**B.      Defendants Violated The NWRSAA By Failing To Prepare a Compatibility Determination Prior To Allowing Farming On Prime Hook Refuge Lands.**

In violation of NWRSAA, the administrative record reveals that every single Cooperative Farming Agreement for farming on the Prime Hook Refuge allowed the farmer to grow commodity crops like corn or soybeans that were or could be sold for revenue or income— exactly what the regulations define as "refuge management economic activity." 50 C.F.R. § 25.12.   Thus, the Act and the regulations required that, before the Defendants could allow farming under each CFA, they were required to make a compatibility determination—i.e., the issuance of a formal document, after the gathering of extensive information and the exercise of sound professional judgment, finding that the proposed farming was compatible with the purposes of the Prime Hook Refuge and the mission of the National Wildlife Refuge System.  16 U.S.C. § 668dd(d)(1)(A); 50 C.F.R. § 25.21(b).

Yet the Administrative Record contains <u>no</u> document that purports to be a compatibility determination for the farming under the CFAs, much less a formal document that complies with the detailed requirements of the FWS Compatibility Policy.  Nor is there any evidence of public hearings being held before a final compatibility determination was made as required by the FWS Compatibility Policy.  In fact, a December 5, 2005 letter to a representative of Plaintiff PEER from the Regional Chief of FWS admitted that "Prime Hook National Wildlife Refuge does not have a formal, written compatibility determination (CD) on the farming of refuge lands."  (A.R. US000804, part of letter set forth at US000803-805).[3]  Quite simply, there is no genuine issue of material fact that the Defendants failed to comply with the explicit requirement in the Act and

---

[3]      Although this document makes an argument that farming is a compatible use, it is missing most of the components required by the Act and the regulations.  Thus, this document cannot serve as some kind of *de facto* compatibility determination.

The document also makes references to "1994 compatibility determinations."  No such documents exist in the Administrative Record presented to Plaintiffs and certified as complete by Defendants.

the regulations to perform a compatibility determination before allowing farming under each CFA.

The failure to comply with the compatibility determination requirements of the law is especially important here because the Refuge itself and Region 5 of FWS (within which the Prime Hook Refuge operates) have both determined that the farming done on the Refuge does *not* serve the Refuge's purposes. In a Biological Profile of the Refuge prepared for FWS Region 5 management (A.R. US000271-281), Prime Hook Refuge staff wrote the following:

> *Current agricultural practices* are intensively dependent on petroleum based products (pesticides), genetically engineered crops, poor soil conservation practices and *do not contribute to achieving refuge objectives*. Currently, food production objectives for migrating and wintering waterfall are fully met with marsh and water level management practices, which also provide more "natural" systems than chemical and GE farming practices . . . *Current chemical farming practices* generate high rates of soil erosion every spring, detract from the "wildlife first principle," eliminate opportunities to manage for endangered species and species of special concern, and *contribute little or nothing to the refuge's purposes*. Service Manual states that the use of intensive chemical farming practices to maintain monocultures of corn or other crops should be used **only if** the annual food production objectives cannot be met in any other way. *Current coop farming practices are on the refuge are also diametrically opposed to Service policy and Manual principles for habitat management practices (620 FW 1) and the Service's policy for biological integrity, diversity and environmental health (601 FW 3).*

*See* A.R. US00280-81 (underlined bold emphasis in original, emphasis in italics added). When Region 5 reviewed this submission, it quoted the above language, *see* A.R. US00360-361, and then stated, "We agree with and support the refuge's position on the cropland management program." *See* A.R. US00361. In short, Fish and Wildlife Service personnel—at both the Refuge and the Regional level—have found that current farming practices create problems that hurt (i.e., are incompatible with) the Prime Hook Refuge's purposes and internal FWS policy.

Therefore, failure to prepare a Compatibility Determination was a violation of NWRSAA.

**C.** **Preparation Of A Comprehensive Conservation Plan Does Not Relieve Defendants' Duty To Prepare A Compatibility Determination.**

Defendants cannot rely upon their apparent belief that their failure to comply with these clear statutory and regulatory mandates is excused because a Comprehensive Conservation Plan ("CCP") process started at the Prime hook Refuge in 2005 (and expected to take three to five years to complete, *see* A.R. US00656, 658), will eventually provide compatibility determinations concerning farming and other activities at the refuge. *See* AR US000803. The CCP process cannot excuse Defendants' failure to prepare compatibility determinations.

Both the Act and the Regulations treat compatibility determinations and CCPs as completely separate requirements. The Act's requirement that a compatibility determination be made, *see* 16 U.S.C. § 668dd(d)(3)(A)(i), is a separate statutory requirement from the requirement that a CCP be prepared, *see* 16 U.S.C. § 668dd(e)(1)(A)(i). While the Act says that compatibility determinations can be made concurrently with a CCP, *id.* at § 668dd(d)(3)(A)(i), it does not permit the agency to put off or avoid the completion of a compatibility determination until the CCP process occurs. This is evident from the language of the Act and the regulations. For example, the Act requires a CCP be done every 15 years. 16 U.S.C. §668dd(e)(1)(A)(iv). If Defendants can wait up to 15 years until preparation of the next CCP rolls around before making a compatibility determination, then the statutory requirement for making such determinations is meaningless. Indeed, both the Act and the regulations require a compatibility determination before the activity takes place, *see* 16 U.S.C. § 668dd(d)(3)(A)(i) ("the Secretary shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use"); 50 C.F.R. 25.21(b) ("We may open a national wildlife refuge for any refuge use, or expand, renew, or extend an existing refuge use only after the Refuge Manager determines that it is a compatible use"). An interpretation which allows Defendants to avoid doing compatibility determinations because it

will eventually be covered in a still-unfinished CCP process eviscerates the meaning of this statutory and regulatory language because it allows activities to take place before the compatibility determination for that activity is made. Thus, at best the language of § 668dd(d)(3)(A)(i) allows Defendants to make compatibility determinations during the CCP process that will cover *future* activities, but it does not empower Defendants to ignore their statutory responsibilities to perform compatibility determinations before allowing a refuge management economic activity like farming to take place. Here, in both 2005 and 2006, Defendants entered or approved Cooperative Farming Agreements that allowed new or renewed previous farming in the Prime Hook Refuge while the CCP process was pending (to say nothing of the previous years of farming without any compatibility determinations). The failure to perform the statutorily-required compatibility determinations cannot be excused by the pending CCP process at Prime Hook Refuge.

There is no genuine issue of material fact that the Defendants failed to perform compatibility determinations before entering or approving any of the Cooperative Farming Agreements. The failure to perform compatibility determinations means the Defendants acted contrary to the statutory and regulatory requirements of the NWRSAA, and thus acted contrary to law. This made the entry and approval of those agreements "arbitrary and capricious" for purposes of the APA, and therefore entitles Plaintiffs to declaratory and injunctive relief as a matter of law.

## II. THERE IS NO ISSUE OF MATERIAL FACT THAT DEFENDANTS ACTED ARBITRARILY AND CAPRICIOUSLY BY VIOLATING THE NATIONAL ENVIRONMENTAL POLICY ACT BY ALLOWING THE FARMING OF GMOs AT THE PRIME HOOK REFUGE.

Defendants must comply with the procedural requirements of NEPA, 42 U.S.C § 4321 et seq., which requires environmental review for any major federal action that may significantly affect the environment. At the very least, Defendants were required to prepare an environmental

assessment ("EA") to explore whether planting GMOs poses significant effects on the Prime Hook Refuge environment. Furthermore, permitting the cultivation of GMOs on Refuge land in fact poses many significant environmental effects that must be analyzed and disclosed in an environmental impact statement ("EIS"). Thus, Defendants violated NEPA by failing to comply with the procedural requirements prior to permitting the planting of GMOs.

### A. NEPA Requires Defendants To Prepare An Environmental Assessment And/or Environmental Impact statement Prior To Allowing The Planting Of GMOs.

NEPA is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a). NEPA sets forth a "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA requires federal agencies to evaluate the impact of their actions on the natural environment. *See* 42 U.S.C. § 4332. It emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making, and to ensure that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 390, 371 (1989). NEPA requires agencies to take a "hard look" at the environmental consequences of their actions so "that environmental consequences are integrated into the very process of decision-making." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976); *Morris County Trust For Historic Preservation v. Morris County Trust*, 714 F.2d 271, 274-75 (3rd Cir. 1983).

Agencies must prepare an "environmental assessment" ("EA") and/or an "environmental impact statement" ("EIS") before taking an action that may effect the environment, except in limited circumstances.[4]  40 C.F.R. §§ 1501.3, 1501.4. An EA is "a

---

[4]    Through NEPA, Congress established the Council on Environmental Quality ("CEQ"), which has promulgated regulations requiring all agencies to comply with certain procedures before taking action. 42 U.S.C. § 4342; 40 C.F.R. Part 1500. CEQ Guidelines are binding on all federal agencies, and are entitled to substantial deference in interpreting the meaning of NEPA provisions. *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1978). The

concise public document" that an agency prepares when deciding whether it needs to prepare an EIS. 40 C.F.R. § 1508.9. An EIS is "a detailed written statement" which comprehensively discloses and analyzes potential environmental impacts of proposed government action. 40 C.F.R. § 1508.11.

"The heart and soul of NEPA is the requirement that Federal agencies, before taking action that may have a significant effect on the environment, must prepare a detailed environmental impact statement (EIS) . . . for all '*major Federal actions* significantly affecting the quality of the human environment." *Morris County,* 714 F.2d at 274 (*quoting* 42 U.S.C. § 4332(2)(C)). "It is the 'continuing responsibility' of the Federal government to preserve historic, cultural, and natural aspects of our national heritage. 42 U.S.C. § 4331(b)(4)." *Morris County,* 714 F.2d at 275.

In this case, NEPA applies to Defendants' permitting the planting of GMOs on Refuge land because permitting the planting of GMOs constitutes "major federal action." 40 C.F.R. § 508.18(b)(4). Defendants violated NEPA by doing absolutely nothing to comply with the procedural requirements of NEPA. 40 C.F.R. § 1501; 42 U.S.C. § 4332. Furthermore, the planting of GMOs on Refuge land poses significant environmental impacts, thus Defendants further violated NEPA by failing to prepare an EIS. 42 U.S.C. § 4332(2)(C)). While categorical exclusions may relieve an agency of its responsibility to comply with NEPA's procedural requirements,[5] no categorical exclusion applies in this case. 40 C.F.R. § 1508.4. Thus, Defendants have violated NEPA and the Court should remand this matter to the agency to fulfill its NEPA responsibilities.

---

Department of the Interior has adopted the CEQ Regulations as "mandatory provisions" governing NEPA procedures. Department of the Interior, Department Manual, 516 DM 1 (1.7(B)) (A.R. US001314).

[5] An agency must conduct NEPA environmental review unless the agency establishes that the action is the subject of a categorical exemption ("CE"). Under the CEQ Regulations, an agency may establish categories of routine activities it has demonstrated do not, individually or cumulatively, have any significant environmental effect, and these normally are exempted from NEPA review. 40 C.F.R. § 1508.4.

1.    **NEPA Applies to FWS Actions Permitting the GMO Planting at Prime Hook Refuge.**

Defendants' decision to allow the planting of GMOs at the Prime Hook Refuge constituted major federal actions for which NEPA compliance was required. Major federal actions that trigger NEPA's EIS requirement include specific projects approved by permit or other entitlement for use. 40 C.F.R. § 508.18(b)(4); *New Jersey, Dept. of Env. Protection and Energy v. Long Island Power Auth.*, 30 F.3d 403, 417 (3rd Cir. 1994); *NAACP v. Medical Ctr., Inc.*, 584 F.2d 619, 630 (3rd Cir. 1978). "There is 'Federal action' . . . whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment." *NAACP*, 584 F.2d at 630.

In this case, Defendants permitted the planting of GMO crops through explicit provisions contained in Cooperative Farming Agreements. In 2004, 2005 and 2006, Defendants authorized CFAs with Fred Bennett and Carlton Wells explicitly permitting the planting of genetically engineered Roundup Ready crops. (A.R. US000436, 576, 584, 842, 851). These CFAs constitute major federal action requiring NEPA compliance.

Projects approved by permit or other entitlement trigger NEPA. 40 C.F.R. § 508.18(b)(4); *Long Island Power Auth.*, 30 F.3d at 417; *NAACP*, 584 F.2d at 629-630; s*ee also Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) ("[I]f a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must conduct an EA and possibly an EIS before granting it."). Furthermore, when "agency action is a *legal requirement* for the other party to affect the environment and [when] the agency has discretion to take environmental considerations into account before acting," then such action is a major federal action requiring NEPA compliance through environmental review. *Long Island Power Auth.*, 30 F. 3d at 417-18 (emphasis in original) (*quoting NAACP*, 584 F.2d at 634).

The Prime Hook CFA provisions, as legal prerequisites to permitting the planting of GMOs, are major federal actions that trigger NEPA. In *NAACP*, the Third Circuit held that NEPA did not apply to the Department of Health, Education and Welfare's capital expenditure for a private hospital because the Department's *ministerial* approval of funding did not reach the level of "entitlement for use" because it was not "a legal precondition which authorizes the other party to proceed with action which will affect the environment," and therefore it did not constitute "major federal action." 584 F.2d at 630-32. However, where an agency action is a legal precondition to private action, that action constitutes major federal action requiring NEPA compliance. *Id*. at 633. Distinguishing the facts of its case, the *NAACP* court provided several examples of agency action that reached the level of 'major federal action,' such as the case where a federal agency issued logging contracts to a private company to log on federal land. *Id*. at 633 (citing *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1322-1323 (8th Cir. 1974)). Like the logging contract case, a court recently found major federal action requiring NEPA compliance where a federal agency permitted the experimental planting of crops genetically engineered to produce pharmaceutical compounds. *Center for Food Safety v. Johanns*, 451 F.Supp.2d 1165, 1183- 1186 (D. Hawaii 2006).

The facts of this case are analogous to the genetically engineered crop field test permits and logging contract cases. The CFAs contain language explicitly permitting the planting of Roundup Ready crops, just like the permits for the planting of experimental pharmaceutical crops. *Center for Food Safety*, 451 F.Supp.2d at 1170. Also, the CFAs are contracts permitting agriculture on Refuge land, including the planting of Roundup Ready crops, just like the contracts to log on land controlled by the agency. *Minnesota Public Interest Research Group,* 498 F.2d at 1322-23. Thus, the CFAs are legal preconditions to the planting of GMOs, and therefore constitute "major federal action" triggering NEPA. *NAACP*, 584 F.2d at 633.

The Prime Hook CFA provisions permitting the planitiff of GMOs are also major agency action because they allow continuous GMO planting on land owned and managed by Defendants. The Third Circuit held that NEPA applied to the demolition of a building as part of an ongoing urban redevelopment project approved by the Department of Housing and Development ("HUD") because HUD maintained a loan contract and therefore legal control over the project. *Morris County Trust*, 714 F.2d at 275-77. The court held that NEPA compliance is required at any stage of the implementation of a project where the agency has authority to require alteration of the project to enhance the environment. *Id*. "Major federal action includes . . . 'new and *continuing* activities … with effects that may be major and which are *potentially subject to Federal control and responsibility*." *Id*. at 276. The applicability of NEPA to the instant case is even more compelling. Unlike *Morris County Trust*, where 'control' of the land was merely through a federal HUD loan to the City of Dover for the demolition and renewal of locally owned land, *id*. at 273, here the Prime Hook Refuge owns and manages the land, and enters into new CFAs with cooperative farmers on an annual basis, allowing for the Refuge to modify the terms of the CFA to permit or prohibit GMOs at FWS' discretion. (*See* A.R. US000060, 67, 73, 81, 90, 99, 109, 121, 127, 137, 146, 153, 161, 169, 176, 185, 195, 205, 213, 220, 233, 247, 253, 302, 312, 320, 327, 369, 379, 382, 385, 433, 442, 451, 576, 582, 840, 849).[6]

Additionally, Defendants have legal authority over the decision whether to allow the planting of GMOs. The National Wildlife Refuge System has a policy prohibiting the use of GMOs unless FWS "**determine[s] their use is essential** to accomplishing refuge purposes(s) and the Director approves the use." FWS Manual, Biological Integrity, Diversity, and Environmental Health, 601 FW 3.15 (emphasis added) (A.R. US000390, 1262). This further

---

[6]    Since 2000, FWS has prohibited the planting of corn genetically modified containing the insecticide Bacillus thuringiensis ("Bt corn"). (See e.g. US000207, 215, 221, 235, 304, 314, 322, 328, 370, 380, 383, 386.) However, even with compelling evidence that genetically engineered Roundup Ready corn and soybeans also pose significant threats to the environment, FWS has opted to not prohibit them, and explicitly permit their use since 2004. (US000436, 576, 584, 842, 851).

demonstrates that defendants have discretion and legal authority in deciding whether to permit the planting of GMOs on Refuge land. *Long Island Power Auth.*, 30 F. 3d at 417-18; *NAACP*, 584 F.2d at 634.

Therefore, Defendants must comply with NEPA procedures by preparing an EA at minimum and an EIS where there are potential significant environmental impacts. 40 C.F.R. § 508.18(b)(4); 40 C.F.R. §§ 1501.3, 1501.4; *NAACP*, 584 F.2d at 629. Failure to comply with NEPA was arbitrary, capricious, an abuse of discretion, and not in accordance with the law. 5 U.S.C. § 706(2)(A).

### 2. Defendants' Repeated Approval Of An Exception To Its Own GMO Prohibition Policy Further Demonstrates That Permitting GMO Planting Constitutes Major Federal Action Requiring NEPA Compliance.

Defendants also violated NEPA when it repeatedly made exceptions to its policy prohibiting the planting of GMOs on Refuge land. (A.R. US000388, 390, 392, 1282, 810). Defendants' approval of GMO planting on Refuge land requires a determination[7] that "[GMO] use is essential to accomplishing refuge purposes" and approval from the FWS Director. FWS Manual, Biological Integrity, Diversity, and Environmental Health, 601 FW 3.15 (A.R. US000390, 1262). This policy gives Defendants discretion in deciding whether to approve GMO planting, and requires agency action prior to such approval. FWS's action also triggers NEPA because FWS maintains control over the continued planting of genetically engineered

---

[7] The determination is the Refuge GMO prohibition policy which requires an approval process including: 1) thorough research on GMO use; 2) justification why using GMOs is *essential*; 3) review and approval of the Regional Office; and 4) approval by the System Director. The process for approving GMCs on Refuge was revised by a Director's Order delegating authority to Regional Chiefs to approve the planting of GMCs. FWS Manual, Biological Integrity, Diversity, and Environmental Health, Delegation of Authority for Genetically Modified Crops, 601 FW 3 Amendment 1, available at http://www.fws.gov/policy/a1601fw3.html last visited August 15, 2007 (US000786). The Delegation maintained that a Refuge "can only use GMCs in circumstances where farming, and in particular farming with GMCs, is essential for accomplishing refuge purposes and where the Regional Chief/CNO Assistant Manager has approved their use." *Id.* The Delegation merely modified the steps for obtaining approval, including 1) the completion of a GMC eligibility Questionnaire, 2) submission of the questionnaire with a memo requesting approval to the Regional Chief, 3) and a decision by the Regional Chief. (US000787-788). **The Delegation explicitly states that compliance with NEPA may be required as a predicate to GMC approval**. (US000788).

crops on Refuge lands. *Morris County Trust*, 714 F.2d at 276.  Thus, approval of GMO planting constitutes "major federal action."  *Long Island Power Auth.*, 30 F. 3d at 418.

FWS exercised its discretion on a system wide basis by allowing the planting of GMOs without any of the required review or approval whatsoever, violating its own policy and triggering NEPA requirements.  In 2003, without any consideration of its own GMO policy, and without any NEPA review, Defendants made a one-year exception to this policy, allowing farmers who had already purchased genetically modified seed for the season to grow GMOs "[i]n order to avoid imposing a significant economic hardship to these individuals." (A.R. US000388, 390, 392)[8].  The Director stated that "the current exception to this policy **applies to this year only** and for only those who have already purchased genetically modified seed, **and that next year the policy will be implemented, without exception, as stated in Section 601 FW 3.15 C**." (A.R. US000388) (emphasis added).  In early 2004, not one year later, however, Defendants allowed this exception again – also with no NEPA review or review under the Refuge's own no GMO policy.  (A.R. US001282).  Yet again in 2006, Defendants flouted their own policy and NEPA by allowing co-operative farmers to plant genetically engineered Roundup Ready crops at the Refuge without any of the required findings of essentiality with the refuge purpose, or any NEPA compliance.  (A.R. US000810).  Each of these repeat exceptions to Defendants' own policy constitutes a "major federal action" for which NEPA review is required.  *Morris County Trust*, 714 F.2d at 276; *Long Island Power Auth.*, 30 F. 3d at 418.  Failure to comply with NEPA's requirements was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

---

[8]     Roundup Ready soybean and corn were planted on the Prime Hook Refuge between 1998 and 2003 in significant acreage.  (US000395).

**3.    Defendants Must Comply With NEPA Because None Of Defendants' Actions Are Categorically Excluded From NEPA Review.**

An agency must comply with the procedural requirements of NEPA and complete an EA or EIS unless the agency establishes that the action is the subject of a categorical exemption.  40 C.F.R. § 1508.4.  Here, FWS has not claimed that a categorical exemption applies to FWS' decision to permit planting of GMOs, and in fact no such exemption applies.

The record contains no statement of reasons justifying the exclusion of NEPA review.  In order to rely on a categorical exemption, the agency must provide a convincing statement of reasons why the environmental effects of its action are insignificant and that no extraordinary circumstances were present. *Alaska Ctr. for the Envt. v. United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999); *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d at 730; *Center for Food Safety*, 451 F. Supp. 2d at 1183-84.  Courts will not accept a claim for a categorical exclusion that is not documented prior to the time the action was undertaken. Mandelker, D., NEPA LAW & LITIG., § 7:10; *California v. Norton*, 311 F.3d 1162 (9th 2002). "At a bare minimum, an agency must state-at the time it engages in the action in question (and not just when engaged in subsequent litigation)-that it is invoking a categorical exclusion." *Center for Food Safety*, 451 F. Supp. 2d at 1183 (citing *California*, 311 F.3d at 1176).  In this case, the record is **devoid of any mention** whatsoever that Defendants considered a categorical exemption to NEPA.

Additionally, an agency may not rely on post hoc rationalization to justify a categorical exemption.  *California*, 311 F.3d at 1176; *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004); *Edmonds Inst. v. Babbit*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999).  Thus, because Defendants did not claim or justify a categorical exemption prior to its approvals of GMO planting, it cannot do so no now.

Lastly, a categorical exclusion cannot apply because the record contains evidence of potential environmental effects that stem from the planting of GMOs. Where there is substantial evidence in the record that an exception applies to a categorical exclusion, the agency may not rely on that exclusion, and at the very least must explain why the action does not fall within the exception. *California*, 311 F.3d at 1177; *Center for Food Safety*, 451 F. Supp. 2d at 1186. In this case, the Department of the Interior's own NEPA Manual explains that "[c]ategorical exclusions are defined as a group of actions that would have no significant individual or cumulative effect on the quality of the human environment." 516 DM 2 (A.R. US001321). Were the agency to claim a categorical exclusion, its own NEPA Manual requires that it subject the action to "sufficient environmental review to determine whether it meets any of the extraordinary circumstances" including: significant impacts on natural resources such as prime farmlands, migratory birds, and other ecologically significant or critical areas; controversial environmental effects or unresolved conflicts concerning alternative uses of available resources; highly uncertain and potentially significant environmental effects or unique or unknown environmental risks. 516 DM 2 (A.R. US001327-28).

The permitting of planting Roundup Ready corn and soybean on Refuge land easily surpass the minimal threshold of potential significance, and trigger at least one of the extraordinary circumstances enumerated above. The administrative record for this case contains uncontested evidence that planting GMOs on Refuge land may pose significant environmental impacts. This case resemble a recent case involving genetically engineered Roundup Ready Bentgrass, where the court found that an agency violates NEPA when it categorically exempted the field testing of a GMO crop that may have the potential to significantly affect the quality of the human environment. *International Center for Technology Assessment v. Johanns*, 473 F. Supp. 2d 9, 29-30 (D.D.C. 2007).

Moreover, FWS' own "Delegation of Authority and Process for Approving the Use Of Genetically Modified Crops on the National Wildlife Refuge System" enumerates several potential environmental risks, including gene flow (biological contamination), non-target effects, increased weed resistance and the increased use of certain toxic pesticides. (A.R. US000517, 787). Additionally, The Prime Hook National Wildlife Refuge's own Biological Profile states: "Genetically engineered crops disrupt soil micro-food webs, disrupt the national biological processes that shape genomes, organisms, and communities of soil organisms to insects and other wildlife species." (A.R. US000281).

The record contains evidence of FWS' own biologist, Annabella Larsen, stating the potentially significant environmental impacts associated with the planting of GMOs on Prime Hook:

> More and more information is becoming available that makes the Use of GMOs on refuges detrimental to the air, soil, and water wherever they are used on refuge lands . . . genetically engineered soybeans and corn are . . . extremely unstable genetically at the cellular level. . . . When GMO crops are planted, an unprecedented horizontal transfer of genes can occur and probably does occur between the beneficial soil bacteria that are essential to the health of soil ecosystems and GMO crop root systems. The loss of long term soil fertility and irreversible negative impacts to soils is alarming scientists nationally and internationally. . . . **We should assess the lack of information critically when making decisions to continue to use GMO crops on NWRS. The high potential for harm can not be ignored**."

(Email to Director Joe Downhan and Prime Hook Refuge Manager Jonathon Schafler et al. (emphasis added) (A.R. US000428)).

In a report prepared by the Refuge biologist, "GMOS – Unlabeled and Untested: What is at Risk? A National Wildlife Refuge Biologist's Perspective," she further enumerated many known environmental impacts associated with using genetically modified crops, including 1) that "GM-crop [sic] themselves can become uncontrollable weeds;" 2) "GM-crops that might serve as conduits through which new genes move into the soil, and/or wild plants disrupting native vegetation communities;" 3) "Engineered crops that produce viruses could facilitate the creation

of new, more virulent and widely spread mutant viruses;" 4) "GM crops may initiate irreversible soil perturbations that may have negative effects that ripple through an entire ecosystem" (A.R. US000505). Larsen also reported that the use of GMO crops, in particular Roundup Ready soybeans, has resulted in a dramatic increase in herbicide use, particularly as weeds become resistant to the herbicide. *Id.*

Moreover, Larsen explained that "glyphosate [the active ingredient in Roundup] will lose its effectiveness as weeds become more and more resistant to the excessive use of this herbicide" requiring the use of "older more toxic herbicides, like paraquat." (A.R. US000506). Larsen also unequivocally stated that "Biological Pollution" is also an environmental impact: "GM-crops have also wreaked havoc in farmers' fields and in the larger environment as insect pollinators, wind and rain are carrying genetically altered pollen to adjoining fields and other areas, polluting organic and conventional crops and native vegetation." *Id.* Additionally, a literature review conducted by Susan Talbott, Assistant Regional Refuge Biologist, concluded that many environmental impacts are associated with planting GMOs on the Refuge, including the potential for genes from GM plants to transfer to non-genetically engineered plants ("biological contamination"), and the potential for the development of herbicide resistance weeds, among others. (A.R. US000404).

The use of GMOs serves no biological purpose on the Refuge. Far from being essential, it may be detrimental to the Refuge's environment. While Refuge leadership has repeatedly granted exceptions to the unequivocal policy prohibiting the use of GMOs in Refuge agriculture unless they are "essential", (A.R. US000388, 390, 392, 810, 1282), notes in the administrative record state that "the use of GMCs in PMH [Prime Hook] management is not essential to accomplishing refuge purposes." (A.R. US000510). And while Joe Downhan, Chief of Wildlife and Habitat Management, signed off on this policy exception in 2003 and beyond, Refuge

Biologist responded by stating, "[b]ased on my professional, biological opinion and experience with the habitat management practices conducted on this refuge for the past 12 years, **I can not condone or justify the use of GMOs (genetifcally modified organisms) in relation to Prime Hook NWRs' farming program**." (A.R. US000426 (emphasis added)). Additionally, Assistant Regional Biologist for Prime Hook stated the importance of environmental review for GMOs on the Refuge: "SOMEONE has to be considering the potential risks, at some level. This step can't be skipped simply because it wouldn't be easy to accomplish . . . **analysis of risks for each GMC is very important**." Email to Refuge managers and directors (A.R. US000394).

The existence of <u>any</u> of the above environmental impacts prohibits the reliance on a categorical exclusion. 516 DM 2 (A.R. US001327-28); *International Center for Technology Assessment*, 473 F. Supp. 2d at 29-30. Since FWS cannot rely on a categorical exemption and have not complied with NEPA's procedural requirements whatsoever, FWS is in violation of NEPA and Plaintiffs are entitled to summary judgment on their NEPA claims.

**B.     FWS Must Prepare An EIS Because The Planting Of GMOs May Cause Significant Environmental Effects.**

The actions to allow planting of GMOs at the Prime Hook Refuge constitute major federal actions that pose significant effects on the environment and therefore require the completion of an EIS. In this case, defendants violated NEPA by failing to do any NEPA assessment of their action such as prepare Environmental Assessments (EAs) or explain if and why a Categorical Exclusion (CE) was applied and appropriate. Further, in addition to violating NEPA by failing to comply with NEPA's most basic procedural requirements, FWS also violated NEPA by failing to prepare a full Environmental Impact Statement ("EIS") for permitting the planting of Roundup Ready corn and soybean on Prime Hook Refuge land.

An agency violates NEPA by failing to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

"Significantly" has two components: context and intensity.  40 C.F.R. § 1508.27.  "Context refers to the setting in which the propose action take place."  40 C.F.R. § 1508.27(a).  Intensity means "the severity of the impact."  40 C.F.R. § 1508.27(b).  CEQ Guidelines enumerate many factors to be considered evaluating the intensity of a project, including whether the proposed action is near prime farmlands, or ecologically critical areas, and whether the possible environmental effects are likely to be controversial, among others.  (40 C.F.R. § 1508.27(b)(3),(4).  In a recent ruling from the Northern District of California, the court held that the planting of GMO Roundup Ready crops may pose environmental impacts, including the threat of biological contamination and the threat of weed resistance development due to the increased use of the herbicide Roundup, that must be disclosed and analyzed in an EIS. *Geertson Seed Farms, et al. v. Johanns*, 2007 WL 518624 *5-10 (N.D. Cal. 2007).

In this case, the record is replete with evidence that the planting of GMOs on Refuge land may pose significant environmental effects.  The administrative record contains uncontested evidence that the planting of GMOs on Refuge land threatens biological contamination.  (A.R. US000517, 787, 404, 428, 505, 506); *Geertson Seed Farms,* 2007 WL 518624 * 8-9 (holding that USDA was required to prepare an EIS to consider the potential effects of biological contamination including, *inter alia*, "the alteration of a plant species' DNA through the transmission of the genetically engineered gene to organic and conventional," stemming from the agency's decision to allow the planting of Roundup Ready alfalfa).  The administrative record contains uncontested evidence that planting GMOs on Refuge land threatens to develop Roundup resistant weeds from the increased use of the herbicide.  (A.R. US000404, 505, 506); *Geertson Seed Farms,* 2007 WL 518624 *10 (holding that USDA violated NEPA by failing to "take the 'hard look' NEPA requires" when it failed to consider the "development of Roundup resistant weeds").  The record enumerates many other potential environmental impacts including the

increased use of toxic pesticides, (A.R. US000506, 517, 787), and damage to soil and crop root systems, (A.R. US000281, 428, 505).

     All of these factors require analysis of the actions in an EIS:

> The standard to determine if an action will significantly affect the quality of the human environment is whether the plaintiff has alleged facts which, if true, show that the proposed project <u>may</u> significantly degrade some human environmental factor. A determination that significant effects on the human environment will in fact occur is not essential.  If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared.

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995); *see also Curry v. U.S. Forest Service*, 988 F. Supp. 541, 550 (W.D. Pa. 1997).

     Here, the Refuge's own documents and biologists have unequivocally stated that the planting of GMOs poses significant environmental impacts, including biological contamination and the development of weed resistance, both of which have been found to trigger the need for an agency to prepare an EIS.  *Geertson Seed Farms,* 2007 WL 518624 *5-10.  Within the context of Prime Hook Refuge land, which is managed to provide habitat for migratory birds, water fowl and endangered species (A.R. US000271-72),  and given the intensity of the environmental risks enumerated above, the permitting of planting GMO crops meets the NEPA standard of significance.  40 C.F.R. § 1508.27.

     Thus, FWS's failure to prepare an EIS was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.  Plaintiffs are therefore entitled to summary judgment as a matter of law.

## III.     PLAINTIFFS ARE ENTITLED TO PERMANENT INJUNCTIVE RELIEF

     Having established that Defendants acted arbitrarily and capriciously in allowing farming at Prime Hook Refuge without first performing the compatibility determinations required by the NWRSAA, and allowing the planting of GMOs without the required EA and EIS

under NEPA, Plaintiffs have shown they are entitled to summary judgment.  To prevent the recurrance of such violations, Plaintiffs are also entitled to injunctive relief.  Indeed, the proper remedy for substantial violations of NEPA is an injunction – "[w]here an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement."  *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 737 (9th Cir. 2001); *Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir. 1985).  To prevent these violations of NWRSAA and NEPA from occurring again, Plaintiffs are also entitled to permanent injunctive relief.

The traditional bases for granting injunctive relief are irreparable injury and inadequacy of legal remedies.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).  With respect to environmental injury, the Supreme Court recognized that "[environmental] injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Id*. at 545.  The Court should issue a permanent injunction in this case to prevent "a potentially environmentally damaging project to proceed prior to [EIS] preparation."  *National Parks*, 241 F.3d at 738.

To grant injunctive relief, the Court must also consider the "balance of harms" by weighing the competing claims of injury and "consider[ing] the effect on each party of the granting or withholding of the requested relief," giving particular regard to the public interest.  *Amoco Prod. Co.,* 480 U.S. at 542.   In this case, the balance of harms favors the Plaintiffs.  The environmental, recreational, and aesthetic injuries arising from the farming on the Prime Hook Refuge are patent, while there is no harm to the Defendants in requiring them to prohibit farming until they comply with NWRSAA and NEPA requirements.  Permanent injunctive relief in such

cases is appropriate.  *See, e.g., Geertson Farms Inc., et al. v. Johanns*, 2007 WL 1302981 (N.D. Cal. 2007) (enjoining the planting of Roundup Ready alfalfa pending completion of the EIS).

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs Delaware Audubon Society, Center for Food Safety, and Public Employees for Environmental Responsibility respectfully request that the Court enter summary judgment in their favor and against the Defendants and grant the following relief:

1.    Declare that Defendants violated the National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd et seq., when they entered into and/or approved Cooperative Farming Agreements for farming at the Prime Hook Wildlife Refuge without first preparing compatibility determinations concerning such farming as required by 16 U.S.C. § 668dd(d)(1)(A) and 50 C.F.R. § 25.21(b), and thus the decision to enter into each such Cooperative Farming Agreement was arbitrary, capricious, and not in accordance with law so as to violate the Administrative Procedures Act, 5 U.S.C. § 706(2)(A);

2.    Declare that Defendants violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., when they entered into and/or approved Cooperative Farming Agreements for farming at the Prime Hook Wildlife Refuge that allowed the planting of Genetically Modified Organisms such as Roundup Ready soybeans without first preparing an Environmental Assessment and Environmental Impact Statement on the use of GMOs as required by 42 U.S.C. § 4332 and 40 C.F.R. §§ 1501.3, 1501.4, and thus the decision to enter into each such Cooperative Farming Agreement was arbitrary, capricious, and not in accordance with law so as to violate the Administrative Procedures Act, 5 U.S.C. § 706(2)(A);

3.    Declare that Defendants violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., when they approved an exception to their GMO prohibition policy and

permitted the planting of Genetically Modified Organisms such as Roundup Ready soybeans without first preparing an Environmental Assessment and Environmental Impact Statement on the use of GMOs as required by 42 U.S.C. § 4332 and 40 C.F.R. §§ 1501.3, 1501.4, and thus the decision to allow GMO planting was arbitrary, capricious, and not in accordance with law so as to violate the Administrative Procedures Act, 5 U.S.C. § 706(2)(A);

4.     Enter final judgment in favor of Plaintiffs and against the Defendants for their violations of the NWRSAA, NEPA, and APA;

5.     Permanently enjoin Defendants from allowing farming on the Prime Hook Wildlife Refuge until Defendants perform compatibility determinations for such farming as required by 16 U.S.C. § 668dd(d)(1)(A) and 50 C.F.R. § 25.21(b);

6.     Permanently enjoin Defendants from allowing the farming of Genetically Modified Organisms of any kind, including but not limited to Roundup Ready crops, on the Prime Hook Wildlife Refuge until they have prepared an Environmental Assessment and Environmental Impact Statement on the use of GMOs as required by 42 U.S.C. § 4332 and 40 C.F.R. §§ 1501.3, 1501.4;

7.     Declare Plaintiffs the prevailing parties in this matter, and the government's position not substantively justified, for purposes of the award of attorneys fees under the Equal Access to Justice Act, 28 U.S.C. §2412; and

8.    For such other and further relief as the Court deems just and proper.

Respectfully submitted,

DELAWARE AUDUBON SOCIETY, CENTER FOR FOOD SAFETY, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY

By: _____
    Vivian A. Houghton, Esquire

Vivian Houghton, DE Bar #
Houghton, Holly & Gray LLP
800 West Street
Wilmington, DE 19801
(302) 658-0518

Attorney for Plaintiffs


William Rostov
Kevin Golden
Center for Food Safety
2601 Mission Street, Suite 803
San Francisco, CA 94110
(415) 826-2770 | fax (415) 826-0507

Attorneys for Center for Food Safety


Paula Dinerstein
Jeffrey Ruch
Public Employees For Environmental Responsibility
2000 P Street, NW; Suite 240
Washington, D.C. 20036
Tele: (202) 265.7337

Attorney for Public Employees for Environmental Responsibility

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DELAWARE  AUDUBON SOCIETY,<br>CENTER FOR FOOD SAFETY, and<br>PUBLIC EMPLOYEES FOR<br>ENVIRONMENTAL RESPONSIBILITY, | )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | Case No. 1:06-cv-223 |
| vs. | )<br>) | |
| Secretary, United States Department<br>of the Interior, DALE HALL,<br>Director of United States Fish<br>And Wildlife Service, and UNITED<br>STATES FISH AND WILDLIFE<br>SERVICE, an administrative agency<br>of the United States Department of the<br>Interior, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>)<br>) | |

**DECLARATION OF ERIC P. LEVY**

I, Eric Levy, state:

1.  My principal place of residence is 1829 Lower Bailey Road, Newport, PA 17074.

I make this declaration upon personal knowledge.

2.  I have been a member and supporter of the Center for Food Safety since 2004.

3.  The Fish and Wildlife Service's allowance of farming genetically engineered

crops at the Prime Hook National Wildlife Refuge without preparation of an

environmental review or a compatibility determination has, and will continue to,

adversely affect me.

4. For four years, until December 2006, I resided at 412 Eastman Rd., Wilmington DE 19803, within an hour and a half of Prime Hook. During these years, I developed a deep connection to the land and wildlife of the Prime Hook Wildlife Refuge, regularly visiting the Refuge to hike, bird watch, look for and watch wildlife, enjoy seeing native and rare plants, and finding peace and quiet on the Refuge land.

5. I now live approximately four hours driving from Prime Hook. I have continued to visit the Refuge and like to camp at Cape Henlopen, enjoying the natural beauty of Prime Hook. When I visit the Refuge, I take pleasure in hiking in the Refuge. During my hikes, I enjoy watching birds such as the herons and egrets that visit the Prime Hook Refuge. I also look for muskrats and other wildlife, and I enjoy seeing native and rare plants. I plan to return to the Prime Hook Refuge at least once, likely twice a year to camp and enjoy Prime Hook.

6. The farming landscapes at the Refuge disrupt my aesthetic enjoyment of the natural areas. I am also concerned that the farming exposes me to herbicides when I visit the Refuge, especially because genetically engineered crops are associated with increased herbicide use. Additionally, the genetically engineered crops interfere with my enjoyment of the Refuge because herbicides harm birds, native plants, and other wildlife. I am also concerned that the crops alter the habitat and the diversity of species will change at the Refuge.

7. When I discovered that Prime Hook Refuge had genetically engineered crops on it, I visited the Refuge and spoke with the Refuge Manager, Jonathan Schafler. I expressed my concerns with him and he offered me explanations. I am concerned that

the Fish and Wildlife Service made its decision to allow genetically engineered crops without considering the environmental effects.

8.  Additionally, I do not want to eat genetically engineered foods, and I am offended by the altering of the genetic structure of foods. I regularly purchase produce from local organic farms. The presence of genetically engineered crops at the Prime Hook Refuge coupled with the lack of labeling of such crops means that I may unintentionally consume foods with genetically engineered material when I buy foods grown near the Prime Hook Refuge.

9.  I have an interest in the Prime Hook National Wildlife Refuge because I watch birds and hike there; and the Fish and Wildlife Service's decision to allow genetically engineered crops at Prime Hook has a negative impact on my aesthetic, recreational, and health interests.

10. I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2007

Eric P. Levy