## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE AUDUBON SOCIETY | ) | |
| CENTER FOR FOOD SAFETY, AND | ) | |
| PUBLIC EMPLOYEES FOR | ) | Ca. No. 06-223 |
| ENVIRONMENTAL RESPONSIBILITY | ) | |
| | ) | MEMORANDUM IN OPPOSITION |
| Plaintiffs | ) | TO PLAINTIFFS' MOTION FOR |
| vs. | ) | SUMMARY JUDGMENT |
| | ) | |
| Secretary, Department of the Interior, | ) | |
| DALE HALL, Director of United States | ) | |
| Fish and Wildlife Service, and UNITED | ) | |
| STATES FISH AND WILDLIFE | ) | |
| SERVICE, an administrative agency of the | ) | |
| United States Department of the Interior | ) | |
| | ) | |
| Defendants | | |

RONALD J. TENPAS
Acting Assistant Attorney General

RUTH ANN STOREY
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0493

Attorney for Defendants

# **TABLE OF CONTENTS**

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Plaintiffs' Claims Are Moot Because There Is No Farming at Prime Hook Refuge and There Will Be No Farming until its CPP is Completed . . . . . . . . . . . . . . . . 13

      B.    No Exceptions to the Mootness Doctrine Apply . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

<u>Am. Rivers v. Nat'l Marine Fisheries Serv.,</u>
126 F.3d 1118 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Center for Food Safety v. Veneman,</u>
364 F.Supp. 2d. 1202 (D. Hawaii, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

<u>Church of Scientology of Cal. v. United States,</u>
506 U.S. 9 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

<u>Citizens for Responsible Gov't State Political Action Comm. v. Davidson,</u>
236 F.3d 1174 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Citizens to Preserve Overton Park v. Volpe,</u>
401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>City of Los Angeles v. Lyons,</u>
449 U.S. 934 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>City of Los Angeles v. Lyons,</u>
461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Clarke v. United States,</u>
915 F.2d 699 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Coral Springs Street Systems, Inc. v. City of Sunrise,</u>
371 F.3d 1320 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>County of Los Angeles v. Davis</u>
440 U.S. 625 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Frizelle v. Slater,</u>
111 F.3d 172 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Headwaters, Inc. v. BLM,</u>
893 F.2d 1012 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Mills v. Green,</u>
159 U.S. 651 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Murphy v. Hunt,</u>
455 U.S. 478 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

-ii-

Nat'l Advertising Co. v. City & County of Denver,
        912 F.2d 405 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

New Jersy Turnpike Authority v. New Jersy Central Power and Light,
        772 F.2d 25 (3rd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

Preiser v. Newkirk,
        422 U.S. 395 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Pub. Utils. Comm'n v. FERC,
        100 F.3d 1451 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ragsdale v. Turnock,
        841 F.2d 1358 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Raines v. Byrd,
        521 U.S. 811 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rendell v. Spencer,
        484 F.3d 236 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Spencer v. Kemna,
        523 U.S. 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Chem. Found.,
        272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**FEDERAL STATUTES**

16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| DELAWARE AUDUBON SOCIETY, CENTER FOR FOOD SAFETY, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY | ) ) ) ) ) | Ca No. 06-223 |
| Plaintiffs, | ) ) ) | MEMORANDUM IN OPPOSITION TO  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) | |
| Secretary, Department of the Interior, DALE HALL, Director of United States Fish and Wildlife Service, and UNITED STATES FISH AND WILDLIFE SERVICE, an administrative agency of the United States Department of the Interior | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

In this matter Delaware Audubon Society, Center for Food Saftey and Public Employees for Environmental Responsibility (Plaintiffs) allege that the Secretary[1] of the U.S. Department of the Interior,  Dale Hall, Director of the United States Fish and Wildlife Service (FWS), and FWS (Federal Defendants) authorized certain farming activities at Prime Hook National Wildlife Refuge (Prime Hook Refuge or the Refuge) without determining that such use of the Refuge was compatible with its purposes under the National Wildlife Refuge System Administration Act of 1966, as amended, 16 U.S.C. § 668dd (NWRSAA), and without conducting an environmental analysis under the National Environmental Policy Act of 1969, 42 U.S.C. §§4321-4361 (NEPA).

However, the actions that Plaintiffs challenge, specifically cooperative farming practices and farming with genetically modified crops (GMCs), are not currently occurring at the Refuge

---

[1] Pursuant to Fed. R. Civ. P. 25(d0(1), Dirk Kempthorne, Secretary of the Department of the Interior, is automatically substituted for his predecessor, Gale A. Norton.

and will not recur until the Refuge completes a Congressionally-mandated comprehensive

conservation plan (CCP) including appropriate environmental analysis under NEPA and a

compatibility determination.  Declaration of Susan R. McMahon at ¶ 10. (Exhibit A.)  Therefore,

Plaintiffs' claims are now moot.  Accordingly, this Court should deny Plaintiffs' motion for

summary judgment and dismiss this action.

## FACTUAL BACKGROUND

Prime Hook Refuge is part of the National Wildlife Refuge System (Refuge System) for

which FWS is responsible.  A.R. 820.  The Refuge, located on approximately 10,000 acres in

Sussex County, Delaware, was established in 1963.  A.R. 28, 29, 818-19, 863, 984.  Its purposes

include: use as an inviolate sanctuary, or any other management purpose, expressly for migratory

birds; fish and wildlife-oriented recreational development; the protection of natural resources;

and, the conservation of endangered species.  A.R. 42, 342, 1342

Farming occurs on numerous refuges within the Refuge System (181 out of nearly 500

refuges in 1989).  A.R. 229.  However, consistent with the Refuge System's Cropland

Management guidance, farming occurs on only a small percentage of the Refuge System

acreage.  A.R. 229, 1018.  Cropland management can serve a variety purposes, including, but not

limited to:  producing supplemental forage to maintain healthy wildlife populations; creating

winter and nesting habitat; preventing of invasion of undesirable vegetation; and,  preparing land

for conversion to other habitats.  A.R. 1004, 1018.

Until 2007, farming had occurred at the Prime Hook Refuge since at least 1970, at which

time approximately 1000 acres, or 10 percent of the Refuge, were managed under annual

cooperative farming agreements. A.R. 1, 7.  Since the 1970's, the Refuge reduced its cropland

acreage by nearly half, converting some of these areas into other wildlife habitat.  A.R. 243, 346, 414-15, 560, 565, 904.  Farming on the Refuge is largely guided by a formal Cropland Management Plan, created by the Refuge in 1970 and revised in 1987.  A.R. 1-25, 26-41.

Farming at the Refuge served a number of objectives:  the provision of habitat for ducks and geese during spring and fall migration; providing forage for geese and upland breeding ducks; creation of nesting habitat for ducks; supplementing habitat for endangered species; and, the prevention of brushy vegetative growth and loss of open space. A.R. 1-3, 29-30.  These objectives and the chosen farming methods are tied to the biological needs of the Refuge's trust resources.  A.R. 30-35.  The farming program was intended to supplement the naturally occurring forage and habitat necessary for healthy wildlife populations.  A.R. 29, 1018.  And although the natural water impoundments managed by the Refuge provide substantial nesting and feeding opportunities, circumstances, such as drought and freeze, can stress natural habitats and lead to reduction in waterfowl populations.  A.R. 545, 725.

As stated in the Cropland Management Plans, and as permitted in the Refuge System Manual, farming at the Prime Hook Refuge was conducted through annual cooperative farming agreements entered into by the Refuge with local farmers.  A.R. 17, 31, 229, 1016-1034; 1019, 1024-25.  During the 12 years between 1995 and 2006, the Refuge entered into 37 cooperative agreements.  See Pl. Brief in Support of SJM at fn. 1.  In 2006, the last year in which farming occurred at the Refuge, two farmers entered into annual cooperative farming agreements, covering a total of approximately 600 acres.  A.R. 840-48, 849-54.

Through these agreements, past farmers were allowed to plant and harvest commodity crops, but in return were required to undertake other farming activities, such as the planting of

3

cover crops and grasses, mowing, weeding, and leaving waste grains in place.  A.R. 31-36; see

e.g., one of the 2006 agreements at A.R. 841-2, and the stipulations included in each of the

cooperative farming agreements previously cited.  The agreements clearly articulated the

responsibilities of the farmers. A.R. 18, 31, 1013.  They also included special use conditions

regarding monitoring and reporting, nutrient applications, weed control, access and time of year

restrictions,  specified locations where farming could occur, the crops to be planted and required

farming practices.  See e.g., A.R. 841-42 and each of the above-referenced cooperative

agreements.   Cooperative agreements are contractual in nature giving the Refuge the ability to

enforce.  A.R. 243-44.  Cooperators with the Refuge were subject to the FWS's terms,

covenants, obligations and restrictions.  See e.g.., A.R. 840.   The agreements  also contained

restrictions on certain crops and practices that the Refuge determined to be unacceptable.  For

instance, the Refuge prohibits ditching and draining of Refuge lands.  See e.g.,  A.R. 842,

condition #15.  The Refuge also prohibited the use of Bacillus thuringiensis (Bt) corn starting in

2000.  A.R. 207, 215, 221, 263 and in all subsequent agreements.  Each agreement also required

regular reporting so that the Refuge could evaluate the program before determining whether to

enter into future agreements.  Of particular importance was the reporting and regulation of

pesticide use, which must be regularly approved and evaluated by the refuge.  See e.g., A.R. 230-

33, 405-07; 842 (conditions ##11 and 16), 986-89.

          The National Wildlife Refuge System Improvement Act of 1997 created new

requirements for each refuge in the Refuge System to develop a Comprehensive Conservation

Plan (CCP) by 2012.  A.R. 913-19, 920-29.  It also created a new standard for refuges to

determine whether refuge uses are compatible with a refuge's purposes or the mission of the

4

Refuge System.  Id.  On July 20, 2000,  three new FWS policies concerning planning, the CCP process, and step-down management plans, became effective.  A.R. 1071-1118.  On November 17, 2000, the FWS's regulation and separate policy regarding compatibility determinations became effective.[2]  A.R. 1106-118, 1146-66.  The FWS's Policy on Maintaining the Biological Integrity, Diversity, and Environmental Health of the National Wildlife Refuge System (Biological Integrity Policy) became effective on February 15, 2001.  A.R. 1166-1180.  This Policy included a provision governing the use of non-native plant species, and genetically modified organisms, on refuge lands.  Id. at 1179 (§ 3.15(C)). The FWS developed and disseminated training materials to educate refuge staff about the new compatibility requirements in 2001.  A.R. 1186-1242.

In 2001, the Northeast Regional Office biologists undertook a survey of individual refuge biologists to determine their capabilities and needs.  A.R. 341. The sole refuge biologist for the Prime Hook Refuge completed a questionnaire, entitled "Biological Profile" A.R. 271-81.  In response to a question about upland land management, she noted her preference that farming be phased out because she thought it no longer contributed to the Refuge's purpose.  A.R. 280-81.  But that document provided no scientific evidence or analysis to support that opinion.

Although complimenting the Refuge on its efforts to reduce the amount of croplands, the Regional biologists who peer reviewed the questionnaire responses addressed the comment by the Prime Hook Refuge biologist stating:

> We recommend that the refuge specifically monitor waterfowl use of all refuge croplands.  A survey protocol is needed to measure waterfowl use of each refuge

---

[2] The FWS's Northeast Regional Office for the Refuge System provided further recommendations on how to conduct compatibility reviews in April 2002.  A.R. 332-37.

5

field and crop type throughout the migration and wintering period.  This data is
critical to making informed decisions pertaining to farming at the refuge, and to
address controversy surrounding this refuge management program.

A.R.  346. They also recommended that "the refuge justify its decision with supporting data."

A.R. 361.   To do so, additional information was needed, especially in anticipation of the

upcoming CCP process and development of a habitat management plan.[3] A.R. 341; 354-55

(identifying the following as an information need: cropland management and wildlife use of

croplands on the refuge).  Finally, they commented on the Refuge biologist's characterization of

the farming program's purpose, which was not, as she identified, to "increase income for local

farmers." A.R. 278, 346.

       In February 2003, the Northeast Regional Chief for the Refuge System issued a

memorandum to refuge managers.  The memorandum reminded them that they were to follow

the procedures in the Biological Integrity Policy regarding the use and approval of genetically

modified organisms on refuge lands.  A.R. 390   The transmittal memo accompanying this

document stated that to avoid economic hardship, a one-year exemption from the policy was

warranted if cooperative farmers had already purchased genetically modified seed.  A.R. 388.

       Also in 2003, the Refuge System Headquarters Office formed an internal team to address

the possible revision of the Biological Integrity Policy provision on genetically modified

organisms, and the creation of guidance.  A.R. 391.   The team asked each of the regions to reply

to a series of questions regarding use of genetically modified crops.  The Northeast Region's

Assistant Regional Biologist provided a transmittal e-mail with the Regional comments, noting

[3] This Biological peer review team drafted its response to the Refuge biologist in 2003.  A.R.
340.  At that time, the Refuge was also scheduled to begin the CCP in 2003. A.R. 343.

that the importance of fairly evaluating the issues: "SOMEONE has to be considering the potential risks at some level." A.R. 391-340, 394 (emphasis in original). But the Regional comments also indicated that "[w]hile the literature is not clear on the potential negative impacts and risks, it also has not been established without question that there are no risks to consider." A.R. 393. The Region also provided its own literature review summarizing the inconclusive nature of studies dealing with human health, potential risks to non-target organisms and ecosystems, potential transfer of genes to other plants, overall benefits from their use, potential risks of weedy crops, and concerns about testing and regulation. A.R. 402-04**.**

During this time, others recognized the need to address the efficacy of the Refuge's farming program. A.R. 408-09. In 2003, 13 refuges in the Northeast Region, including the Prime Hook Refuge, participated in a grassland bird study to assess geographic relationships between different grassland management techniques used in that Region. A.R. 267, 460, 467, 864, 872. The Prime Hook Refuge designated approximately 150 acres, previously farmed under cooperative agreement and managed them as alternative grassland management regimes. A.R. 267-68, 466, 755 The study was scheduled to be undertaken during a two year period. A.R. 467. As to refuges in the mid-Atlantic, including Prime Hook, the study revealed that species diversity was low in this area, compared to others that were "the best places for grassland birds." A.R. 473. The study proffered a possible explanation that the mid-Atlantic does not provide a "hospitable matrix of habitats for grassland birds." Id. It also contemplated that the recent conversion from agriculture to grassland might be a reason for the low diversity, and recommended further examination. Id. Although not required to do so, the Prime Hook Refuge allowed an additional year of study in 2005. A.R. 755. In 2006, it returned the experimental

grasslands back to farming for the 2006 season.

In the fall of 2003, pursuant to the Regional Chief's memorandum and policy, and despite the allowance of a one-year grace period, the Prime Hook Refuge Manager issued letters to farmers advising them not to plant genetically modified crops on the Refuge during the 2004 season. A.R. 509. Subsequently, FWS Headquarters staff visited the Refuge and announced that the Director's Office would be issuing guidance for the 2004 season. A.R. 509, 802. The new guidance would allow for the use of genetically modified crops under certain circumstances; the Refuge Manager was tasked with amending the correspondence he had previously sent to farmers. A.R. 509, 802. The FWS Director issued an Interim Directive in January 2004 making the following change to the Biological Integrity Policy:

> We are currently developing new guidelines for the use of genetically modified crops (GMCs) within the farming programs of the National Wildlife Refuge System. It is Service policy that genetically modified organisms can be used in refuge management when it is determined that their use is essential to accomplishing refuge purpose(s) and the Director has approved their use.
>
> Until the new guidelines for the use of GMCs are completed, the use of GMCs that have been historically used on refuges or have been approved for use by the Director are authorized for the 2004 growing season. Policy guidance regarding future use of GMCs will be forthcoming.

A.R. 1282-84. At or about the same time, the Prime Hook Refuge biologist wrote a memorandum stating that she "can not condone or justify the use of GMCs …in relation to Prime Hook NWR's farming program." A.R. 426. This document reflected her opinion that using GMCs ran counter to the FWS's Biological Integrity Policy, but provided no biological analysis or support for that contention. In March, 2004, the Refuge issued two cooperative agreements for the 2004 season, allowing the use of genetically modified crops. A.R. 442-59.

In November 2004, the Refuge System Headquarters Office circulated draft guidance on

8

the provision of the Biological Integrity Policy dealing with genetically modified organisms. It identified a preferred means to evaluate their use and the method for their approval. A.R. 516-522. It also provided a brief summary of the benefits associated with the use of genetically modified crops, and an assessment of their potential risks. A.R. 516-17. However, this draft was never finalized. Given that the Director's interim directive appeared to be time limited and the Headquarters' guidance had not been finalized, the Prime Hook Refuge requested that the Regional Office advise on how to proceed with genetically modified crops during 2005. A.R. 531-32. The Regional Office responded that the course forward was unclear and decisions would be made on a case-by-case basis. Id. The Refuge subsequently entered into two cooperative farming agreements for 2005, allowing the use of genetically modified crops. A.R. 576-589.

In the Spring of 2005, some individuals within the Delaware farming community wrote letters criticizing the Refuge for reducing farming acreage and turning waterfowl production areas into grassland and forestlands. See e.g., A.R. 590-96, 627. In response to these letters, the Refuge undertook an outreach campaign and held meetings addressing long-term Refuge management. A.R. 607, 617-18, 621-22. One of these was a Town Hall meeting scheduled in advance of the official commencement of the CCP process. It was held on July 13, 2005, with considerable public comment both supportive of and opposed to farming. A.R. 628, 630-33.

In October 2005, the Refuge officially published a Federal Register Notice of its intent to prepare a CCP[4] and Environmental Assessment under the National Environmental Policy Act.

---

[4] The preference of Regional management has been to evaluate farming through development of the Refuge's land management plans so that it could holistically and contemporaneously consider Refuge resources and goals. A.R. 646, 691. For example, the Refuge could accomplish this through development of its outstanding CCP and step down plans, like the required habitat

9

A.R. 818.  It subsequently held  three combined open houses and public meetings in Dover,

Lewes and Milton, Delaware.  A.R. 819-20. At each of these, the Refuge received numerous

public comments regarding the farming program.[5]   A.R. 292-4.

At or about the same time, the FWS received numerous letters from members of the

public concerned about the Refuge's plan to return the 150 acres of grassland bird study plots

back to farming.  See e.g., A.R. 643-44, 647, 663-64, 692.  Others commented that the Refuge

had not followed policies and procedures in continuing its cropland management program.  A.R.

757.  The Refuge and Regional Office responded to these criticisms, explaining that the fields

would be returned to their original use since the grassland bird study, extended an extra year, had

been completed.[6]  A.R. 656-59, 688, 693-4 751, 755, 803-05.  The Regional Office prepared an

attachment articulating its position. A.R. 804-05.   On or about March 15, 2006, the Refuge

entered into two cooperative farming agreements, which allowed for the use of genetically

management plan. These plans, which have not yet been completed, assess overall habitat needs
in context of the purposes for which refuge was created.  A.R. 342-43, 729.  At Prime Hook
Refuge, development of the CCP was delayed until the fall of 2005.  A.R. 343, 412, 564, 818.
Regardless of the date, the Refuge's and Region's position, consistently conveyed, has been that
the issues surrounding farming -- its need, compatibility, etc. --  would be evaluated though the
CCP and planning process, and the ultimate decision on whether farming would continue, and in
what capacity, would be made in the final CCP and accompanying findings.  A.R. 412, 560, 573,
607, 617, 656, 725.

[5] Since then, the Refuge has convened three workshops to solicit comment on more focused
topics, such as habitat management, protected resources, and the vision for the CCP.  See
McMahon Declaration, para. 18.  Plaintiff Delaware Audubon Society (DAS), as well as a
number of other interested stake holders were invited to participate. Id.  Although critical of the
Refuge's past approach to farming and alleged non-compliance with FWS policies, DAS has
stated it "considers the development of the CCP to be an incredibly important endeavor" and
therefore "will be actively engaged as this process moves forward."   A.R. 759

[6] Others in the FWS acknowledged that complexities involved in the decision to return the 150
acres to farmland.  A.R. 775-76.

modified crops.  A.R. 840-54.

These agreements expired on December 1, 2006.  A.R. 840-54.   There has been no farming at the Refuge since that time.  See McMahon Declaration, para. 10. The Refuge did not enter into any agreements in 2007.  Id.   The Refuge and Regional Office have consistently communicated their position that there will be no more cooperative farming agreements until completion of the CCP:

> Pending the completion of the CCP, the refuge will not enter into annual farming
> cooperative agreements.  Through the CCP public process, the refuge will
> thoroughly examine farming, among other things, in the context of the purposes for
> which the refuge was established, and habitat management.  At the conclusion of that
> public process, with the completion of the CCP, the refuge will determine the degree
> to which, if any, farming will constitute a long-term refuge management tool.

Id. at para. 13 and Attachment D; see also id. at paras. 12, 15 and 19, and Attachments C, E and G.

Presently, the Refuge expects to have a draft CCP, draft environmental analysis under NEPA and draft compatibility determinations available for public review and comment sometime in 2008.  See id. at para. 20.  The Refuge will then evaluate those comments and finalize the CCP, accompanying NEPA analysis, and other required determinations.  Id.

## LEGAL BACKGROUND

The Supreme Court has long held that "[th]e exercise of judicial power under Article III of the Constitution depends on the existence of a case or controversy." Preiser v. Newkirk, 422 U.S. 395, 401 (1975).  As the Court explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997).  Accordingly, federal courts lack jurisdiction "to give opinions upon moot questions or

11

abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992); see also Am. Rivers v. Nat'l Marine Fisheries Serv., 126 F.3d 1118, 1123 (9th Cir. 1997). Furthermore, courts have "neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." Preiser, 422 U.S. at 401.

The case-or-controversy requirement "subsists through all stages of federal judicial proceedings, trial and appellate." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (citations omitted); Rendell v. Spencer, 484 F.3d 236, 241-42 (3rd Cir. 2007). "[T]hroughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Id. (citation and internal quotation marks omitted); see also Pub. Utils. Comm'n v. FERC, 100 F.3d 1451, 1458 (9th Cir. 1996). The plaintiff bears the burden of demonstrating the existence of a case or controversy at all stages of the litigation. New Jersy Turnpike Authority v. New Jersy Central Power and Light, 772 F2d 25, 33 (3rd Cir. 1985). A "mere physical or theoretical possibility" that the challenged conduct will again injure the plaintiff is insufficient to establish a present case or controversy. Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982).

Thus, if actual or threatened injury from the particular action challenged no longer exists, or a change in circumstances deprives a court of the ability to provide any meaningful or effective relief for the alleged violation, the matter is moot and must be dismissed for lack of jurisdiction. See Mills v. Green, 159 U.S. 651, 653 (1895).

**ARGUMENT**

**A.    Plaintiffs' Claims Are Moot Because There Is No Farming at Prime Hook Refuge and There Will Be No Farming until its CCP Is Completed**

Because FWS has not issued any cooperative agreements to allow farming at the Refuges since 2006, and does not intend to, if at all, until the CCP is completed, there remains no "live" controversy.  See McMahon Declaration, ¶¶ 10, 13 and Attachment D; see also id. at ¶¶ 12, 15 and 19, and Attachments C, E and G.

The particular decision regarding which Plaintiffs sought review, i.e. allowing cooperative farming and the use of GMCs at the Refuge, no longer exists and will not be repeated absent additional environmental analysis.  Id.. at ¶¶19-20.   Therefore, there is no basis for meaningful relief.  Since it is impossible for the court to "grant any effectual relief whatsoever," the matter is moot.  Church of Scientology, 506 U.S. at 12; see also Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000) (action moot if any relief would have no "effect in the real world").  In such a case, Article III prevents the Court from issuing advisory opinions on a "hypothetical state of facts" that Plaintiffs assert may at some time come to pass.  Nat'l Advertising Co. v. City & County of Denver, 912 F.2d 405, 412 (10th Cir. 1990).

**B.    No Exceptions to the Mootness Doctrine Apply**

There are two recognized exceptions to the mootness doctrine.  The first is for challenges to conduct that is "capable of repetition yet evading review," and the second is for voluntary cessation of allegedly unlawful conduct.  See City of Los Angeles v. Lyons, 449 U.S. 934, 935 n.1 (1980).  Neither exception applies here.

The "repetition/evasion" exception "is a narrow one, and applies only in 'exceptional

situations'" that are not present here.  Headwaters, Inc. v. BLM, 893 F.2d 1012, 1016 (9th Cir. 1989) (citing Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983)).  Under this exception, "federal courts may exercise jurisdiction over otherwise moot matters in which [1] the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and [2] there [is] a reasonable expectation that the same complaining party would be subjected to the same action again."  Id. (citations omitted).

There is no indication that there is insufficient time to litigate the decision to allow farming at Prime Hook Refuge if and when it is approved in the future.  Moreover, there is no reasonable expectation that the Refuge will undertake cooperative farming in the manner that Plaintiff complains in this litigation.  Here, the Declarations of Refuge System employees clearly state that Defendants' intent is not to enter into cooperative farming agreements until they complete a mandatory, formal comprehensive conservation planning process.  Since November 2006, the Service has clearly communicated its position to past cooperative farmers, the public and to members of the Delaware Congressional delegation.  Moreover, during the Refuge has not entered in any new cooperative agreements, nor have any been requested, since the start of this litigation.  See McMahon Declaration, ¶¶ 10, 19.  Thus, the "repetition/evasion" exception does not apply here.[7]

---

[7] This case can be distinguished from another case, involving some of the same Plaintiffs, that addressed the repetition/evasions test.  In a case challenging the U.S. Department of Agriculture's permitting of experimental GMC field testing that had been completed,  the court noted that "Defendants [had] themselves repeatedly asserted that the activity will recur. Center for Food Safety v. Veneman, 364 F.Supp. 2d. 1202, 1211 (D. Hawaii, 2006), (citing Defendant's declaration stating that the same fields would be used for future testing).  In addition to finding that field testing would likely occur, it found that "it is also likely that the testing will continue under the circumstances to which plaintiffs object." Id.   Unlike Center for Food Safety, Federal Defendants here have not made "multiple assurances by Defendants that the challenged actions will recur." Id.  Quite to the contrary. Therefore there is no basis to conclude, as did the court in

The "voluntary cessation" exception arises where "despite the apparent demise of the controversy, its resolution has a reasonable chance of affecting the parties' future relations." Clarke v. United States, 915 F.2d 699, 703 (D.C. Cir. 1990). The early cases developing the exception focused on preventing a private defendant from returning to its "old ways." Id. at 705. Thus, voluntary cessation does not save an action from mootness where: (1) there is no reasonable expectation that the wrong will be repeated; and (2) interim events have eliminated the effects of the alleged violation. County of Los Angeles v. Davis, 440 U.S. at 631. The burden is on moving party to demonstrate that the there is no reasonable expectation of a recurrence. New Jersy Turnpike Authority, 772 F2d at 33

There is a presumption of agency regularity and compliance. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971); United States v. Chem. Found., 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Based upon the general presumption that public officers "discharge their duties correctly, lawfully, and in good faith," Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997), courts have treated the cessation of allegedly unlawful conduct by government officials with more solicitude than similar actions by private parties. Coral Springs Street Systems, Inc. v. City of Sunrise, 371 F.3d 1320, 1329 (11th Cir. 2004); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988); see also Clarke, 915 F.2d at 705 (with respect to Congress, "[a]t least in the absence of overwhelming evidence (and perhaps not then) it would seem inappropriate for the

---

Center for Food Safety, that "a substantial controversy of sufficient immediacy and reality exists to warrant continuation of the suit. Id

.

courts to either impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose.").  The Court should apply the presumption of good faith and regularity to FWS here.

FWS has clearly demonstrated that there is no reasonable expectation that the conduct at issue will be repeated.  If FWS should decide to authorize cooperative farming or the use of GMCs at Prime Hook Refuge, it will only be after the CCP is completed with the appropriate environmental analysis under NEPA, compatibility determination and other required findings.  If Plaintiffs bring a challenge to that new  decision, this will create a controversy that is separate and distinct from the basis for the current case.  Such an agency decision would be amenable to judicial review in a new action.  In addition, the second component of the "voluntary cessation" exception is not met because the decision not to enter into any cooperative agreements for farming until the CCP is completed eliminated any effects of the violations Plaintiffs alleged.  Thus, neither prong of this exception to the mootness doctrine is satisfied.  The Court now lacks jurisdiction over this matter and should enter an order of dismissal.

**CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' motion for summary judgment and dismiss this action.

Dated this 3rd day of October, 2007          Respectfully submitted,
                                                   RONALD J. TENPAS
                                                   Acting Assistant Attorney General

                                                    /s/ Ruth Ann Storey
                                                   RUTH ANN STOREY
                                                   U.S. Department of Justice
                                                   Environment and Natural Resources
                                                   Division
                                                   General Litigation Section
                                                   P.O. Box 663
                                                   Washington, D.C. 20044-0663
                                                   (202) 305-0493

                                                   Attorney for Defendants

17

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELAWARE AUDUBON SOCIETY,<br>CENTER FOR FOOD SAFETY, and<br>PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,<br><br>Plaintiffs,<br><br>v.<br><br>Secretary, United States Department<br>of the Interior, DALE HALL,<br>Director, U.S. Fish and Wildlife Service, and<br>the U.S. FISH AND WILDLIFE SERVICE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil No.<br>) 06-223-GMS<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF SUSAN R. MCMAHON

I, Susan R. McMahon, do make the following declaration:

1. I earned a B.S. Degree in Parks and Recreation, Resource Management from Slippery Rock State College in 1979.

2. I have been employed by the U.S. Fish and Wildlife Service since 1978.

3. My prior assignments with the U.S. Fish and Wildlife Service include:

   A. Group Leader, Erie National Wildlife Refuge, Guys Mills, Pennsylvania, May 1978 to September 1981.

   B. Works Program Officer, Iroquois Job Corps, Medina, New York, September 1981 to January 1988.

   C. Various positions, up to and including Refuge Manager, Patuxent Research Refuge, Laurel, Maryland, January 1988 to October 1999.

4. I am presently the Deputy Regional Chief, National Wildlife Refuge System,

Northeast Region, U.S. Fish and Wildlife Service (Service), U.S. Department of the

Interior.  As such, I am responsible for oversight of the Regionwide programs, issues and

policies relative to the protection of fish and wildlife resources within the National

Wildlife Refuge System, including matters dealing with formulating and implementing

policies, standards, and procedures; coordinating Regionwide Program issues/policies

(e.g., refuge management, public use, compatibility, comprehensive planning and

outreach); developing short- and long-range plans, objectives, and priorities for ensuring

adherence to the laws and policies which govern the management of the Service; and

managing multimillion dollar budgets for assigned programs.  I perform a full range of

supervisory/managerial duties and responsibilities over four Divisions and two Branch

Offices.  These include the Division of Conservation Planning and Policy, Division of

Visitor Services and Communications, Division of Refuge Field Support, Division of

Realty, Office of Refuge Law Enforcement, and Office of National Wildlife Refuge

System Budget.  I also supervise the two Program Supervisors who provide direct

oversight to all of the Refuge Project Leaders in Region 5.  I have served in this capacity

since September 12, 2001.

     5.  As the Deputy Regional Chief, National Wildlife Refuge System, I am aware

of or was involved with the issues that are the subject of this proceeding, and am familiar

with the files from various Service offices that comprise the Service's Administrative

Record.

     6.  On May 11, 2007, the U.S. Fish and Wildlife Service's Northeast Regional

Office officially reorganized the management of two national wildlife refuges within the

State of Delaware into one Complex.  See Attachment A, organizational chart.

7. On May 31, 2007, the Regional Office assigned Lydia Terry Villanueva to be the Complex Manager (or Project Leader) for the newly reorganized Prime Hook/Bombay Hook National Wildlife Refuge Complex, later renamed the Coastal Delaware National Wildlife Refuge Complex. See Attachment A. Ms. Villanueva had previously been the Refuge Manager for Bombay Hook National Wildlife Refuge.

8. Ms. Villanueva assumed her new role on July 8, 2007. In that role, she is responsible for assuring the formulation of Complex priorities to be reflected in an Annual Work Plan, managing budget allocations, providing direction and counsel to complex staff, and all other duties of a Project Leader. See Attachment A.

9. As the Complex Manager, Ms. Villanueva also supervises the Refuge Managers for both Bombay Hook National Wildlife Refuge and Prime Hook National Wildlife Refuge. See Attachment A. When Ms. Villanueva assumed her new position, Oscar Reed became the Refuge Manager for Bombay Hook National Wildlife Refuge, replacing her. See Attachment A. As of July 8, 2007, the Refuge Manager for Prime Hook National Wildlife Refuge, Jonathan Schafler, was reassigned to be the Refuge Manager of Canaan Valley National Wildlife Refuge in West Virginia. See Attachment A. Since that time, Ms. Villanueva has assumed his Refuge Manager duties in addition to those as Complex Manager.

10. As to farming practices, Prime Hook National Wildlife Refuge had entered into annual cooperative farming agreements in past years, the last being for the calendar year 2006. No cooperative farming agreements have been executed this year, 2007. Farming is not currently occurring at Prime Hook National Wildlife Refuge. As I will describe, this will continue to be the case pending the completion of the Refuge's

comprehensive conservation plan (CCP). Through the development of the CCP, the

process for which is described below, we will determine whether and to what extent

farming may be resumed.

11. I am familiar with the Declaration of the former Prime Hook National

Wildlife Refuge Manager, Jonathan Schafler, who in both November 2006 and January

2007, met with Fred A. Bennettt III and Carlton Wells and Sons, Inc., at the Refuge

headquarters. See Attachment B. On both occasions, Mr. Schafler informed these

individuals that:  the Refuge did not intend to enter into cooperative farming agreements

for the 2007 farming season, and perhaps longer; and, that the ultimate determination as

to whether and when farming would resume would be made at the completion of the

Refuge's CCP process. See Attachment B. Fred A. Bennett III and Carlton Wells and

Sons, Inc., were the only two entities with which Prime Hook National Wildlife Refuge

had entered into cooperative farming agreements covering March 15, 2006 through

December 1, 2006. AR at 840-48, 849-54.

12. By memorandum to the Complex Manager on July 26, 2007, the Regional

Chief for the National Wildlife Refuge System in the Northeast Region of the U.S. Fish

and Wildlife Service conveyed his understanding and agreement that "beginning in

calendar year 2007, no farming is occurring on the [Prime Hook] refuge, and that none

will occur until the refuge fully examines and approves the need for cooperative farming

through the CCP process." See Attachment C. The Regional Chief also requested Ms.

Villanueva, as Complex Manager, to correspond in writing with the two 2006 cooperative

farming entities and inform them of such, thereby reiterating the Refuge position on

farming they had previously received verbally in November 2006 and January 2007. See

Attachment C. Ms. Villanueva was also instructed to provide similar responses to any

other farmers who inquire about or request cooperative farming agreements, pending

completion of the CCP. See Attachment C.

13. On August 6, 2007, Ms. Villanueva mailed the correspondence requested in

the above paragraph to Fred A. Bennett III and Carlton Wells and Sons, Inc. See

Attachment D. Those correspondence, which were identical in content stated in part:

> I want to confirm that the refuge's position remains unchanged. Pending
> the completion of the CCP, the refuge will not enter into annual farming
> cooperative agreements. Through the CCP public process, the refuge will
> thoroughly examine farming, among other things, in the context of the
> purposes for which the refuge was established, and habitat management.
> At the conclusion of that public process, with the completion of the CCP,
> the refuge will determine the degree to which, if any, farming will
> constitute a long-term refuge management tool.

Attachment D.

14. On August 1, 2007, Otis J. Clifton sent Senator Thomas R. Carper (DE)

correspondence asking "why Prime Hook National Wildlife Refuge is not using any of

the agriculture land for farming." See Attachment E, p. 2.

15. On August 17, 2007, Senator Carper's Office forwarded Mr. Clifton's inquiry

to the U.S. Fish and Wildlife Service for a response. See Attachment E, p. 1. On August

30, 2007, the Regional Director for the Service's Northeast Regional Office replied to

Sen. Carper's inquiry, noting in part:

> Farming had been permitted on portions of the refuge since its establishment,
> originally as a refuge management activity, and more recently as an economic
> use through cooperative farming agreements. As of 2006, approximately 600
> acres were managed under two cooperative farming agreements, resulting in the
> production of corn, soybeans, wheat, and pasture. During development of a
> required comprehensive conservation plan (CCP) for the refuge, which began in
> November 2005, and in response to a habitat management planning meeting held
> in July 2005 that Mr. Clifton attended, we received divergent public comments
> about the cooperative farming program, cropland management, and the refuge's
> compliance with applicable laws and policies. Recognizing the mixed

viewpoints and the need for a thorough evaluation of potential wildlife benefits associated with farming practices, we decided in 2006 that pending the completion of the CCP, the refuge will not enter into annual farming cooperative agreements. Because the 2006 season was underway, we did not disrupt the harvesting of crops, although we retained standing wildlife food crops, as usual. However, there were no cooperative farming agreements for the 2007 calendar year.

Through the CCP public process, the refuge will carefully examine farming, among other things, in the context of the purposes for which the refuge was established, and the mission of the NWRS. During all stages of the CCP and National Environmental Policy Act processes, the Service will consider and comply with applicable laws, regulations and policies; and, ensure that required documentation, including where appropriate, compatibility determinations for particular uses, is complete. At the conclusion of that public and scientifically based process (completion of the CCP), we will determine the degree to which, if any, farming will constitute a long-term refuge management tool for wildlife.

Attachment E, p. 3-4.

16. The CCP process, which I refer to in the above paragraphs, is a requirement enacted by Congress. The National Wildlife Refuge System Improvement Act of 1997 (Pub. L. 105–57) mandated that the U.S. Fish and Wildlife Service write CCPs for all national wildlife refuges and reevaluate them every 15 years or as needed. See 16 U.S.C. § 668dd(e) (A.R. 916-17).

17. A CCP describes the desired future conditions of a refuge or planning unit and provides long-range guidance and management direction to achieve the purposes of the refuge; helps fulfill the mission of the Refuge System; maintains and, where appropriate, restores the ecological integrity of each refuge and the Refuge System; helps achieve the goals of the National Wilderness Preservation System; and meets other mandates. See 50 C.F.R. § 25.12 (A.R. 953). The CCP process is also described on the Refuge's Web page at:

http://www.fws.gov/northeast/planning/Prime%20Hook/process.html

Additionally, the Service's Final Refuge Management Policy (65 Fed. Reg. 33892

(May 25, 2000); FWS Manual, Part 602, section 1; A.R. 1042-1070, 1071-1078)

and Comprehensive Conservation Planning policy (FWS Manual, Part 602,

section 3; A.R. 1079-1101), guide the development of CCPs.  The formal CCP

process provides for considerable public input, review and comment, which may

take a variety of forms.

      18.  The Refuge officially began its CCP process on October 17, 2005 by

publishing a Federal Register notice, alerting the public of its intent to prepare a CCP,

and an Environmental Assessment under the National Environmental Policy Act.

Attachment F.   The Refuge then held a series of three combined open houses and public

meetings in Dover, Lewes, and Milton, Delaware, in November 2005.  See A.R. 819-20.

The Refuge conducted additional CCP planning workshops for interested stakeholders,

including Plaintiff Delaware Audubon Society, between July 2006 and June 2007.  These

workshops focused, for example, on plan objectives, habitat management planning, and

resources of concern

      19.  Beginning in August 2007, Prime Hook National Wildlife Refuge posted a

document entitled "Prime Hook National Wildlife Refuge:  Conservation Planning

Update, August 2007" on its publicly accessible governmental Web page.  See

Attachment G; also available at

http://www.fws.gov/northeast/primehook/Newsletter_July07_Final.pdf.  This public

newsletter, which is one in a continuing series of Refuge planning updates, addresses

cooperative farming, by noting, in part:

> This year you may have noticed that the refuge appears a little different in
> areas that had been farmed in 2006, when approximately 600 acres were
> managed under two cooperative farming agreements resulting in the
> production of corn, soybeans, and cover crops. During the CCP process,

which began in November 2005, and in response to a habitat management planning meeting held in July of 2005, we received considerable public comments regarding the cooperative farming program and cropland management. Recognizing the various viewpoints and the need for a thorough evaluation of our farming practices, we decided that pending the completion of the CCP, the refuge will not enter into annual farming cooperative agreements. As such, beginning in 2007, there has been no farming at the refuge, although standing crops planted in 2006 to benefit wildlife were not harvested, as planned.

20. Presently, the Refuge expects to have a draft CCP, draft NEPA and draft compatibility determinations available for public review and comment sometime in 2008. The Refuge will then evaluate those comments and finalize the CCP, and accompanying NEPA documentation, and other required determinations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _25_ day of September, 2007.


Susan R. McMahon
Deputy Regional Chief
National Wildlife Refuge System
U.S. Fish and Wildlife Service

DECLARATION OF SUSAN R. MCMAHON

# ATTACHMENT A



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
### 300 Westgate Center Drive
### Hadley, MA 01035-9589

In Reply Refer To:
FWS/Region 5/NWRS

MAY 3 1 2007

Memorandum

To:         Wildlife Refuge Manager, Bombay Hook National Wildlife Refuge

From:       Deputy Regional Chief, National Wildlife Refuge System

Subject:    Change in Scope of Current Work Duties

As you are aware, Bombay Hook National Wildlife Refuge (NWR) and Prime Hook NWR were complexed as outlined in the June 29, 2006, approved Phase 1 Strategic Workforce Plan. Attached is an approved organizational chart for Bombay Hook/Prime Hook NWR Complex. The Senior Leadership Team has already implemented a number of changes as outlined in the plan, and we are moving forward with implementing the final changes.

We are assigning you as the Project Leader for Bombay Hook/Prime Hook NWR Complex, giving you supervisory and management authority for both refuges. This assignment will take effect July 8, 2007. In your reassigned capacity, you will be responsible for assuring the formulation of complex priorities to be reflected in an Annual Work Plan, managing budget allocations, providing clear direction and counsel to complex staff, and all other usual duties of a Project Leader.

You will directly supervise Oscar Reed, Wildlife Refuge Manager, Bombay Hook NWR, and the Wildlife Refuge Manager for Prime Hook NWR. That position will be vacant July 8, 2007, following the reassignment of Jonathan to Canaan Valley NWR, and we will fill the position vacancy as soon as possible.

Bombay Hook/Prime Hook NWR Complex is one of our most important complexes in the Region, which is why it was designated as a focus refuge in the strategic workforce plan, and is recognized as such by the Washington Office. We are confident you will seek every opportunity to ensure that the complex operates as effectively as possible, while facilitating collaborative interaction among the stations' supervisors and staff to accomplish the most important needs of the complex.

Thank you in advance for your cooperation with this assignment. Please contact me at 413-253-8551 if you have any questions on this change.



U.S. Fish and Wildlife Service
Northeast Region
Regional Chief, National Wildlife Refuge System
Bombay Hook/Prime Hook NWR Complex



Wildlife Refuge Manager
GS-0485-13 51550

Wildlife Refuge Manager
GS-0485-13 51560

Wildlife Refuge Manager
GS-0485-12 51550

Prime Hook NWR

Bombay Hook NWR

Maintenance Worker
WG-4749-8  51560

Park Ranger
GS-0025-9  51560

Administrative Support Assistant (OA)
GS-0303-6  51560

Supervisory Wildlife Biologist
GS-0486-12 51550

Wildlife Biologist (Vacant)
GS-0486-11 51550

Wildlife Biologist
GS-0486-11 51560

Outdoor Recreation Planner
GS-0023-9 51550

Recreation Aid
GS-0189-3 51550

Engineering Equipment Operator
WG-5716-10 51550

Maintenance Worker
WG-4749-8 51550

Park Ranger (LE/Refuge)
GL-0025-9 51550

Administrative Support Assistant
GS-0303-7  51550

Office Automation Assistant
GS-0326-5  51550

Regional Chief, NWRS          5/10/07          Date

Regional Director          Acting          5-11-07          Date

DECLARATION OF SUSAN R. MCMAHON

# **ATTACHMENT B**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELAWARE AUDUBON SOCIETY, <br> CENTER FOR FOOD SAFETY, and <br> PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, <br><br> Plaintiffs, <br><br> v. <br><br> Secretary, United States Department <br> of the Interior, DALE HALL, <br> Director, U.S. Fish and Wildlife Service, and <br> the U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil No. <br> ) 06-223-GMS <br> ) <br> ) <br> ) <br> ) <br> ) |

## DECLARATION OF JONATHAN I. SCHAFLER

I, Jonathan I. Schafler, hereby declare as follows:

1. I have an Associates Degree in the Administration of Justice and a Bachelor's Degree in Environmental Studies. I am also a graduate of the Penn State Executive Leadership Program for Natural Resource Managers and the U.S. Fish and Wildlife Service Refuge Management Academy.

2. I am a 21 year veteran of the United States Coast Guard Reserves currently assigned to Sector Delaware Bay in Philadelphia as the district training officer. I have been deployed three times including overseas in support of Operation Iraqi Freedom.

3. I have been employed with the United States Department of the Interior since 1987. I worked for the National Park Service from 1987 to 1997 at five different National Park Service units including Lake Mead National Recreation Area, Petrified Forrest National Park, Sequoia/Kings Canyon National Parks, San Juan National Historic Site, and Boston National Historic Park. My work with the National Park Service

included law enforcement, search and rescue, emergency medicine, and as a supervisor and Chief Park Ranger.

4. My previous assignments with the U.S. Fish and Wildlife Service include Supervisory Park Ranger at Kodiak National Wildlife Refuge (1997-2000), in Alaska managing that unit's public use program and at Crab Orchard National Wildlife Refgue (2000-2002), in Illinois as an Assistant Refuge Manager responsible for facilities and public use.

5. I am currently employed by the U.S. Fish and Wildlife Service as the Refuge Manager for Prime Hook National Wildlife Refuge in Milton, Delaware. I have been so employed at this location since September, 2002.

6. In my duties as Refuge Manager I have the overall responsibility for managing the public lands of this unit of the National Wildlife Refuge System. This includes, but is not limited to, administration and budget, staffing, personnel, public use, special use permitting, law enforcement policy, biological and ecological considerations, and community involvement.

7. As Refuge Manager, I am the responsible signatory on most special use permits, approvals, and cooperative agreements, including cooperative farming agreements.

8. For the calendar year 2006, farming between March 15 and December 1 was authorized through two cooperative farming agreements between Prime Hook National Wildlife Refuge and the following individuals or entities: Fred A. Bennett III , and J. Carlton Wells and Sons, Inc.

9.  Both Fred A. Bennett III and Glenn Wells of Carlton Wells and Sons, Inc, independently stopped by my office in November 2006 to discuss the prospects for farming during the calendar year 2007 at Prime hook National Wildlife Refuge.  During those conversations, I verbally informed both individuals that the Refuge ~~would~~ did not envision entering into cooperative farming agreement for the calendar year 2007, and perhaps longer, and that the ultimate determination as to whether and when farming would resume would be made at the completion of the Refuge's comprehensive conservation planning process, which is currently underway.   I was candid about this position out of concern they might unnecessarily or prematurely purchase seed or equipment, or needlessly incur lost opportunity costs.

10.  I had one additional conversation, individually, with  Fred A. Bennett III and Glen Wells in January at my Refuge Office, in which I reiterated what I had told them during our respective November meetings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  __/__  day of March, 2007.


Jonathan I. Schafler
Refuge Manager, Prime Hook National Wildlife Refuge
U.S. Fish and Wildlife Service

DECLARATION OF SUSAN R. MCMAHON

# ATTACHMENT C



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
300 Westgate Center Drive
Hadley, MA 01035-9589



In Reply Refer To:
FWS/Region 5/NWRS

JUL 2 6 2007

Memorandum

To:         Project Leader, Prime Hook/Bombay Hook National Wildlife Refuge Complex

From:       Regional Chief, National Wildlife Refuge System

Subject:    Notification to Calendar Year 2006 Cooperative Farmers at Prime Hook National Wildlife
            Refuge

I am aware that Jonathan Schafler, former Refuge Manager, Prime Hook National Wildlife Refuge, twice met with the two farmers with whom the refuge entered into cooperative farming agreements during the 2006 calendar year (March 15 to December 1). At each of these meetings, which occurred at the refuge headquarters office in November 2006 and January 2007, Jonathan advised them that the refuge did not intend to enter into cooperative agreements for the coming farming seasons pending completion of the comprehensive conservation plan (CCP). One of Jonathan's motivations in contacting the farmers in advance of what would have been the 2007 farming season was his concern that they might unnecessarily purchase seed or equipment, or needlessly incur lost opportunity costs.

It is through the CCP public process that the refuge will thoroughly examine farming, among other things, in the context of the purposes for which the refuge was established, and habitat management. At the conclusion of that public process, with the completion of the CCP, the refuge will determine the degree to which, if any, farming will constitute a long-term refuge management tool. During all stages of the CCP and National Environmental Policy Act (NEPA) processes, the U.S. Fish and Wildlife Service (Service) will: (1) Consider and comply with applicable laws, regulations and policies; and, (2) ensure that required documentation, including where appropriate, compatibility determinations for particular uses, is complete.

It is my understanding that beginning in calendar year 2007, no farming is occurring on the refuge, and that none will occur until the refuge fully examines and approves the need for cooperative farming through the CCP process. This approach reflects both the perspective of the Regional Office, as well as the refuge. I am requesting that you follow up with the two cooperative farmers from calendar year 2006 and provide them written confirmation of the above. I also request that you provide similar responses to any other farmers who inquire about or request cooperative farming agreements, pending completion of the CCP.

Thank you for your attention is this manner. Please contact me if you have any questions.

DECLARATION OF SUSAN R. MCMAHON

# ATTACHMENT D



# United States Department of the Interior



### FISH AND WILDLIFE SERVICE

Prime Hook/Bombay Hook NWR Complex
2591 Whitehall Neck Road
Smyrna, DE 19977

In Reply Refer To:
FWS/Region 5/NWRS

August 6, 2007

Fred A. Bennett III
24139 Sugar Hill Road
Milford, DE 19963

Dear Mr. Bennett:

I am writing you as the Project Leader of Prime Hook/Bombay Hook National Wildlife Refuge (NWR) Complex. You have previously entered into cooperative farming agreements with Prime Hook NWR, including the 2006 calendar year (March 15 to December 1). I wanted to take the opportunity to introduce myself, and convey my approach to cropland management in the foreseeable future. I also want to acknowledge your past cooperation and contributions toward the cropland management program.

I am aware that Jonathan Schafler, former Refuge Manager, Prime Hook NWR, met with you personally at the refuge near the conclusion of the 2006 farming season, and again in January 2007. It is my understanding from talking with Mr. Schafler that at each of these meetings, he advised you that the refuge did not intend to enter into annual cooperative farming agreements for the coming farming seasons pending completion of its comprehensive conservation plan (CCP), described below. One of Mr. Schafler's motivations in contacting you in advance of what would have been the 2007 farming season was his concern that you might unnecessarily purchase seed or equipment, or needlessly incur lost opportunity costs.

I want to confirm that the refuge's position remains unchanged. Pending the completion of the CCP, the refuge will not enter into annual farming cooperative agreements. Through the CCP public process, the refuge will thoroughly examine farming, among other things, in the context of the purposes for which the refuge was established, and habitat management. At the conclusion of that public process, with the completion of the CCP, the refuge will determine the degree to which, if any, farming will constitute a long-term refuge management tool. During all stages of the CCP and National Environmental Policy Act (NEPA) processes, the U.S. Fish and Wildlife Service (Service) will: (1) Consider and comply with applicable laws, regulations and policies; and, (2) ensure that required documentation, including where appropriate, compatibility determinations for particular uses, is complete.

The Service manages the refuge and other units of the National Wildlife Refuge System (NWRS) for the benefit of migratory birds, threatened and endangered plants and animals, and other species protected under Federal law. Habitats are to be managed at the refuge according to Service mandates and policies,

and management activities are continually modified to adapt to changing environmental conditions, habitat requirements, and evolving science. A CCP describes the desired future conditions of a refuge or planning unit; provides long-range guidance and management direction to achieve the purposes of the refuge; helps fulfill the mission of the NWRS; maintains and, where appropriate, restores the ecological integrity of each refuge and the NWRS; helps achieve the goals of the National Wilderness Preservation System; and meets other mandates. The National Wildlife Refuge System Improvement Act of 1997 (Pub. L. 105–57) mandates that the Service write CCPs for all national wildlife refuges and reevaluate them every 15 years, or as needed. We must also comply with NEPA when we develop our CCP. That planning provides a unique opportunity for the Service to involve individuals and local communities in the long-term management of refuges.

The refuge began its CCP effort in November 2005, holding a series of three combined open houses and public meetings in Dover, Lewes, and Milton. There have been numerous and repeated opportunities for public involvement throughout this process. When the combined Draft CCP and NEPA documentation is complete, there will be additional opportunities for formal public comment.

We have already received considerable public comments regarding the farming program and cropland management. We welcome and encourage your perspective on these and other issues for our consideration in the drafting and finalization of the Prime Hook NWR CCP.

Please contact me at 302-653-9345 if you have any questions.

Sincerely,

Terry Villanueva
Project Leader



# United States Department of the Interior



FISH AND WILDLIFE SERVICE

Prime Hook/Bombay Hook NWR Complex
2591 Whitehall Neck Road
Smyrna, DE 19977

In Reply Refer To:
FWS/Region 5/NWRS

August 6, 2007

J. Carlton Wells and Sons, Inc.
24868 Broadkill Road
Milton, DE 19968

Dear Mr. Wells:

I am writing you as the Project Leader of Prime Hook/Bombay Hook National Wildlife Refuge (NWR) Complex. You have previously entered into cooperative farming agreements with Prime Hook NWR, including the 2006 calendar year (March 15 to December 1). I wanted to take the opportunity to introduce myself, and convey my approach to cropland management in the foreseeable future. I also want to acknowledge your past cooperation and contributions toward the cropland management program.

I am aware that Jonathan Schafler, former Refuge Manager, Prime Hook NWR, met with you personally at the refuge near the conclusion of the 2006 farming season, and again in January 2007. It is my understanding from talking with Mr. Schafler that at each of these meetings, he advised you that the refuge did not intend to enter into annual cooperative farming agreements for the coming farming seasons pending completion of its comprehensive conservation plan (CCP), described below. One of Mr. Schafler's motivations in contacting you in advance of what would have been the 2007 farming season was his concern that you might unnecessarily purchase seed or equipment, or needlessly incur lost opportunity costs.

I want to confirm that the refuge's position remains unchanged. Pending the completion of the CCP, the refuge will not enter into annual farming cooperative agreements. Through the CCP public process, the refuge will thoroughly examine farming, among other things, in the context of the purposes for which the refuge was established, and habitat management. At the conclusion of that public process, with the completion of the CCP, the refuge will determine the degree to which, if any, farming will constitute a long-term refuge management tool. During all stages of the CCP and National Environmental Policy Act (NEPA) processes, the U.S. Fish and Wildlife Service (Service) will: (1) Consider and comply with applicable laws, regulations and policies; and, (2) ensure that required documentation, including where appropriate, compatibility determinations for particular uses, is complete.

The Service manages the refuge and other units of the National Wildlife Refuge System (NWRS) for the benefit of migratory birds, threatened and endangered plants and animals, and other species protected under Federal law. Habitats are to be managed at the refuge according to Service mandates and policies,

and management activities are continually modified to adapt to changing environmental conditions, habitat requirements, and evolving science. A CCP describes the desired future conditions of a refuge or planning unit; provides long-range guidance and management direction to achieve the purposes of the refuge; helps fulfill the mission of the NWRS; maintains and, where appropriate, restores the ecological integrity of each refuge and the NWRS; helps achieve the goals of the National Wilderness Preservation System; and meets other mandates. The National Wildlife Refuge System Improvement Act of 1997 (Pub. L. 105–57) mandates that the Service write CCPs for all national wildlife refuges and reevaluate them every 15 years, or as needed. We must also comply with NEPA when we develop our CCP. That planning provides a unique opportunity for the Service to involve individuals and local communities in the long-term management of refuges.

The refuge began its CCP effort in November 2005, holding a series of three combined open houses and public meetings in Dover, Lewes, and Milton. There have been numerous and repeated opportunities for public involvement throughout this process. When the combined Draft CCP and NEPA documentation is complete, there will be additional opportunities for formal public comment.

We have already received considerable public comments regarding the farming program and cropland management. We welcome and encourage your perspective on these and other issues for our consideration in the drafting and finalization of the Prime Hook NWR CCP.

Please contact me at 302-653-9345 if you have any questions.

Sincerely,

Terry Villanueva

Terry Villanueva
Project Leader

DECLARATION OF SUSAN R. MCMAHON

# ATTACHMENT E

08/17/2007 16:15 FAX 1 302 856 3001      SEN. CARPER OFC/CEO                    Ø002

THOMAS R. CARPER
DELAWARE

032675   R5-
         RD-Sign
         prepare reply

## United States Senate

WASHINGTON, DC 20510

August 17, 2007

| | |
|---|---|
| Date Received: | AUG 2 0 2007 |
| Lead RDT Member: | NWRS |
| Log Number: | 1083 |
| Due RD: | 8/29/07 |
| Action: | Prepare reply for RD Signature |
| cc: | RD DRD |
| | EA |
| DTS Response DCN: | 032675 |

Ms. Christine Eustis
Chief, Office of Congressional and Legislative Affairs
U.S. Department of the Interior
U.S. Fish and Wildlife Service
1849 C Street Northwest, Rm 3038
Washington, District of Columbia 20240-0001

Dear Ms. Eustis:

I am enclosing correspondence from Mr. Otis Clifton. I believe the correspondence is self-explanatory and adequately conveys the concerns of my constituent. I would appreciate your prompt and thorough review of this.

I have asked Mr. Tim Winstead, Sussex County Director, to look into this matter on Mr. Clifton's behalf. Correspondence may be mailed to the Office of U.S. Senator Thomas R. Carper, Attn: Mr. Winstead, 12 The Circle, Georgetown, Delaware 19947. If you have any questions, please feel free to contact Mr. Winstead in my Georgetown office at (302) 856-7690.

Thank you for your attention to this matter; I look forward to your response.

Sincerely,

Thomas R. Carper
United States Senate

August 1, 2007

Senator Thomas Carper
12 The Circle
Georgetown, Delaware 19947

Dear Senator Carper:

I would like to have an answer as to why Prime Hook National Wildlife
Refuge is not using any of the agriculture land for farming. Please do not tell
me that it is because we have to wait for the CCP plan to be completed. This
land has been used for agriculture for well over 300 years. This was before a
CCP plan was ever thought of . This land was taken from the people to be
used as a waterfowl refuge. The agricultural land was to be used to grow
crops to supplement foods for waterfowl, not to grow up into a forest.
Nothing has changed at this refuge since it was established, except for the
people who manage it. The same birds, ducks, and geese do the same things
they have always done.


Sincerely,

Otis J. Clifton


(Otis J. Clifton, 26103 Deep Branch Road, Milton, Delaware 19968)
(phone number is 302-684-4510)



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
300 Westgate Center Drive
Hadley, MA 01035-9589



In Reply Refer To:
FWS/R5/NWRS/032675

AUG 3 0 2007

The Honorable Thomas R. Carper
United States Senator
12 The Circle
Georgetown, Delaware  19947

Dear Senator Carper:

Thank you for your August 17, 2007, letter to Ms. Christine Eustis, Office of Congressional and
Legislative Affairs, and correspondence you received from your constituent, Mr. Otis J. Clifton.
Mr. Clifton questions why Prime Hook National Wildlife Refuge (NWR) is not managing the refuge for
agricultural use.  We have been asked to respond to you.

Prime Hook NWR was established in 1963 under authority of the Migratory Bird Conservation Act for
use as an inviolate sanctuary, or any other management purpose, expressly for migratory birds.  Since that
time, the purposes of the refuge have expanded under the auspices of the Refuge Recreation Act to
include fish and wildlife-oriented recreational development, the protection of natural resources, and the
conservation of endangered species.  The refuge provides many wildlife species with necessary habitats
crucial to their populations and survival.

Farming had been permitted on portions of the refuge since its establishment, originally as a refuge
management activity, and more recently as an economic use through cooperative farming agreements.  As
of 2006, approximately 600 acres were managed under two cooperative farming agreements, resulting in
the production of corn, soybeans, wheat, and pasture.  During development of a required comprehensive
conservation plan (CCP) for the refuge, which began in November 2005, and in response to a habitat
management planning meeting held in July 2005 that Mr. Clifton attended, we received divergent public
comments about the cooperative farming program, cropland management, and the refuge's compliance
with applicable laws and policies.  Recognizing the mixed viewpoints and the need for a thorough
evaluation of potential wildlife benefits associated with farming practices, we decided in 2006 that
pending the completion of the CCP, the refuge will not enter into annual farming cooperative agreements.
Because the 2006 season was underway, we did not disrupt the harvesting of crops, although we retained
standing wildlife food crops, as usual.  However, there were no cooperative farming agreements for the
2007 calendar year.

Mr. Clifton appears frustrated by the developing CCP and its affect on cooperative farming at the refuge.
He maintains that farming is a long standing practice in the area.  Though true, it is essential to recognize
that the National Wildlife Refuge System (NWRS), its mandates, its management, and its visitors'
expectations have changed since the refuge's establishment.  For instance, under the National Wildlife
Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System
Improvement Act of 1997 (16 U.S.C. 668dd–668ee), all lands in the NWRS are to be managed in
accordance with an approved CCP.  The plan guides management decisions and identifies refuge goals,

The Honorable Thomas R. Carper                                                                    2

long-range objectives, and strategies for achieving refuge purposes over a 15-year period. The planning process covers many elements, including wildlife and habitat management, visitor and recreational activities, cultural resource protection, and facilities and infrastructure. Subsequent U.S. Fish and Wildlife Service (Service) implementing regulations and policies developed following the above acts also impose fundamental standards for assuring that refuge lands are appropriately managed using the best available science to benefit wildlife and the habitats they rely upon. Notably, these include the planning policy, appropriate use policy, compatibility regulations and policy, and biological integrity, diversity, and environmental health policy. We are legally obliged to determine which existing (e.g., cooperative farming) or proposed uses of the refuge are appropriate and compatible.

Through the CCP public process, the refuge will carefully examine farming, among other things, in the context of the purposes for which the refuge was established, and the mission of the NWRS. During all stages of the CCP and National Environmental Policy Act processes, the Service will consider and comply with applicable laws, regulations and policies; and, ensure that required documentation, including where appropriate, compatibility determinations for particular uses, is complete. At the conclusion of that public and scientifically based process (completion of the CCP), we will determine the degree to which, if any, farming will constitute a long-term refuge management tool for wildlife.

Thank you for making us aware of the concerns of your constituent. We hope this letter explains the decision that the Service has made regarding farming on Prime Hook NWR. If you have additional questions or require further information, please contact Anthony D. Léger, Regional Chief, National Wildlife Refuge System, at 413-253-8550.

Sincerely,     *Acting*

Marvin E. Moriarty
Regional Director

Copy to your Washington Office

DECLARATION OF SUSAN R. MCMAHON

# ATTACHMENT F

Source: Legal > Federal Legal - U.S. > **FR - Federal Register** ⓘ
Terms: **ccp & prime w/1 hook** (Edit Search | Suggest Terms for My Search)

🖘Select for FOCUS™ or Delivery
☐

*70 FR 60365*

FEDERAL REGISTER

Vol. 70, No. 199

Notices

DEPARTMENT OF THE INTERIOR (DOI)

United States Fish and Wildlife Service (FWS)

**Notice of Intent to Prepare a Comprehensive Conservation Plan and Environmental Assessment for Prime Hook National Wildlife Refuge**

70 FR 60365

**DATE:** Monday, October 17, 2005

**ACTION:** Notice of intent.

**SUMMARY:** The Fish and Wildlife Service (Service) is preparing a Comprehensive Conservation Plan (**CCP**) and Environmental Assessment (EA) document for **Prime Hook** National Wildlife Refuge (NWR). This notice advises the public that the Service intends to gather information necessary to prepare a **CCP** and an EA pursuant to the National Wildlife Refuge System Administration Act of 1966, as amended, and the National Environmental Policy Act. The public is invited to participate in the planning process. The Service is furnishing this notice in compliance with the Service's **CCP** policy to:

1. Advise other agencies and the public of our intentions; and

2. Obtain suggestions and information on the scope of issues to include in the environmental documents.

The Service will solicit information from the public via open houses, meetings, and written comments. Special mailings, newspaper articles, refuge Web site postings, and announcements will provide information regarding opportunities for public involvement in the planning process. The first public meetings are scheduled for the week of November 7, 2005.

**DATES:** Please provide written comments to the address below by December 1, 2005.

*Send Comments To:* Thomas Bonetti, Refuge Planner, Fish and Wildlife Service, 300 Westgate Center Drive, Hadley, Massachusetts, 01035. Additional information is available on the refuge Web site at: *http://primehook.fws.gov.*

**FOR FURTHER INFORMATION CONTACT:** Thomas Bonetti, Refuge Planner, U.S. Fish and Wildlife Service, 300 Westgate Center Drive, Hadley, Massachusetts, 01035, 413-253-8307; or e-mail *northeastplanning@fws.gov.*

**SUPPLEMENTARY INFORMATION:** In accordance with the National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997 (16 U.S.C. 668dd-668ee), the Service is to manage all lands within the National Wildlife Refuge System in accordance with an approved **CCP**. The plan guides management decisions and identifies refuge goals, long-range objectives, and strategies for achieving refuge purposes. The planning process will consider many elements, including wildlife and habitat management, public recreational activities such as hunting and fishing, and cultural resource protection. Public input into the planning process is essential.

The **CCP** will provide other agencies and the public with information regarding the future desired conditions for the refuge and how the Service will implement management strategies. The Service will prepare an EA in accordance with procedures for implementing the National Environmental Policy Act of 1969 (42 U.S.C. 4321-4370d). Concurrent with the **CCP** process, the Service will conduct a wilderness review and incorporate a summary of the review into the **CCP,** as well as include compatibility determinations for all applicable refuge uses.

In 1963, **Prime Hook** NWR was established under the authority of the Migratory Bird Conservation Act for use as an inviolate sanctuary, or any other management purpose, expressly for migratory birds. Many farms and residences were once present on what is now the refuge. **Prime Hook** NWR was established primarily to preserve coastal wetlands as wintering and breeding habitat for migratory waterfowl. It is located on the west shore of Delaware Bay, 22 miles southeast of Dover, Delaware. Refuge habitat types are varied and are currently managed to maintain a diversity of wildlife species. **Prime Hook** NWR consists of over 9,700 acres, of which 7,400 acres are fresh marsh, tidal marsh, and open water. Other habitats include 1,000 acres of timber and brush and 1,300 acres of grasslands and croplands. Data collection has been initiated to create computerized mapping, including vegetation, topography, habitat types and existing land uses.

Comments received will be used to help identify key issues and to develop refuge goals, habitat management and visitor services strategies. Additional opportunities for public participation will occur throughout the planning process, which is expected to be completed in 2008. The outcome of this planning process will be a **CCP** to guide refuge management for the next 15 years.

Dated: September 21, 2005.

**Richard O. Bennett,**

*Acting Regional Director, Fish and Wildlife Service, Hadley, Massachusetts.*

[FR Doc. 05-20682 Filed 10-14-05; 8:45 am]

BILLING CODE 4310-55-P

Source: Legal > Federal Legal - U.S. > **FR - Federal Register** ⓘ
Terms: **ccp & prime w/1 hook** (Edit Search | Suggest Terms for My Search)
View: Full

DECLARATION OF SUSAN R. MCMAHON

# ATTACHMENT G

**U.S. Fish & Wildlife Service**

# Prime Hook National Wildlife Refuge

*Conservation Planning Update*

*August 2007*

**Plan to be completed in 2008**

Thanks for being a part of the Prime Hook National Wildlife Refuge Comprehensive Conservation Planning process. We want to take this opportunity to share with you the latest progress on the plan, as well as other recent refuge news and happenings. In our last update to you in December 2006, we said we anticipated a summer 2007 release of the plan. Since that time, as most of you now know, Project Leader Jonathan Schafler left to accept the refuge manager position at Canaan Valley NWR in West Virginia. The U.S. Fish and Wildlife Service, which oversees the state's refuges, has already started the search to hire a new refuge manager for Prime Hook, but that manager will be under the umbrella of the Bombay Hook-Prime Hook refuge complex. In July, Terry Villanueva, refuge manager at Bombay Hook, became Project Leader over both Delaware refuges. We now anticipate that the plan will be completed in 2008.

**Progress on the plan**

As before, we are still in the process of developing and evaluating alternatives. Alternatives are packages of complementary management objectives for achieving the missions of the Service and the National Wildlife Refuge System. Additionally, alternatives fulfill the vision and goals of the refuge while also responding to the issues and opportunities identified.

### Visit our website

Our website has links to information including refuge history, birding and hunting opportunities, current events, refuge activities, and more!

http://primehook.fws.gov/



*Standing: Governor Ruth Ann Minner, Deputy Secretary Lynn Scarlett; Terri and Richard Clifton; Regional Director Marvin Moriarty. Kneeling: U.S. Senator Thomas Carper; Ryan Clifton; John Tomke (President of Ducks Unlimited de Mexico).*

This year we have hosted a couple of technical workshops with diverse members of the natural resources community to discuss the importance of Prime Hook's habitat types and identifying the refuge's priority resources that merit conservation and management. One of the next steps in the planning process will be to discuss recreational objectives that will help us meet our public use goals and mandates.

**Refuge event a success!**

On July 14, the refuge hosted the Richard Clifton Hometown Event, a celebration in honor of Richard Clifton winning the 2006 Federal Duck Stamp Competition with a pair of swimming ring-necked ducks. The event, attended by Governor Ruth Ann Minner, United States Senator Thomas Carper and Deputy Secretary of the Interior Lynn

Scarlett, featured duck and goose calling contests, live music, live wildlife presentations, conservation displays, and a sale of Federal duck stamps featuring Richard's artwork. A great time was had by all!

**Upcoming photography contest**

The Friends of Prime Hook National Wildlife Refuge are sponsoring the Fourth Annual Nature Photography Contest in the fall of 2007. Entries will be accepted in three categories: Delmarva Scenery (landscapes or seascapes), Native Wildlife (birds, animals, insects, amphibians, etc.), and Native Flowers and Plants. For a full account of what can or cannot be included in an entry and of what counts as "native" with respect to the flora and fauna photographed, please consult the Refuge website—http:\\primehook. fws.gov. All entries should be either



*Will Betts of Milton, Delaware, shown here, demonstrates his duck calling skills during a special duck and goose calling contest at the Richard Clifton Hometown Event at Prime Hook National Wildlife Refuge. Mr. Betts eventually won the duck calling portion of the contest.*

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect and enhance fish, wildlife, plants and their habitats for the continuing benefit of the American people.*

**For more information, contact:**
Terry Villanueva, Refuge Manager
Prime Hook National Wildlife Refuge
11978 Turkle Pond Road
Milton, DE 19968
302/684 8419
302/684 8504 Fax
fw5rw_phnwr@fws.gov
http://primehook.fws.gov

**Federal Relay Service for the deaf and hard-of-hearing: 1 800/877 8339**

**U.S. Fish & Wildlife Service**
**http://www.fws.gov**
**August 2007**

 

mailed to the refuge office between September 9th and October 6th, or hand-delivered between September 17th and September 28th. The judging and awarding of prizes will take place during a reception for the artists and the public on Sunday, October 14th.

### Farming

This year you may have noticed that the refuge appears a little different in areas that had been farmed in 2006, when approximately 600 acres were managed under two cooperative farming agreements resulting in the production of corn, soybeans, and cover crops. During the CCP process, which began in November 2005, and in response to a habitat management planning meeting held in July of 2005, we received considerable public comments regarding the cooperative farming program and cropland management. Recognizing the various viewpoints and the need for a thorough evaluation of our farming practices, we decided that pending the completion of the CCP, the refuge will not enter into annual farming cooperative agreements. As such, beginning in 2007, there has been no farming at the refuge, although standing crops planted in 2006 to benefit wildlife were not harvested, as planned.

Through the CCP process, the refuge will thoroughly examine farming, among other things, in the context of the purposes for which the refuge was established, and habitat management. At the conclusion of that public process, with the completion of the CCP, the refuge will determine the degree to which, if any, farming will constitute a long-term refuge management tool. During all stages of the CCP and National Environmental Policy Act processes, the U.S. Fish and Wildlife Service will: Consider and comply with applicable laws, regulations and policies; and, ensure that required documentation, including where appropriate, compatibility determinations for particular uses, is complete.

We continue to encourage you to share your perspective on this and other issues for our consideration in the drafting and finalization of the Prime Hook National Wildlife Refuge CCP.



Bill Buchanan/USFWS

*Black-necked stilt*