**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DELAWARE AUDUBON SOCIETY, | ) | |
| CENTER FOR FOOD SAFETY, and | ) | |
| PUBLIC EMPLOYEES FOR | ) | |
| ENVIRONMENTAL RESPONSIBILITY, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-cv-223 |
| vs. | ) | |
| | ) | |
| Secretary, United States Department of the | ) | |
| Interior, DALE HALL, Director of | ) | |
| United States Fish And Wildlife Service, | ) | |
| and UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE, an administrative agency | ) | |
| of the United States Department of the | ) | |
| Interior, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS REPLY BRIEF IN SUPPORT**
**OF THEIR MOTION FOR SUMMARY JUDGMENT**

Vivian A. Houghton, DE Bar #2010
800 West Street
Wilmington, DE 19801
(302) 658-0518

William Rostov                          Paula Dinerstein
Kevin Golden                            Jeffrey Ruch
Center for Food Safety                  Public Employees For Environmental Responsibility
2601 Mission Street, Suite 803          2000 P Street, NW; Suite 240
San Francisco, CA 94110                 Washington, D.C. 20036
 (415) 826-2770                         (202) 265-7337

# TABLE OF CONTENTS

I.    DEFENDANTS BEAR A "HEAVY BURDEN" OF PROOF TO ESTABLISH
      MOOTNESS BASED ON THE ALLEGED VOLUNTARY CESSATION OF
      ALLOWING FARMING AT THE REFUGE ...................................................................4

II.   DEFENDANTS HAVE FAILED TO CARRY THEIR HEAVY BURDEN OF
      PROOF TO ESTABLISH MOOTNESS BASED ON THE ALLEGED
      VOLUNTARY CESSATION OF ALLOWING FARMING AT THE REFUGE .......5

      A.    The Facts Of This Case Show That The Most Likely Reason For The
            Defenants' Voluntary Cessation Of Allowing Farming On The Refuge
            Was To Avoid Litigation ..........................................................................................6

            a.   Defendants' Conduct Immediately Prior To This Litigation ............................7

            b.   Defendants' Conduct In the Settlement Negotiations Of This Case ..................8

            c.   The Lateness Of Defendants' Mootness Claim ..................................................8

      B.    Defendants Are Not Entitled To Any "Presumption" That Requires A
            Finding Of Mootness .............................................................................................11

CONCLUSION  ......................................................................................................................14

# TABLE OF CITATIONS

## FEDERAL CASES

*Armster v. United States District Court for the Central District of California,*
806 F.2d 1347 .................................................................................................................6, 10

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971).....................................11

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 and 289 n. 10 (1982) ..................4

*Clarke v. United States,* 915 F.2d 699 (D.C. Cir. 1990) .............................................................12

*Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.2d 1320 (11th Cir. 2004) ..............11

*Friends of the Earth v. Laidlaw Envt'l Services, Inc.*, 528 U.S. 167, 189 (2000) ........................4

*Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir. 1991) .................................5, 12

*Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir. 1988) .................................................5, 9, 11

*Sasnett v. Litscher,* 197 F.3d 290, 291-92 (7th Cir. 1999)........................................................6, 10

*United States v. Chemical Foundation*, 272 U.S. 1 (1924) ........................................................11

*United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ...................4

*United States v. Gov't of Virgin Islands,* 363 F.3d 276, 285 (3d Cir. 2004) .......................5, 6, 9

*United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ........................................................4

*Walling v. Helmrich & Payne, Inc.*, 323 U.S. 37, 43 (1944).......................................................10

## FEDERAL STATUTES

16 U.S.C. §668dd *et seq.* ...............................................................................................................3

42 U.S.C. § 4331 et seq. ..................................................................................................................3

## OTHER

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3533.7 (2d ed.
2004) ...............................................................................................................................................5

Plaintiffs Delaware Audubon Society, Center for Food Safety, and Public Employees for Environmental Responsibility hereby submit their Reply Brief in Support of their Motion for Summary Judgment.

Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Mem. Opp.") is striking in what it fails to do. Despite their burden to respond, Defendants fail to offer any challenge to Plaintiffs' standing, the factual basis for Plaintiffs' claims, or the law which governs Plaintiffs' claims. Defendants do not contest that, despite the clear statutory requirements of the National Wildlife Refuge System Administration Act, 16 U.S.C. §668dd *et seq.*, they failed to make the required compatibility determinations before allowing farming at the Prime Hook Wildlife Refuge. Nor do they contest that, despite the clear requirements of the National Environmental Policy Act, 42 U.S.C. § 4331 et seq., Defendants failed to perform the required Environmental Assessment and Environmental Impact Statement before allowing the planting of Genetically Modified Crops at the Refuge. Defendants' failure to acknowledge the legal requirements asserted by Plaintiffs here necessitates a court ruling on the legal issues in this case. In completely failing to challenge the merits of Plaintiffs' claims as Rule 56 requires, Defendants have acquiesced to Plaintiff's claims that they violated these statutes in this case.

Defendants have instead hung their hat on the slender reed of mootness, claiming that their post-litigation decision to voluntarily cease allowing farming at the Refuge until the completion of a Comprehensive Conservation Plan renders Plaintiffs' claims no longer capable of adjudication by this Court. The Court should reject Defendants' mootness argument. Defendants have failed to carry their "heavy burden" of showing that their voluntary cessation renders this case moot. With liability unchallenged and a continuing live controversy, the Court should grant Plaintiffs' Motion for Summary Judgment.

I.     **DEFENDANTS BEAR A "HEAVY BURDEN" OF PROOF TO ESTABLISH MOOTNESS BASED ON THE ALLEGED VOLUNTARY CESSATION OF ALLOWING FARMING AT THE REFUGE**.

Defendants' mootness argument rests on one single fact:  the alleged voluntary cessation of the thirty-plus year practice of allowing farming on the Refuge, including the recent practice of allowing the use of GMO crops.  The Supreme Court has stated "[i]t is well settled that " 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" for "if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.' " *Friends of the Earth v. Laidlaw Envt'l Services, Inc.*, 528 U.S. 167, 189 (2000) (*quoting City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 and 289 n. 10 (1982)); see *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot").  When the basis for mootness is voluntary cessation, "[a] case *might* become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw,* 528 U.S. at 191 (emphasis added).  Precisely because the voluntary cessation of allegedly wrongful activity can be undone by an equally voluntary decision to resume the conduct, courts have consistently held that "[t]he heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968); *see Laidlaw*, 528 U.S. at 189 (*quoting Concentrated Phosphate*).

Defendants completely ignore the Supreme Court's clear and long-standing requirement of their burden of proof.  However, this Court should hold Defendants to the established legal standard governing mootness based on voluntary cessation.  Application of that standard shows

that the Defendants have utterly failed to carry their burden, and thus their mootness argument is without merit.

## II.    DEFENDANTS HAVE FAILED TO CARRY THEIR HEAVY BURDEN OF PROOF TO ESTABLISH MOOTNESS BASED ON THE ALLEGED VOLUNTARY CESSATION OF ALLOWING FARMING AT THE REFUGE.

At its core, Defendants' mootness argument rests on the legally deficient assertion that a "presumption" of future government compliance means that violations cannot be reasonably expected to recur. Mem. Opp. 15- 16. This argument ignores the law on voluntary cessation. A close examination of the law as applied to the facts of this case shows that Defendants have failed to carry their heavy burden.

In cases involving voluntary cessation of challenged conduct by public officials, courts generally require that the cessation of challenged conduct be accompanied by circumstances indicating the change is a "genuine" act of "self-correction" in order to find mootness. *See Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir. 1991); *see also* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3533.7 (2d ed. 2004) (noting that while "[c]ourts are more apt to trust public officials than private defendants to desist from future violations ... the tendency to trust public officials is not complete ... nor is it invoked automatically"). Where the governmental defendant has ceased to engage in the challenged conduct only for practical or strategic reasons—such as avoiding litigation—the cessation does not make the case moot. *See United States v. Gov't of Virgin Islands,* 363 F.3d 276, 285 (3d Cir. 2004) (holding that where Government of Virgin Islands withdrew from challenged contract just before litigation was initiated and governor offered only general reason that withdrawal was in the "best interest" of the Virgin Islands, voluntary cessation was likely only a strategic move to avoid litigation and therefore case was not moot); *Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th

Cir. 1988).

The case law suggests that a key factor in determining whether a government defendant's voluntary cessation of alleged wrongful conduct renders a case moot is whether the defendant has shown that the change in conduct was the result of serious deliberation and made for convincing reasons other than the desire to avoid litigation, *see e.g.*, *Gov't of Virgin Islands,* 363 F.3d at 285.   Under the facts of this case, this factor strongly points away from a finding of mootness here.

> **A.   The Facts Of This Case Show That The Most Likely Reason For The Defendants' Voluntary Cessation Of Allowing Farming On The Refuge Was To Avoid Litigation.**

As noted above, the Third Circuit has found that voluntary cessations of wrongful activity by governmental defendants that is motivated by litigation purposes does not render a case moot. In a related vain, where a government defendant has not acknowledged that its past conduct is illegal, courts are less likely to find a cessation of challenged conduct makes the case moot. *See Armster v. United States District Court for the Central District of California,* 806 F.2d 1347, 1359 (9th Cir. 1986) (holding that where Justice Department did not concede that challenged conduct was illegal, bare assertion that it would not recur was insufficient to establish mootness because "[i]t has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based on a recognition of the initial illegality of that conduct"); *see also Sasnett v. Litscher,* 197 F.3d 290, 291-92 (7th Cir. 1999).

The facts in this case strongly suggest that avoidance of litigation (and the system-wide precedent that a ruling in this case would set) likely motivated the Defendants' voluntary cessation.   This can be seen in:   (a) the Defendants' conduct immediately prior to the commencement of this litigation; (b) the Defendants' conduct in the settlement negotiations of

this case; and (c) the lateness of Defendants' mootness claim.

a.      *Defendants' Conduct Immediately Prior To This Litigation*

Defendants do not offer any rationale why they chose to voluntarily cease their practice of allowing farming at the Refuge.  Instead, one has to parse through the vague references and attachments to find some kind of explanation.  The most direct is contained in a letter written to Senator Carper's office on August 30, 2007—**one week after the Plaintiffs had filed the present Motion for Summary Judgment**.  In that letter, the Regional Director for the Fish and Wildlife Service's Northeast Regional Office claimed that, starting in July 2005 Defendants had received "divergent public comments" about farming at the Refuge, and that these "mixed viewpoints" led to a decision not to enter into cooperative farming agreements.  *See* McMahon Declaration, ¶ 15 and Attachment E thereto at pp. 3-4.  The contemporaneous evidence in the Administrative Record prepared for this litigation, however, shows no such qualms about allowing farming during late 2005 and early 2006:

> \*       On December 5, 2005, Anthony Leger, the Regional Chief for the National Wildlife System within FWS, wrote Gene Hocutt at PEER taking the position that farming was a compatible use and that a written Compatibility Determination was not needed.  (A.R. US 000803-05)  On the issue of GMOs, Legar took the position that GMOs will be considered within the CCP process without any claim that their use need be suspended until the CCP process was completed.

> \*       On January 13, 2006, Jonathon Schafler, the Prime Hook Refuge Manager, wrote an email to Mark Martell of Delaware Audubon (A.R. US 000807-09) and stated: "No cooperative farmer gets more than a year's contract until we decide the farming policy through the CCP" (AR 808).  In other words, Cooperative Farming Agreements would not be banned until the CCP process was completed—only limited to a year in length.

> \*       In January or February 2006, the Refuge entered into Cooperative Farming Agreements with Fred Bennett III (A.R. US 000840-48) and Carlton Wells & Sons, Inc. (A.R. US 000849-54).

Thus, despite hearing "divergent public comments" and "mixed viewpoints" eight months earlier, all evidence indicates that the Refuge and the FWS were full speed ahead on farming at the Refuge up to the date that Plaintiffs filed their complaint in this case—April 4, 2006.

> b.    *Defendants' Conduct In the Settlement Negotiations Of This Case*

Only after the Plaintiffs filed their complaint did the Defendants start to change their tune, and then only slowly. As this Court is aware from the numerous extensions of time sought by the Defendants to answer, the parties negotiated a tentative settlement of this case in August 2006. *See* Docket No. 18 (August 15, 2006 letter from US Attorney to the Court). The settlement broke down in February 2007. *See* Docket Nos. 22 (February 26, 2007 letter from Vivian Houghton to the Court); 23 (February 26, 2007 letter from US Attorney to the Court). Thus, the contacts by the Refuge Manager with the farmers in November 2006 and January 2007 that Defendants now tout as evidence of their decision to voluntarily cease allowing farming, *see* McMahon Decl. ¶ 11 and Attachment B thereto, were likely driven by the tentative settlement of this litigation, not by some serious, deliberative process or policy.

> c.    *The Lateness Of Defendants' Mootness Claim*

After the settlement broke down in early February 2007, the Defendants were forced to answer Plaintiffs' complaint. Their answer, filed February 28, 2007, makes no mention of the decision (supposedly made in 2006) to voluntarily cease allowing farming at the Refuge until the CCP process is completed. Nor does the Answer raise the issue of mootness at all.

The first mention of mootness came in the Status Report filed June 8, 2007, and thereafter Defendants commenced what appears to be a concerted campaign to create a record to support a claim of mootness. On July 26, 2007, the Regional Chief for the National Wildlife Refuge System (who in December 2005 said compatibility determinations were not needed and

GMOs would be dealt with but not prohibited until the CCP process was complete (*see* A.R. US 000803-805)) issued a memo expressing his understanding that farming will not occur until the CCP process was complete. *See* McMahon Decl. at ¶ 12 and Attachment C thereto. On August 6, 2007, the Complex Manager sent a letter to the cooperative farmers to "confirm" that no farming will occur until the CCP process is complete. McMahon Decl. at ¶ 13 and Attachment D thereto. And on August 30, 2007, the above-referenced letter to Senator Carper's office was sent.

From this evidence, the conclusion is inescapable that Defendants' mootness claim arose from litigation concerns. No evidence exists that the Defendants did anything to stop farming until well after this case was filed. Defendants, faced with having to respond to Plaintiffs' Motion for Summary Judgment and the prospect that an award of relief to Plaintiffs would create a damaging precedent for Defendants, are now trying to short-circuit judicial consideration of their conduct via mootness. This threat of bad precedent is not mere speculation. As Defendants themselves admit, farming occurs on 181 out of nearly 500 National Wildlife Refuges nationwide. Mem. Opp. p. 2. Based on limited review of documents from other refuges, the problems of allowing farming without compatibility determinations and allowing the use of GMOs without any environmental assessments is not limited to Prime Hook alone. *See* Rostov Decl. ¶ 4. Defendants' late assertion of mootness here appears designed to shield the Defendants from the inexorable effects of collateral estoppel on similar claims elsewhere. Such litigation motives preclude findings of mootness. *See Gov't of Virgin Islands,* 363 F.3d at 285; *Ragsdale*, 841 F.2d at 1366 (finding claim not moot because "the State produced no pre-existing documentation of the policy. We share the district court's concern that the State's position on this provision is asserted only in this litigation").

9

Further proving that the reason for the voluntary cessation does not support a finding of mootness is the fact that the Defendants have not acknowledged that their conduct at Prime Hook violated the NWRSAA, NEPA, and the APA. In the Factual background section of their brief, Defendants take the position that farming at the Refuge was "consistent with the Refuge system's Cropland Management guidance," Mem. Opp. 2, "serves a number of objectives" of the refuge, *id*. at 3, was "as permitted in the Refuge System Manual," *id*., and generally argues that both the farming and the use of GMOs was pursuant to and in compliance with various Refuge System policies. *Id*. 4-10. Defendants may be trying to keep their options open for the CCP process to provide the necessary cover for the resumption of farming with GMOs, but the utter failure to recognize that what the Defendants did was unlawful is fatal to the assertion of mootness here. As the Ninth Circuit said in denying a claim of mootness after a government assertion of voluntary cessation, "[i]t has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based on a recognition of the initial illegality of that conduct." *Armster,* 806 F.2d at 1359. *See Sasnet*, 197 F.3d at 291-92. *See also Walling v. Helmrich & Payne, Inc.*, 323 U.S. 37, 43 (1944) (defendant's decision to cease offering allegedly illegal contract terms two months after complaint was filed but before trial did not moot controversy where defendant failed to acknowledge illegality of conduct).

Quite simply, all evidence points to a litigation motive for the Defendants' sudden declaration of a voluntary cessation of allowing farming at the Refuge. That litigation motive, plus the utter failure to acknowledge the illegality of the underlying conduct here, means that the Defendants have not carried their heavy burden to show mootness.

**B.     Defendants Are Not Entitled To Any "Presumption" That Requires A Finding Of Mootness.**

A large part of Defendants' argument here rests on the claim of a "presumption" that governmental actors will follow the law such that a promise not to violate the law in the future is sufficient to establish mootness.  This is not an accurate statement of the law.  The "presumption" of agency "regularity and compliance" Defendants find in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971) and *United States v. Chemical Foundation*, 272 U.S. 1 (1924) is inapplicable here because (a) it refers to past decision making, having nothing to do with future conduct, (b) neither case dealt with mootness from a voluntary cessation of governmental conduct, and (c) it applies only in the absence of clear evidence to the contrary.  In this case, the evidence clearly shows that the Defendants violated the NWRSAA by allowing farming without making compatibility determinations for over 10 years and violated NEPA by allowing farming of GMOs without the necessary environmental analyses for six years.  Indeed, up to the filing of the complaint these same actors believed they had done nothing wrong despite the fact that Plainitffs Delaware Audubon and PEER raised the very concerns that drive this lawsuit.  *See* A.R. US000803-805, 807-809.  It is more than a bit of a stretch to claim that government officials who did not follow the law before will suddenly follow the law now— especially when they have not acknowledged that their previous course of conduct was wrongful.

The cases Defendants cite (Mem. Opp. 15-16) are easily distinguishable.  *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.2d 1320 (11th Cir. 2004), involved mootness based on the fact that the City had enacted a new ordinance which eliminated the constitutional infirmities of the old code.  There is no evidence that Defendants here changed any Refuge System policies, manuals, guidance, or anything else.  The assertion that Defendants will not engage in certain conduct in the future is a far cry from enacting a new law.  In *Ragsdale v.*

*Turnock*, 841 F.2d 1358 (7th Cir. 1988), the court specifically found a claim ***not*** moot even though the Defendant claimed he would not enforce the challenged reporting requirement because "the State produced no pre-existing documentation of the policy. We share the district court's concern that the State's position on this provision is asserted only in this litigation." *Id*. at 1366.  In other words, a claim of voluntary cessation that appears to be motivated by litigation strategy entitles the government actor to no solicitude or special "presumption" for mootness purposes.  The court in *Clarke v. United States,* 915 F.2d 699 (D.C. Cir. 1990) found that the voluntary cessation doctrine ***did not even apply*** in that case:

> We find that non-reenactment of a one-time condition that expired of its own terms cannot be viewed as cessation of conduct . . . In essence, Congress shot an arrow into the air, and it fell to earth.  It stretches the words beyond recognition to say that Congress "voluntarily ceased" anything merely because it refrained from shooting some more arrows after the first landed. More important, extension of the doctrine to this case would not fit its basic theory. While the cessation of an ongoing activity pending a lawsuit may well imply an intent to renew the activity once the court has dropped out, this is hardly true of Congress's allowing a one-time provision to pass into history by its own terms.

*Id*. at 705-06.  In fact, the only remotely applicable language of *Clarke*—"the cessation of an ongoing activity pending a lawsuit may well imply an intent to renew the activity once the court has dropped out"—supports Plaintiffs' position because it articulates the very risk inherent in Defendants' belated claim of voluntary cessation here.  In short, Defendants offer no valid legal support for their claim that the mere promise not to allow farming for some unknown period of time in the future justifies a "presumption" or a finding of mootness, especially in light of the clear litigation motive behind Defendants' voluntary cessation here.

In contrast, the cases cited in section A above involved governmental actors who voluntarily ceased the challenged conduct but whose promise did not result in a finding of mootness.  As Wright and Miller states (and cited by the 7th Circuit in *Magnuson*, 933 F.2d at

565), while "[c]ourts are more apt to trust public officials than private defendants to desist from future violations ... the tendency to trust public officials is not complete ... nor is it invoked automatically").  Rather, factors such as the Defendants' motive in claiming mootness must be explored.  Because Defendants failed to explain why they decided to voluntarily cease allowing farming at the Refuge, there is simply no evidence of the serious deliberation or long-standing policy that courts require in order to find mootness.  Indeed, all the evidence available strongly suggests that the mootness claim here is merely a litigation tactic to avoid a crippling precedent.  That is simply not enough to satisfy Defendants' "heavy burden" in this case and provides this Court with more than enough support to conclude that there is a risk of recurrence of Defendants' wrongful conduct such that Plaintiffs' claims are not moot.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Brief in Support of their Motion for Summary

Judgment, Plaintiffs have established that they are entitled to judgment as a matter of law on all

their claims.  Because this controversy is not moot, Plaintiffs Delaware Audubon Society, Center

for Food Safety, and Public Employees for Environmental Responsibility respectfully request

that this Court makes findings of fact and conclusions of law and enter summary judgment in

Plaintiffs' favor on all claims.

Respectfully submitted,

DELAWARE AUDUBON SOCIETY, CENTER FOR FOOD
SAFETY, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY


By:_____/S/_____
        Vivian A. Houghton, Esquire

Vivian A. Houghton DE Bar #2010
800 West Street
Wilmington, DE 19801
(302) 658-0518
Attorney for Plaintiffs

William Rostov
Kevin Golden
Center for Food Safety
2601 Mission Street, Suite 803
San Francisco, CA 94110
 (415) 826-2770 | fax (415) 826-0507
Attorneys for Center for Food Safety

Paula Dinerstein
Jeffrey Ruch
Public Employees For Environmental Responsibility
2000 P Street, NW; Suite 240
Washington, D.C. 20036
Tele: (202) 265.7337
Attorney for Public Employees for Environmental Responsibility

**U.S. Fish & Wildlife Service**

# Fax

*National Wildlife
Refuge System*



**Regional Office, Mountain-Prairie Region**
P.O. Box 25486, Denver Federal Center, Denver Colorado 80225-0486
134 Union Blvd., Lakewood Colorado 80228-1807
Telephone: 303 / 236 4305, **Fax 303 / 236 4792**

**To:**  J. Frederick Milton

**Fax Number:**

**From:**        Dave Linehan, 303 236-4308

**Date:**   9/6/07

**Pages to follow:**

**Subject:**  All SUP's allowing GMC's
on Refuge land. No eligibility
Questionnaires were completed &
no other documents found addressing
use of GMC's on Refuges in
Region 6.

                              Dave Linehan

 

**United States Department of the Interior**
U.S. FISH AND WILDLIFE SERVICE

COOPERATIVE FARMING AGREEMENT-ADDENDUM

Rodney Epping
Cooperator's name

12015 734 Road,Funk, NE 68940
Address

5/7/2007
Date of original agreement

**Rainwater Basin WMD, Nebraska**
Refuge name and State where located

Pursuant to the provisions of the cooperative farming agreement entered into on the date and by the persons indicated above, for the use of certain lands of the National Wildlife Refuge indicated, the Cooperator and the U.S. Fish and Wildlife Service hereby agree that crops shall be planted and the distribution of the harvest shall be as specified below for the Calendar Year 2007

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres / Fee) Harvested | Unharvested | Fee |
|---|---|---|---|---|---|---|---|
| Funk WPA | Peterson | roundup ready soybeans | 31.0 | 100 | | | $775.00 |
| | Pintail | roundup ready soybeans | 70.1 | 100 | | | $1,752.50 |
| | Mallard North | roundup ready soybeans | 68.0 | 100 | | | $1,700.00 |
| | Mallard SW | roundup ready soybeans | 44.0 | 100 | | | $1,100.00 |
| | Mallard SE | roundup ready soybeans | 54.0 | 100 | | | $1,350.00 |
| | Discount: (Reason stated below.) | | | | | | $5,008.12 |
| | **Total:** | | 267.1 | | | | **$1,669.38** |

Special Conditions (if none so state)

The cooperator is preparing the seed bed for preparation of seeding the area with a high diversity native seed mix.  The costs of preparation (chemical for Canada thistle control, planting without rows, multiple disking) will dramatically reduce the quality of the crop while still being extremely beneficial for our goals.


(Cooperator's Signature)

Brad Krohn  Biological Science Technician
(Issuing Officer's Signature)

5/7/2007

(Date)

(Date)

3-1492a (Rev. 4/78)



# United States Department of the Interior
## U.S. FISH AND WILDLIFE SERVICE

### COOPERATIVE FARMING AGREEMENT-ADDENDUM



| Chris Epping | 12015 734 Road,Funk, NE 68940 |
|---|---|
| Cooperator's name | Address |

| 5/7/2007 | **Rainwater Basin WMD, Nebraska** |
|---|---|
| Date of original agreement | Refuge name and State where located |

Pursuant to the provisions of the cooperative farming agreement entered into on the date and by the persons indicated above, for the use of certain lands of the National Wildlife Refuge indicated, the Cooperator and the U.S. Fish and Wildlife Service hereby agree that crops shall be planted and the distribution of the harvest shall be as specified below for the Calendar Year 2007

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres / Fee) Harvested | Unharvested | Fee |
|---|---|---|---|---|---|---|---|
| Funk | Willet North | rounup ready soybeans | 42.0 | 100 | | | $1,050.00 |
| WPA | Willet South | roundup ready soybens | 24.0 | 100 | | | $600.00 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

|  | Discount: (Reason stated below.) | | $1,237.50 |
|---|---|---|---|
| | **Total:** | 66.0 | **$412.50** |

Special Conditions (if none so state)

The cooperator is preparing the seed bed for preparation of seeding the area with a high diversity native seed mix. The costs of preparation (chemical for Canada thistle control, planting without rows, multiple disking) will dramatically reduce the quality of the crop while still being extremely beneficial for our goals.

| (Cooperator's Signature) | Brad Krohn  Biological Science Technician |
|---|---|
| | (Issuing Officer's Signature) |

| (Date) | 5/7/2007 |
|---|---|
| | (Date) |

3-1492a (Rev. 4/78)



**United States Department of the Interior**
U.S. FISH AND WILDLIFE SERVICE

COOPERATIVE FARMING AGREEMENT-ADDENDUM



Tim Erickson
Cooperator's name

73869 R Road,Funk, NE 68940
Address

5/7/2007
Date of original agreement

**Rainwater Basin WMD, Nebraska**
Refuge name and State where located

Pursuant to the provisions of the cooperative farming agreement entered into on the date and by the persons indicated above, for the use of certain lands of the National Wildlife Refuge indicated, the Cooperator and the U.S. Fish and Wildlife Service hereby agree that crops shall be planted and the distribution of the harvest shall be as specified below for the Calendar Year **2007**

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres / Fee) Harvested | Unharvested | Fee |
|---|---|---|---|---|---|---|---|
| Johnson WPA | Big Marsh Unit | round-up ready soybean | 104.0 | 100 | | | $2,600.00 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | Discount: (Reason stated below.) | | | | | | $1,950.00 |
| | **Total:** | | 104.0 | | | | **$650.00** |

Special Conditions (if none so state)

The cooperator is preparing the seed bed for preparation of seeding the area with a high diversity native seed mix.  The costs of preparation; chemical for Canada thistle control, planting 'no hill' rows, multiple discing, and the chance of not harvesting due to water will dramatically reduce the quality of the crop while still being extremely beneficial for our goals.  ATV use is allowed to check unit throughout the season.

_____
(Cooperator's Signature)

Brice Krohn  Supervisory Range Technician
(Issuing Officer's Signature)

_____
(Date)

5/7/2007
(Date)

3-1492a (Rev. 4/78)




# United States Department of the Interior
### U.S. FISH AND WILDLIFE SERVICE

## COOPERATIVE FARMING AGREEMENT-ADDENDUM

| Lavern Dannehl | 43634 Rd 736,Bertrand, NE 68927 |
|---|---|
| Cooperator's name | Address |
| 5/7/2007 | **Rainwater Basin WMD, Nebraska** |
| Date of original agreement | Refuge name and State where located |

Pursuant to the provisions of the cooperative farming agreement entered into on the date and by the persons indicated above, for the use of certain lands of the National Wildlife Refuge indicated, the Cooperator and the U.S. Fish and Wildlife Service hereby agree that crops shall be planted and the distribution of the harvest shall be as specified below for the Calendar Year 2007

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres / Fee) Harvested | Unharvested | Fee |
|---|---|---|---|---|---|---|---|
| Peterson WPA | North | rounup ready soybeans | 9.0 | 100 | | | $225.00 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

|  | Discount: (Reason stated below.) | | $225.00 |
|---|---|---|---|
| | **Total:** | 9.0 | **$0.00** |

Special Conditions (if none so state)

The cooperator is preparing the seedbed for preparation of seeding the area with a high diversity native seed mix in the fall/winter of 2007. The costs of preparation (disking, spraying, planting without rows) outweigh the income of the nine acres. The area was flooded and too wet for planting in 2006.

| | Brad Krohn  Biological Science Technician |
|---|---|
| (Cooperator's Signature) | (Issuing Officer's Signature) |
| | 5/7/2007 |
| (Date) | (Date) |

3-1492a (Rev. 4/78)

UNITED STATES DEPARTMENT OF THE INTERIOR
U. S. Fish and Wildlife Service

## COOPERATIVE FARMING AGREEMENT

| COOPERATOR'S NAME | ADDRESS |
|---|---|
| Robert Olstad    701-488-2295 (H)  701-430-0868 (C) | R.R. 1 Box 71<br>Galesburg, ND 58035 |

| PERIOD OF USE | REFUGE NAME, STATE AND LOCATION |
|---|---|
| October 1, 2005 through March 1, 2010 | Fullers Lake WPA - Steele County<br>T 144 N., R 55 W., SE1/4 Section 12 |

The U.S. Fish and Wildlife Service (FWS), for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the FWS indicated below, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Year | Fields(s) | Crop | Tillable Acres | Rental Fee | Deductions | Balance |
|---|---|---|---|---|---|---|
| 2006 | Field I | BREAKOUT<br>Soybeans (Organic) | 75 | 75 acres @ $43/acre = $3,225 | Disk 4 times ($6.50/ac) +Cultivate 2 times ($6.50/ac)<br>(Weed Control) | Fee = $3,225 – 25% Gov. share food plot =$2,418.75 - $2,925 Deduction = $506.25 Credit (Carry-over to 2007) |
| 2007 | Field I | Corn<br>(Round-Up Ready) | 75 | 75 acres @ $43/acre = $3,225 | Spray Round-up ($12.75/ac)<br>(Weed Control) | Fee:$3,225 - $506.25 credit carry-over - $956.25 Deduction = $1,762.50 Due (Carry-over to 2008) |
| 2008 | Field I | Soybeans | 75 | 75 acres @ $43/acre = $3,225 | Spray Pursuit ($12.75/ac)<br>(Weed Control) | Fee:  $3,225 Fee + $1,762.50 Carryover - $956.25 Deduction = $4,031.25 Due (Carry-over to 2009) |
| 2009 | Field I | Soybeans<br>(Round-Up Ready) | 75 | 75 acres @ $43/acre = $3,225 | Spray Round-Up ($12.75/ac)<br>(Weed Control) | Fee: $3,225 Fee + $4,031.25 carry-over - $956.25 = $6,300 Due (Carry over to 2010) |
| 2010 | Field I | Purchase Grass Seed | | | Purchase grass seed and chemical (actual cost, receipt required ) cost $4,725<br><br>Valley City WMD will determine seed mixture and chemical to purchase. The WMD will seed grass and apply chemical at the approiate time. | $6,300 carry-over - $4,725 grass seed and chemical =$1,575. |

1. The Cooperator agrees that agricultural crops of the type and acreage specified above must be planted during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.

2. These privileges are granted by the Fish and Wildlife Service and accepted by the undersigned, subject to the terms, covenants, obligations, and reservations, expressed or implied therein, and to the conditions and requirements appearing on the reverse side, and any special conditions indicated below.



Lake Andes Refuge Complex
38672 291st Street
Lake Andes, SD 57356
Telephone: 605-487-7603

# COOPERATIVE FARMING AGREEMENT

| Cooperator's Name | Address: | 38046 272nd Street |
| --- | --- | --- |
| Calvin Veurink | | Harrison, SD 57344 |
| | | 605/946-5786 |

| Period of Use: | Unit and Location: |
| --- | --- |
| From: May 1, 2006 | New Holland WPA |
| To: December 31, 2010 | Douglas County |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or Acres) | Government's Share Harvested | Unharvested |
| --- | --- | --- | --- | --- | --- | --- |
| 2006 | 1 | round-up ready crops (corn preferred) | ~20 | 100% | 0 | 0 |
| 2007 | | same as 2006 | " | 100% | 0 | 0 |
| 2008 | | same as 2006 | " | 100% | 0 | 0 |
| 2009 | | same as 2006 | " | 100% | 0 | 0 |
| 2010 | | same as 2006 | " | 100% | 0 | 0 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTALS | | | | | | |

1.  The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in made prior to planting season by an addendum, which is attached to and become part of the agreement.

2.  These privileges are granted by the U. S. Fish and Wildlife Service, and accepted by the undersigned, subject to t obligations, and reservations, expressed or implied therein, and to the conditions and requirements appearing on the r special conditions indicated below.

3.  SPECIAL CONDITIONS:  (If none, so state)
A.   The Service's objective for this management is to significantly reduce the presence of noxious weeds specifically Canada thistle.
B.  Permittee may farm as much of the WPA as is possible, east of non-maintained road.
C.  Permittee will control noxious weeds with the use of Roundup herbicide on all farmed areas as well as areas immediately adjacent to the farm field.
D. Permittee will bear all costs associated with planting, cultivating, spraying and harvesting of the crops.
E. The WPA will remain open to all hunting fishing and trapping as allowed by State regulations.
F. The Fish and Wildlife Service bears no liability for crop loss or damage from flooding, wind, hail, wildlife, hunters, or any other perils.
3. The Fish and Wildlife Service bears no liability for damage to farm equipment from rocks, trees or other objects.

_Calvin Veurink_     5-21-06
(Cooperator's Signature)     DATE

_Mark Hunt_     5-12-06
(Issuing Officer's Signature and Title)
Wetland Manager



**Lake Andes Refuge Complex**
38672 291ˢᵗ Street
Lake Andes, SD 57356
Telephone: 605-487-7603

# COOPERATIVE FARMING AGREEMENT

| Cooperator's Name | Address: | 38085 SD Hwy 44 |
|---|---|---|
| Willis DeLange | | Corsica, SD 57328 |
| | | 605/946-5544 |

| Period of Use: | Unit and Location: |
|---|---|
| From: May 1, 2006 | New Holland WPA |
| To: December 31, 2010 | Douglas County |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or Acres) | Government's Share Harvested | Government's Share Unharvested |
|---|---|---|---|---|---|---|
| 2006 | 1 | round-up ready crops (corn preferred) | 300 | 100% | 0 | 0 |
| 2007 | | same as 2006 | " | 100% | 0 | 0 |
| 2008 | | same as 2006 | " | 100% | 0 | 0 |
| 2009 | | same as 2006 | " | 100% | 0 | 0 |
| 2010 | | same as 2006 | " | 100% | 0 | 0 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTALS | | | | | | |

. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated, harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, e altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in ade prior to planting season by an addendum, which is attached to and become part of the agreement.

. These privileges are granted by the U. S. Fish and Wildlife Service, and accepted by the undersigned, subject to t bligations, and reservations, expressed or implied therein, and to the conditions and requirements appearing on the pecial conditions indicated below.

. SPECIAL CONDITIONS: (If none, so state)
. The Service's objective for this management is to significantly reduce the presence of noxious weeds specifically Canada thistle.
. Permittee may farm as much of the WPA as is possible, south of the evergreen trees and west of the non-maintained road.
. Permittee will control noxious weeds with the use of Roundup herbicide on all farmed areas as well as areas immediately adjacent to the farm field.
. Permittee will bear all costs associated with planting, cultivating, spraying and harvesting of the crops.
. The WPA will remain open to all hunting fishing and trapping as allowed by State regulations.
. The Fish and Wildlife Service bears no liability for crop loss or damage from flooding, wind, hail, wildlife, hunters, or any other perils.
. The Fish and Wildlife Service bears no liability for damage to farm equipment from rocks, trees or other objects.

| | |
|---|---|
| _Willis De Lang_  7/16/06 | _Mark Timm_  5-12-06 |
| (Cooperator's Signature)  DATE | (Issuing Officer's Signature and Title) |
| | Wetland Manager |

| 2007 | 4 | Winter wheat | " | 67% | 33% | 0 |
|---|---|---|---|---|---|---|
| 2008 | 1 | round-up ready soybeans | " | 67% | 33% | 0 |
| TOTALS | 1 | | 81 | | | |

1. The Cooperators agree that agricultural crops of the type and acreages specified above must be planted and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and become part of the agreement.

2. These privileges are granted by the U. S. Fish and Wildlife Service (Service), and accepted by the undersigned, subject to the terms, covenants, obligations, and reservations, expressed or implied therein, and to the conditions and requirements appearing on the reverse side, and any special conditions indicated below.

3. SPECIAL CONDITIONS: (If none, so state)

A. The Service's objective for this management is to convert monoculture tame grass grassland to a native grass/forb grassland to improve nesting cover and species diversity.

B. Cooperators will control noxious weeds with the use of a glyphosate-type herbicide on all farmed areas.

C. The Service will be responsible for 1/3 of the cost associated with fertilizing. Cooperators will bear all other costs associated with planting, spraying and harvesting of the crops.

D. The Fish and Wildlife Service bears no liability for damage from flooding, drought, wind, hail, wildlife, or any other perils.

E. The Fish and Wildlife Service bears no liability for damage to farm equipment from rocks, trees or other objects.

F. Cooperators will pay all fertilizer bills in full each year during this agreement and provide documentation to the Service of what the Service's 1/3 share of this bill would have been. Cooperators will also retain all crop proceeds each year during this agreement and provide documentation to the Service of what the Service's 1/3 share of the proceeds would have been. At the end of this agreement, the Service's total cost for fertilizer will be subtracted from the total crop proceeds due to the Service resulting in an amount due to the Service. Cooperators will be responsible for this amount due and agree to purchase native grass and forb seeds for use on the prairie restoration project.

Cooperator's Signature                          DATE  6-23-06

Michael A. Bryant
Issuing Officer's Signature and Title            DATE  6/23/06

08/24/2007 FRI 15:51 [TX/RX NO 9375]



Lake Andes Refuge Complex
38672 291ˢᵗ Street
Lake Andes, SD 57356
Telephone: 605-487-7603

RECEIVED

OCT 31 2006

LAKE ANDES NWR

# COOPERATIVE FARMING AGREEMENT

| Cooperator's Name | Address: |
|---|---|
| Mike Wojciechowski | 37964 280ᵗʰ St<br>Geddes, SD 57342<br>h) 605 243-2202 |

| Period of Use:<br>From: October 2, 2006<br>To: April 15, 2009 | Unit and Location:<br>Putnam WPA<br>Charles Mix County |
|---|---|

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Crop or Crop Group | Acres | Cooperator's Share (% or Acres) | Government's Share Harvested | Unharvested |
|---|---|---|---|---|---|---|
| 2007 | 1 | Roundup Ready crops | ~60 | 67% | 33% | 0 |
| 2008 | | Roundup Ready crops | " | 67% | 33% | 0 |
| 2009 | | Roundup Ready soybeans | " | 67% | 33% | 0 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTALS | | | | | | |

1. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated, and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and become part of the agreement.

2. These privileges are granted by the U. S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, covenants, obligations, and reservations, expressed or implied therein, and to the conditions and requirements appearing on the reverse side, and any special conditions indicated below.

3. SPECIAL CONDITIONS:  (If none, so state)
A. The Service's objective for this management is to significantly reduce the presence of non-native, invasive plants to all successful restoration of native grasses in the spring of 2010.
B. Cooperator may farm as much of the WPA as is possible, south of the cross fence.
C. Cooperator will control noxious weeds with the use of Roundup herbicide on all farmed areas as well as areas immediately adjacent to the farm field.
D. Cooperator will bear all costs associated with planting, cultivating, spraying and harvesting of the crops.
E. The field will remain open to hunting and trapping as allowed by State and Federal regulations.
F. The Fish and Wildlife Service bears no liability for crop loss or damage from flooding, wind, hail, wildlife, hunters, or any other perils.
G. The Fish and Wildlife Service bears no liability for damage to farm equipment from rocks, trees or other objects.
H. Up to 75% of the government's share will be a payment-in-kind used to purchase native grass seed for this restoration.

| | | | |
|---|---|---|---|
| (Cooperator's Signature) | 10·24·06<br>DATE | (Issuing Officer's Signature and Title)<br>Refuge Manager | 10/13/06<br>DATE |

DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service
COOPERATIVE FARMING AGREEMENT

| Cooperator's name | Address: | 9558 72nd St. NE |
| John Martinson  644-2617 | | Edmore, ND 58330 |

| Period of use: | Refuge Name and State where located |
| From: May , 2007 | Breakey WPA, Ramsey County |
| To: October , 2011 | T157N., R62W., Sec. 2, SE1/4 |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Year | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres) | |
| | | | | | | Harvested | Unharvested |
| Breakey WPA | T.157N., R.62W., sec.2, SE1/4 | 2007 | Breakout sod and cultivate | 72 | 0 | | 72 (seedbed prep) |
| | | 2008 | summer fallow and pick rock | 72 | 0 | | 72 (seedbed prep) |
| | | 2009 | Cooperator will seed small grain crop | 72 | 72 | | 0 |
| | | 2010 | Cooperator will seed RU Ready soybeans | 72 | 72 | | 0 |
| | | 2011 | Cooperator will seed RU Ready soybeans | 72 | 72 | | 72 (coop purchased grass seed) |

1. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated, and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.
2. These privileges are granted by the U.S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, convenants, obligations, and reservations contained therein.
3. Special conditions: (If none, so state)
   a) Cooperator will ensure that the pesticide will be applied in accordance with label restrictions and according to Fish and Wildlife Service Pesticide Use Proposal.
   b) Cooperator will purchase grass seed mixture (to be determined).
   c) No tillage will take place in the fall of 2011. Grass mixture will be no-till seeded into soybean stubble by FWS in the fall of 2011 or the spring of 2012.

4. Cooperative farmers are prohibited from participating in USDA farm subsidy programs involving refuge cropland, except for crop insurance on their share of refuge crops. In situations such as the 1988 drought relief legislation, managers may sign USDA certifications that an individual farmed certain acres on a refuge. This acreage should only include the cooperator's acres, not the refuge share.

| X _____ | X _____ |
| Cooperator's Signature | Issuing Officer's Signature and Title  Refuge Manager |
| X  7-10-07 | 6/15/07 |
| Date | Date |

3-1492 (Rev. 3/78)

DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service
COOPERATIVE FARMING AGREEMENT

| Cooperator's name | | Address: | 7155 100ᵗʰ AVE NE Edmore, ND 58330 |
|---|---|---|---|
| Rick Knoke | 644-2666 644-2648 (shop) | | |

| Period of use: From: May , 2006 To: May , 2010 | Refuge Name and State where located Martinson WPA Devils Lake WMD Devils Lake, ND |
|---|---|

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Year | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres) | |
|---|---|---|---|---|---|---|---|
| | | | | | | Harvested | Unharvested |
| Martinson WPA | T.156N., R.61W. E1/2 sec.31, | 2006 | Hay 144 acres & breakout sod | 144 | 144 | | 144 (seedbed prep) |
| | | 2007 | Cultivate 2x and Seed roundup ready soybeans | 65 | 65 | | 65 (seedbed prep) |
| | | 2008 | Seed roundup ready soybeans | 144 | 144 | | 144 (seedbed prep) |
| | | 2009 | Seed roundup ready soybeans | 144 | 144 | | 144 (seedbed prep) |
| | | 2010 | Seed roundup ready soybeans | 144 | 144 | Cooperator purchased grass seed | |

1. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated, and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.

2. These privileges are granted by the U.S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, convenants, obligations, and reservations contained therein.

3. Special conditions: (If none, so state)
   a) Cooperator will ensure that the pesticide will be applied in accordance with label restrictions and according to Fish and Wildlife Service Pesticide Use Proposal.
   b) Cooperator will purchase grass seed mixture (to be determined).
   c) No tillage will take place in the fall of 2007, 2008, 2009 and 2010. Grass mixture will be no-till seeded into soybean stubble by FWS in the spring of 2011.

4. Cooperative farmers are prohibited from participating in USDA farm subsidy programs involving refuge cropland, except for crop insurance on their share of refuge crops. In situations such as the 1988 drought relief legislation, managers may sign USDA certifications that an individual farmed certain acres on a refuge. This acreage should only include the cooperator's acres, not the refuge share.

| Cooperator's Signature | Issuing Officer's Signature and Title |
|---|---|
| Date | Date |

3-1492 (Rev. 3/78)

DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service
COOPERATIVE FARMING AGREEMENT

| Cooperator's name | Address: | 7155 100th AVE NE |
| --- | --- | --- |
| Rick Knoke    644-2666    644-2648 (shop) | | Edmore, ND 58330 |

| Period of use: From: May , 2007  To: May , 2009 | Refuge Name and State where located  Martinson WPA  Devils Lake WMD  Devils Lake, ND |
| --- | --- |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Year | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres) | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Harvested | Unharvested |
| Martinson WPA | T.158N., R.62W. NE1/4 sec.35, frac. NW1/4, Sec 36 | 2007 | Cultivate 3X and seed roundup ready soybeans | 105 | 105 | | 105 (seedbed prep) |
| | | 2008 | Seed roundup ready soybeans | 105 | 105 | | 105 (seedbed prep) |
| | | 2009 | Cooperator will puchase all or a percentage of grass seed mix determined by the FWS (FWS will plant the grass) | 105 | 0 | | 105 grass seed provided by cooperator Planted by the FWS |
| | | | | | | | |

1. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated, and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.
2. These privileges are granted by the U.S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, convenants, obligations, and reservations contained therein.
3. Special conditions: (if none, so state)
   a)  Cooperator will ensure that the pesticide will be applied in accordance with label restrictions and according to Fish and Wildlife Service Pesticide Use Proposal.
   b)  Cooperator will purchase grass seed mixture (to be determined).
   c)  No tillage will take place in the fall of 2007 or spring 2008. Grass mixture will be no-till seeded into soybean stubble by FWS in the spring of 2009.

4. Cooperative farmers are prohibited from participating in USDA farm subsidy programs involving refuge cropland, except for crop insurance on their share of refuge crops. In situations such as the 1988 drought relief legislation, managers may sign USDA certifications that an individual farmed certain acres on a refuge. This acreage should only include the cooperator's acres, not the refuge share.

| Cooperator's Signature | Issuing Officer's Signature and Title |
| --- | --- |
| Date | Date |

3-1492 (Rev. 3/78)

DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service
COOPERATIVE FARMING AGREEMENT

✻ Amended ✻

| ...rator's name | | | Address: | HC1 Box 25A |
|---|---|---|---|---|
| Knoke | 644-2666 | | | Edmore, ND |
| | 644-2648 (shop) | | | |

| ...riod of use: | | | Refuge Name and State where located |
|---|---|---|---|
| From: July 20 03 | | | Martinson WPA |
| To: October 20 07 | | | Devils Lake WMD |
| | | | Devils Lake, ND |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Year | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres) | |
|---|---|---|---|---|---|---|---|
| | | | | | | Harvested | Unharvested |
| Martinson WPA | T.158N., R.62W. W1/2 sec.35 | 2003 | Hay/spray/ breakout | 231 | 231(Hay) | | 231 (seedbed prep) |
| | | 2004 | summer fallow | 231 | 0 | | 231 (seedbed prep) |
| | | 2005 | small grain | 231 | 231 | 0 | 0 |
| | | 2006 | roundup ready soybeans | 231 | 231 | 0 | 0 |
| | | 2007 | Oats (cover crop) seed grass/weed control | 116 | 231 (oats) | | 231 (grass) |

1. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated, and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.

2. These privileges are granted by the U.S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, convenants, obligations, and reservations contained therein.

3. Special conditions: (If none, so state)
   a) Cooperator will ensure that the pesticide will be applied in accordance with label restrictions and according to Fish and Wildlife Service Pesticide Use Proposal.
   b) Cooperator will pack field before/after soybeans are seeded with USFWS provided packer
   c) Cooperator will purchase grass seed mixture (attached), and seed grass in spring 2007 with an oats cover crop. Grass will be seeded at a 45 degree angle to oats seeding between May 1,2007-May 30,2007.
   g) No tillage will take place in the fall of 2006 or spring 2007. Grass/oats mixture will be no-till seeded into soybean stubble.

4. Cooperative farmers are prohibited from participating in USDA farm subsidy programs involving refuge cropland, except for crop insurance on their share of refuge crops. In situations such as the 1988 drought relief legislation, managers may sign USDA certifications that an individual farmed certain acres on a refuge. This acreage should only include the cooperator's acres, not the refuge share.

_____
Cooperator's Signature

5/14/03
_____
Date

_____
Issuing Officer's Signature and Title

5/8/03
_____
Date

3-1492 (Rev. 3/78)

DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service
COOPERATIVE FARMING AGREEMENT

| Cooperator's name | Address: | HC1 Box 25A |
| --- | --- | --- |

Rick Knoke     644-2666
           644-2648 (shop)

Address:   HC1 Box 25A
        Edmore, ND

Period of use:
    From:   July     , 20 03
    To:   October    , 20 07

Refuge Name and State where located
     Martinson WPA
     Devils Lake WMD
     Devils Lake, ND

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Year | Crop or Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres) | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Harvested | Unharvested |
| Martinson WPA | T.158N., R.62W. W1/2 sec. 35 | 2003 | Hay/spray/ breakout | 231 | 231 (Hay) | | 231 (seedbed prep) |
| | | 2004 | summer fallow | 231 | 0 | | 231 (seedbed prep) |
| | | 2005 | small grain | 231 | 231 | 0 | 0 |
| | | 2006 | roundup ready soybeans | 231 | 231 | 0 | 0 |
| | | 2007 | roundup ready soybeans | 231 | 231 | | 231 (grass) |

1. The Cooperator agrees that agricultural crops of the type and acreage specified above must be planted, cultivated, and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.
2. These privileges are granted by the U.S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, convenants, obligations, and reservations contained therein.
3. Special conditions: (If none, so state)
    a)   Cooperator will ensure that the pesticide will be applied in accordance with label restrictions and according to Fish and Wildlife Service Pesticide Use Proposal.
    b)   Cooperator will pack field before/after soybeans are seeded with USFWS provided packer
    c)   Cooperator will purchase grass seed mixture (attached). The Service will seed grass in spring 2008.
    g)   No tillage will take place in the fall of 2006 or spring 2007. Grass/oats mixture will be no-till seeded into soybean stubble.

4. Cooperative farmers are prohibited from participating in USDA farm subsidy programs involving refuge cropland, except for crop insurance on their share of refuge crops. In situations such as the 1988 drought relief legislation, managers may sign USDA certifications that an individual farmed certain acres on a refuge. This acreage should only include the cooperator's acres, not the refuge share.

Cooperator's Signature

Issuing Officer's Signature and Title

Date

Date

3-1492 (Rev. 3/78)

## COOPERATIVE FARMING AGREEMENT
## OFFICE RECORD

### Agreement Number 07-001-CFA

This form is estimates equitability of the Cooperative Farming Agreement shares

| Cooperator's Name | Address |
|---|---|
| Tim and Randy Neva | 8254 14th St. SE<br>Kensal, ND 58455 |

| Period of Use | Refuge Name, Location |
|---|---|
| From:  Fall 2006<br>To:  Fall 2011 | Arrowwood NWR, T. 133 N., R. 64 W.,<br>section 34 |

| YEAR | FIELD | CROP | ACRES | FEE | DEDUCTIONS | BALANCE |
|---|---|---|---|---|---|---|
| 2006 | D10 | Hay/Spray Roundup | 137 | $3.50/acre for hay due to weeds and rough terrain = $480 | Chemical Weed Control @ $12.75/acre = $1,747 (NRCS Oct. 2006 Cost Data) | $1,267 credit applied to 2007 |
| 2007 | D10 | Roundup-Ready Soybeans | 137 | Estimated "Return to Labor & Mgmt." from 2007 NDSU Extension Service "Farm Mgmt Planning Guide = $33.50/acre; govt.'s 25% = $8.37/acre, or $1,147 | Chisel-plow to smooth field (seedbed prep) $9.00/acre = $1,233 | +$1,267 credit<br><br>-$1,147 fee<br><br>+$1,233 deductions<br><br>= +$1,353 to be applied in 2008 |
| 2008 | D10 | Spring wheat | 137 | Estimated return = $5.93; govt.'s 25% = $203 | | $1,353 credit carried over<br><br>-$203 fee<br><br>= +$1,150 to be applied in 2009 |

| | | | | | |
|---|---|---|---|---|---|
| 2009 | D10 | Roundup-Ready Soybeans | 137 | Estimated "Return to Labor & Mgmt." from 2007 NDSU Extension Service "Farm Mgmt Planning Guide = $33.50/acre; govt.'s 25% = $8.37/acre, or $1,147 | $1,150 credit carried over<br><br>-$1,147 fee<br><br>= +$3 |
| 2010 | D10 | Spring wheat | 137 | Estimated return = $5.93; govt.'s 25% = $203 | $3 credit carried over<br><br>-$203 fee<br><br>██████ |
| 2011 | D10 | Roundup-Ready Soybeans | 137 | Estimated "Return to Labor & Mgmt." from 2007 NDSU Extension Service "Farm Mgmt Planning Guide = $33.50/acre; govt.'s 25% = $8.37/acre, or $1,147 | No credit carried over<br><br>-$1,147 fee<br><br>██████ |

DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service
Arrowwood National Wildlife Refuge
Pingree, ND  58476
COOPERATIVE FARMING AGREEMENT

Agreement Number _07-001____

| Cooperator's Name:<br>Tim Neva and Randy Neva<br>(701) 952-2881 & 701-952-2118 (cell 701-320-9931) | Address:<br>818 17th St. NE<br>Jamestown, ND 58104 |
|---|---|
| Period of Use:<br>From:  March 1, 2007<br>To: September 30, 2012 | Unit and County Where Located<br><br>Arrowwood NWR – Unit D10 (Stutsman County) |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands on the National Wildlife Refuge System indicated above, for the cultivation, production and/or harvesting of agricultural crops, on a share basis as specified below:

| Year | Field | Crop or Crop Group | Acres | Cooperator's Share (Percent) | Government's Share (Percent) | |
|---|---|---|---|---|---|---|
| | | | | | Harvested | Unharvested |
| 2006 | D10 | Hay & Spray Roundup | 137 | | | |
| 2007 | D10 | RoundUP Ready (RR) Soybeans | 137 | | | |
| 2008 | D10 | Small Grains | 137 | | | |
| 2009 | D10 | RR Soybeans | 137 | | | |
| 2010 | D10 | Small Grains | 137 | | | |
| 2011 | D10 | RR Soybeans | 137 | | | |

1. The Cooperator agrees that agricultural crops of the type and acreage specified above must be planted, cultivated, and harvested during the year indicated.  If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to and becomes part of the agreement.

2. These privileges are granted by the U.S. Fish and Wildlife Service, and accepted by the undersigned, subject to the terms, covenants, obligations and reservations, expressed or implied therein, and to the conditions and requirements appearing on the reverse side and any special conditions indicated on an attached page.

_____
(Cooperator's Signature)

_____, Wildlife Refuge Specialist
(Issuing Officer's Signature and Title)

_____
(Date)

_____
(Date)



DEPARTMENT OF THE INTERIOR
U.S. Fish and Wildlife Service

COOPERATIVE FARMING AGREEMENT



| Cooperator's Name: Fred Shelton | Address: Route 1 Box 217A Amoret, MO  64722 |
|---|---|
| Period of Use: January 1, 2007 - December 31, 2008 | Refuge Name/State Where Located: Marais des Cygnes NWR Kansas |

The U.S. Fish and Wildlife Service, for and in consideration of the mutual benefits arising hereunder, grants to the Cooperator named above, privileges of using lands of the National Wildlife Refuge System indicated above, for the cultivation, production, and/or harvesting of agricultural crops, on a share basis as specified below:

| Farm Unit | Field | Crop/Crop Group | Acres | Cooperator's Share (% or acres) | Government's Share (% or acres) Harvested | Government's Share (% or acres) Unharvested |
|---|---|---|---|---|---|---|
| S-07 | 5 | Winter Wheat | 20.55 | 100% | | |
| | 6 | Winter Wheat | 15.32 | 100% | | |
| | 7 | Winter Wheat | 28.87 | 100% | | |
| | 8 | Winter Wheat | 30.76 | 100% | | |
| | 9 | Soybeans to Winter Wheat | 88.19 | 75% | 25% | |
| S-08 | 5 | Roundup Ready Soybeans | 20.55 | 100% | | |
| | 6 | Roundup Ready Soybeans | 15.32 | 100% | | |
| | 7 | Roundup Ready Soybeans | 28.87 | 100% | | |
| | 8 | Roundup Ready Soybeans | 30.76 | 100% | | |
| | 9 | Winter Wheat | 88.19 | 75% | | 25% |
| | 5 | Native Grass Mixture (see attached special conditions) | 20.0 | | | 100% |
| | 6 | Native Grass Mixture (see attached special conditions) | 15.0 | | | 100% |
| | 7 | Native Grass Mixture (see attached special conditions) | 30.0 | | | 100% |
| | 8 | Native Grass Mixture (see attached special conditions) | 30.0 | | | 100% |

1. The Cooperator agrees that agricultural crops of the type and acreages specified above must be planted, cultivated and harvested during the first year of operation. If this agreement is for more than one year, the type of crop, acreage, and distribution may be altered or modified annually, following the first year of operation, by mutual consent of both parties. Changes in the agreement must be made prior to planting season by an addendum, which is attached to this agreement.
2. These privileges are granted by the U.S. Fish and Wildlife Service and accepted by the undersigned, subject to the terms, covenants, obligations, and reservations contained therein.
3. Special Conditions: See Attached

_Fred E. Shelton_
(Cooperator's Signature)

_3-23-07_
(Date)

_Bryan Stahl_
(Issuing Officer's Signature and Title)

_3/26/2007_
(Date)

08/23/2007 THU 13:51  [TX/RX NO 9368]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DELAWARE  AUDUBON SOCIETY, | ) | |
| CENTER FOR FOOD SAFETY, and | ) | |
| PUBLIC EMPLOYEES FOR | ) | |
| ENVIRONMENTAL RESPONSIBILITY, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-cv-223 |
| | ) | |
| vs. | ) | |
| | ) | |
| Secretary, United States Department | ) | |
| of the Interior, DALE HALL, | ) | |
| Director of United States Fish | ) | |
| And Wildlife Service, and UNITED | ) | |
| STATES FISH AND WILDLIFE | ) | |
| SERVICE, an administrative agency | ) | |
| of the United States Department of the | ) | |
| Interior, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF WILLIAM B. ROSTOV IN SUPPORT OF PLAINTIFFS**
**SUMMARY JUDGMENT REPLY**

I, William B. Rostov, state:

1.   I am an attorney admitted to practice law in California.  I am a senior attorney with Plaintiff Center for Food Safety and counsel for Plaintiffs in this action.  I make this declaration based upon my own personal knowledge and if called upon to testify, could and would do so competently.

2.   I have been admitted Pro Hac Vice to represent the Center for Food Safety for this case in the United States District Court for the District of Delaware.

3.   On July 30, 2007, I sent Freedom of Information Act (5 U.S.C. § 552 ("FOIA")) requests to the Regional Headquarters for Regions one through six of the Fish and Wildlife Service of the Department of the Interior, requesting any documents pertaining

to Cooperative Farming Agreements for National Wildlife Refuges ("NWR") within

Region 6 for 2007 and 2008, any documents prepared pursuant to the National

Environmental Policy Act ("NEPA") pertaining to genetically modified crops ("GMCs")

from 2004 to the present, any documents pertaining to an "Essential Determination"

regarding GMCs from 2004 through the present date, all completed GMC Eligibility

Questionnaires, any documents pertaining to summaries of GMC acreage between 2004

and the present date plus any estimates for 2008, any documents containing information

regarding the approval or rejection of GMCs form 2004 through the present date, and any

documents about GMCs in NWRs from 2004 through the present date.

4.   I received a partial response to these FOIA requests that was dated September 17,

2007, including documents from Region Six.  Attached as Exhibit 1 to this declaration

are some of the documents sent to me by Region Six of the Fish and Wildlife Service.

These documents show that the planting of genetically modified, Roundup Ready

soybeans and corn have been approved by Region Six for 2007, and in some cases,

through 2010 and 2011.  On the fax cover sheet included in the response, notes from

Dave Linehan state that "No eligibility questionnaires were completed and no other

documents found [sic] addressing use of GMCs on Refuges in Region 6."  The response

shows that these refuges have no NEPA documents nor compatibility determinations

addressing the use of GMCs.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 23, 2007                     _____/s/_____

                                                  William B. Rostov