IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELAWARE AUDUBON SOCIETY, INC., CENTER FOR FOOD SAFETY, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, <br><br> Plaintiffs, <br><br> v. <br><br> Secretary of the U.S. Department of Interior, DALE HALL, Director of U.S. Fish and Wildlife Service, and U.S. FISH AND WILDLIFE SERVICE, an administrative agency of the U.S. Department of Interior, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 06-223-GMS ) ) ) ) ) ) ) ) ) |

**MEMORANDUM**

**I.   INTRODUCTION**

On April 5, 2006, the plaintiffs[1] filed a complaint in this action seeking both declaratory and injunctive relief. (D.I. 1.) In the complaint, the plaintiffs allege that the defendants[2] violated various federal environmental and wildlife conservation laws by, among other things, allowing cooperative farming and farming with genetically modified crops to take place at the Prime Hook

---

[1] The plaintiffs in this action are: (1) Delaware Audubon Society, Inc., (2) Center for Food Safety and (3) Public Employees for Environmental Responsibility (collectively, "Delaware Audubon" or the "plaintiffs").

[2] The defendants in this action are: (1) the Secretary of the U.S. Department of Interior, (2) Dale Hall, (3) the Director of the U.S. Fish and Wildlife Service, and (4) the U.S. Fish and Wildlife Service (collectively, "FWS" or the "defendants").

national wildlife refuge in Delaware. (*Id.*) Specifically, they allege that the defendants violated the: (1) Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq.* (the "APA"); (2) National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd *et seq.* (the "NWRSAA"); and the (3) National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.* ("NEPA"). (*Id.*) Presently before the court is the plaintiffs' motion for summary judgment. (D.I. 35.) For the reasons that follow, the court will grant the plaintiffs' motion and their request for injunctive relief.

## II.     BACKGROUND

The Prime Hook National Wildlife Refuge ("Prime Hook") is part of the National Wildlife Refuge System. (D.I. 32 at 9.) This refuge consists of approximately 10,000 acres of land located in Sussex County, Delaware. (*Id.*) It was formed in 1963 for use as a sanctuary and for the management of migratory birds. (*Id.*) Prime Hook's aim and primary purposes include: (a) providing a resting and feeding habitat for migratory birds, particularly waterfowl, and (b) providing a habitat for a variety of other species, such as ducks, the endangered Delmarva squirrel, and the southern bald eagle. (*Id.*) The defendants are responsible for overseeing and maintaining Prime Hook in accordance with various federal habitat preservation and wildlife conservation requirements. (D.I. 32 at 10.)

Prior to 2007, a small percentage of Prime Hook's acreage was also utilized for commercial agriculture, including private farming. (D.I. 32 at 9-10.) Specifically, from 1995 to 2007, Prime Hook entered into 37 cooperative farming agreements. (*Id.*) Under these agreements, farmers were permitted to harvest commodity corn or soybean crops at Prime Hook. (*Id.* at 10.) In return for these farming rights, the farmers were required to do certain work on the land, including, among other things, tilling and planting winter crops. (*Id.* at 10.) Before

entering these cooperative farming agreements, the defendants did not make any compatibility determinations or conduct any studies to assess whether these agricultural uses, including the harvesting of commodity crops, were "compatible" with Prime Hook's purposes. (D.I. 32 at 10.) In addition, in 2001, the defendants allowed 150 acres of agricultural land at Prime Hook to return to a natural vegetative state as part of a grassland breeding bird survey and an inventory of flora and fauna conducted by the State of Delaware. (*Id.* at 10.) When that study concluded, however, the defendants re-authorized the acreage for agricultural use -- again, without first determining whether such use was "compatible." (*Id.* at 11.)

In 2001, FWS also adopted a policy that prohibited the use of genetically modified crops or organisms (the "GMO Policy").[3] (D.I. 32 at 11.) Specifically, the GMO Policy states that:

> We do not allow refuge uses or management practices that result in the maintenance of non-native plant communities unless we determine there is no feasible alternative for accomplishing refuge purpose(s). ... *We do not use genetically modified organisms in refuge management unless we determine their use is essential to accomplishing refuge purpose(s)* and the Director approves the use.

(*Id.* at 11) (emphasis added). At that time, Prime Hook's stated goal in this regard was to phase out the use of genetically engineered crops because the crops "do not contribute to achieving refuge objectives." (*Id.*)

Starting in 2003, however, the defendants made repeated exceptions to their own GMO Policy, by continuing to allow genetically modified crops to be planted on Prime Hook -- despite evidence that these activities posed "significant environmental risks" to Prime Hook. (D.I. 32 at 12.) The defendants' own biologists identified several significant risks in connection with

---

[3] Note that "genetically modified crops" are also referred to as "genetically modified organisms." (D.I. 32 at 11.)

planting genetically modified crops at Prime Hook, including biological contamination, increased weed resistance, and damage to soils.[4] (*Id.* at 13.) Nonetheless, the defendants did not determine whether the use of genetically modified crops at Prime Hook is "essential to accomplishing refuge purpose(s)" in compliance with the GMO policy. (*Id.*) They also did not conduct any NEPA environmental assessments, make any compatibility determinations, or prepare any environmental impact statements concerning the impact of private farming at Prime Hook. (*Id.*) Likewise, the defendants did not perform any NEPA environmental assessments, or make any written compatibility determinations, or prepare an environmental impact statement to assess the impact of farming with genetically modified crops at Prime Hook. (*Id.* at 12-13.)

In March 2006, the defendants entered into two additional cooperative farming agreements that once again permitted the use of genetically modified crops at Prime Hook. (D.I. 37 at 10-11.) Before entering these agreements, the defendants, again, did not make any written compatibility determinations, conduct any NEPA environmental assessments, or prepare any environmental impact statements. (*Id.*) These two cooperative farming agreements expired on December 1, 2006. (*Id.* at 11.) According to the defendants, there has been no farming at Prime Hook since that time. (*Id.*)

On April 5, 2006, the plaintiffs filed this action seeking to: (1) enjoin the defendants from allowing any further cooperative farming at Prime Hook, until a written compatibility determination is completed; and (2) enjoin the defendants from allowing any further cultivation

---

[4] Moreover, in response to the objections to the policy prohibiting genetically modified crops, a FWS biologist stated, "I cannot condone or justify the use of [genetically modified organisms] in relation to Prime Hook." (D.I. 32 at 13.)

4

or farming with genetically modified crops at Prime Hook until an environmental assessment and/or environmental impact statement is completed. (D.I. 1.) After this suit was filed, the defendants stated that "there will be no more farming agreements" until the completion and final consideration of, among other things, an "environmental analysis under NEPA, . . . compatibility determinations available for public review and comment, . . . and other required determinations."[5] (D.I. 37 at 11.)

### III.  THE PARTIES' CONTENTIONS

The plaintiffs contend that there are no issues of material fact as to the defendants' conduct, and they are entitled to judgment on their claims as a matter of law. Specifically, they contend that there is no dispute that the defendants: (a) failed to make written compatibility determinations before entering into any of the cooperative farming agreements and allowing agricultural activity at Prime Hook, in violation of the NWRSAA; (b) failed to make a written compatibility determination before allowing the resumption of farming on 150 acres of Prime Hook, in violation of the NWRSAA; and (c) failed to prepare an environmental impact statement or an environmental assessment before allowing the farming of genetically modified crops at Prime Hook, in violation of the NEPA. (D.I. 1.) In addition, the plaintiffs contend that, in so doing, the defendants' conduct was "arbitrary, capricious, and not in accordance with existing law," in violation of the APA. (*Id.*)

---

[5] This includes the completion of a comprehensive conservation plan (the "CCP"). (*See* D.I. 37 at 1-2.) The CCP is a Congressionally-mandated conservation and land management plan that requires, among other things, that an appropriate environmental analysis under NEPA be conducted and that a written compatibility determination be completed.

The defendants contend that the plaintiffs' motion should be denied, and that this action should be dismissed on mootness grounds. (D.I. 37 at 2.) Specifically, they contend that the claims alleged in this case are "moot" because cooperative farming and farming with genetically modified crops are not presently occurring at Prime Hook, and will not recur, until the necessary compatibility determinations, environmental assessments, and environmental impact statements are completed. (*Id.* at 1-2.). They maintain that this case should be dismissed because there exists no "live" case or controversy. (*Id.* at 13.)

## IV. DISCUSSION

After having considered the record in this case, the parties' briefing, and the applicable law, the court concludes that: (A) the plaintiffs' claims are not moot; (B) the plaintiffs are entitled to summary judgment; and (C) the plaintiffs are entitled to injunctive relief. Specifically, the court finds that there are no issues of material fact, and that the plaintiffs are entitled to judgment on their claims that the defendants violated the NWRSAA, the NEPA, and the APA; and the defendants' conduct was arbitrary, capricious, and not in accordance with existing law. The court further finds that injunctive relief is warranted. The court will, therefore, grant the plaintiffs' motion for summary judgment and their request for injunctive relief.

### A. Whether the Plaintiffs' Claims are Moot

It is well-settled that the "exercise of judicial power under Article III of the Constitution depends on the existence of a case or controversy." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *see also Am. Bird Conservancy v. Kempthorne*, No. 07-4609, 2009 U.S. App. LEXIS 5139, at *10, (3d Cir. Mar. 11, 2009) ("The mootness doctrine derives from Article III of the Constitution, which limits the 'judicial Power' of the United States to the adjudication of 'Cases'

or 'Controversies.'") (citing U.S. Const. art. III, § 2). Therefore, federal courts lack jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *see also Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) (holding that the court does "not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties").

Moreover, the "central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Am. Bird Conservancy*, 2009 U.S. App. LEXIS 5139 at *10 (quoting *In re Surrick*, 338 F.3d 224, 230 (3d Cir. 2003)). Thus, when an actual or threatened injury from a challenged action no longer exists, or a change in circumstances deprives a court the ability to provide effective relief, the matter is moot, and must be dismissed for lack of jurisdiction. *See Mills v. Green*, 159 U.S. 651, 653 (1985).

It is equally well-settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of [that] practice." *Friends of the Earth v. Laidlaw Envtl. Services, Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982)). When a party voluntarily ceases a challenged activity, the court should only find the action moot if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 191. In making this determination, a court must consider "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see*

*also People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 232 (3d Cir. 2008) (holding that a defendant's representation that it would no longer enforce a challenged activity does not deprive a court of jurisdiction). The burden of persuading the court that the ceased conduct will not recur lies with the party asserting mootness. *See United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968).

Here, the defendants contend that the plaintiffs' claims are moot because there is currently no cooperative farming or farming with genetically modified crops at Prime Hook, and there will be no cooperative farming or farming with genetically modified crops at Prime Hook in the foreseeable future, until the necessary compatibility determinations, environmental assessments, and environmental impact statements are completed. They contend that the challenged activities have ceased and will not recur. The court does not agree.

First, as the plaintiffs correctly point out, the defendants' decision to voluntarily cease cooperative farming and farming with genetically modified crops at Prime Hook does not render the plaintiffs' claims moot. Indeed, the Third Circuit has concluded as much. Specifically, in *United States v. Gov't of Virgin Islands*, the Third Circuit held that a defendant's voluntary cessation of a challenged activity does not result in mootness, where the defendant ceases to engage in the challenged activity for "purely practical" or strategic reasons, such as avoiding litigation. *Cf. United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004) (holding that a defendant's "voluntary termination" was not enough to "render the case moot"). In that case, the Third Circuit noted that the timing of the defendant's "voluntary termination" -- occurring "with litigation lurking a couple of days away" -- was insufficient to render the plaintiff's claims moot. *Id.* at 285.

Here, like the defendants in *United States v. Gov't of Virgin Islands*, the facts of this case also suggest that the defendants' decision to voluntarily cease the cooperative farming and farming with genetically modified crops at Prime Hook is motivated by "purely practical" reasons, *i.e.*, an attempt to avoid litigation. In reviewing the administrative record, it strikes the court that the defendants did not indicate their willingness to cease allowing those farming practices at issue to take place at Prime Hook until *after* this suit was filed. The record reflects that, prior to that time, the defendants did not take any steps to cease or otherwise limit cooperative farming practices or farming with genetically modified crops at Prime Hook. Indeed, in January and February 2006, approximately eight months after receiving "divergent public comments" opposing further cooperative farming at Prime Hook, the defendants entered into two new, additional cooperative farming agreements -- once again permitting the use of genetically modified crops at Prime Hook. The court is not persuaded that the defendants' decision now, to "voluntarily" cease allowing the farming at issue at Prime Hook, necessarily renders the plaintiffs' claims moot.

The court is, likewise, not convinced that the defendants' practices will not necessarily resume in the future. Specifically, the defendants' decision to voluntarily cease cooperative farming and farming with genetically modified crops at Prime Hook provides no legally-binding assurances that the defendants will not resume these same practices again in the future. Without more, the mere fact that, while in litigation, the defendants proclaim that "there will be no cooperative farming or farming with genetically modified crops at Prime Hook until the necessary compatibility determinations and environmental assessments are completed" is not enough. *Cf. Pennsylvania v. Porter*, 659 F.2d 306, 313 (3d Cir. 1981) (*en banc*) (holding that a

case was not moot where city failed to provide assurance that the challenged conduct would not be resumed); *People Against Police Violence*, 520 F.3d at 232 (same). The court finds that the plaintiffs' claims are not moot.

### B. Whether Summary Judgment Is Appropriate

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit. *Id.* at 247-48. An issue is "genuine" if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* at 249.

The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In addition, the court views the evidence in the light most favorable to the nonmoving party, with all doubts resolved against entry of summary judgment. *See Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 91 (3d Cir. 1999). Summary judgment is particularly appropriate where the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. *See Donald M. Durkin Contracting, Inc. v. City of Newark*, No. 04-163-GMS, 2006 U.S. Dist. LEXIS 68221, at *12 (D. Del. Sept. 22, 2006).

In this case, the court finds that there are no genuine issues of material fact, and that the plaintiffs are entitled to judgment as a matter of law on their claims that the defendants violated: (1) the NWRSAA, (2) the NEPA, and (3) the APA; and their claim that the defendants' conduct was arbitrary, capricious, and not in accordance with existing law.

### 1.   *Whether the Defendants Violated the NWRSAA*

According to the NWRSAA, the mission of the National Wildlife Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish wildlife, and plant resources and their habitats within the United States." 16 U.S.C. § 668dd(a)(2). In addition, the NWRSAA empowers the Secretary of the Interior to "permit the use of any area within the System for any purpose . . . whenever [he or she] determines that such uses are compatible with the major purposes for which such areas were established." *Id.* at § 668dd(d)(1)(A).

Under NWRSAA regulations, a national wildlife refuge may be opened "for any refuge use . . . only *after* the [FWS] determines that it is a *compatible use* and not inconsistent with any applicable law."[6] 50 C.F.R. § 25.21(b) (emphasis added). In particular, these regulations require that such compatibility determinations must: (1) be in writing; (2) identify the proposed or existing use that the compatibility determination applies to; and (3) state whether the proposed use is in fact a compatible use based on "sound professional judgment." *See* 50 C.F.R. § 25.12.

---

[6] The term "refuge use" includes farming. *See* 50 C.F.R. § 25.12.

In addition, the NWRSAA requires that a written compatibility determination be completed *before* farming is permitted on a national wildlife refuge.[7] *Id.*

Here, there is no dispute that the defendants permitted farming on Prime Hook without first conducting or preparing a written compatibility determination. The defendants do not contest that from 1995 to 2007, they entered into no less than 37 cooperative farming agreements, and that under these agreements, farmers were permitted to harvest commodity corn or soybean crops at Prime Hook. The defendants also do not contest that prior to entering these cooperative farming agreements, they did not make any compatibility determinations, or conduct any studies to assess whether these uses were compatible with Prime Hook's purposes. The administrative record is simply devoid of anything that even purports to be a compatibility determination, much less a formal document that comports with the clear requirements set forth in the NWRSAA regulations.

Because there are no issues of material fact that the defendants failed to make a written compatibility determination -- prior to permitting cooperative farming on Prime Hook -- the court concludes that the defendants violated the NWRSAA as a matter of law.

### 2.   *Whether the Defendants Violated the NEPA*

The court, likewise, concludes that the defendants violated the NEPA. The NEPA requires environmental review for any major federal action that may significantly affect the

---

[7] This written compatibility determination should take into consideration, among other things, the "applicable law, principles of sound fish and wildlife management, available science, and refuge resources." *See* 50 C.F.R. § 25.12.

environment. *See* 42 U.S.C. § 4321.[8] The act was established to ensure that federal agencies carefully consider the environmental impacts of their projects and that information about those impacts be made available to the public. *See, e.g., Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2004.) The NEPA was also intended to reduce or eliminate environmental damage and to promote the understanding of the ecological systems and natural resources important to the United States. *Id.* at 237. To that end, the NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") for all "major federal actions significantly [affecting] the quality of the human environment." 42 U.S.C. § 4332(C). The NEPA itself does not mandate particular results, rather NEPA imposes procedural requirements on federal agencies, requiring them to analyze the environmental impact of their proposals and actions. *See, e.g., Coliseum Square Assoc., Inc. v. Jackson*, 465 F.3d at 215, 223 (5th Cir. 2006).

Under NEPA regulations, an agency undertaking an action is required to determine whether its proposal requires an EIS. *See* 40 C.F.R. § 1501.4(a). The agency is to first prepare a more limited environmental assessment ("EA") to determine whether an EIS is required. *See* 40 C.F.R. § 1501.4(b).[9] If the agency determines, based on the EA, that no EIS is needed because

---

[8] In the Third Circuit, "major federal action" exists when the "agency action is a legal requirement for the other party to affect the environment and [when] the agency has discretion to take environmental considerations into account before acting." *N.J. Dept. of Env. Prot. and Energy v. Long Island Power Auth.*, 30 F.3d 403, 417-18 (3d Cir. 1994) (quoting *NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 634 (3d Cir. 1978)).

[9] An EA is "a concise public document" that an agency prepares when deciding whether it needs to prepare an EIS. 40 C.F.R. § 1508.9. An EIS is a "detailed written statement" which comprehensively discloses and analyzes potential environmental impacts of proposed government action. 40 C.F.R. § 1508.11. There is an exception to each of these requirements, where an agency establishes that the challenged conduct were routine activities that did not, individually or cumulatively, have any significant impact on the environment. *See* 40 C.F.R. § 1508.4. The defendants, however, have not asserted that this exception applies in this case.

the action would not significantly affect the environment, it must issue a "finding of no significant impact", which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment. *See* 40 C.F.R. §§ 1501.4(e), 1508.13. Otherwise, the agency must prepare an EIS. Furthermore, an EIS must describe the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided should the proposal be implemented, alternatives to the proposed action, and any irreversible and irretrievable commitments of resources that would be involved if the proposed action should be implemented. *See* 42 U.S.C. § 4332(2)(C).

Again, there is no issue of material fact that the defendants in this case permitted farming of genetically modified crops to occur at Prime Hook without first preparing either an EIS or an EA, as required by NEPA. The defendants do not contest that, starting in 2003, they allowed genetically modified crops to be planted on Prime Hook. They also do not contest that their own biologists determined that these activities posed significant environmental risks to Prime Hook, including biological contamination, increased weed resistance, and damage to soils. Nonetheless, the record reflects that the defendants did not conduct any NEPA environmental assessments, make any compatibility determinations, or prepare any environmental impact statements to assess the impact of these activities on Prime Hook. Because there is no genuine issue of material fact that the defendants allowed farmers to grow genetically modified crops on Prime Hook without first preparing either an environmental assessment or an environmental impact statement, the court concludes that the defendants violated the NEPA as a matter of law.

### 3.    *Whether the Defendants Violated the APA*

Under the APA, a final agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 414 (1971); *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 179 (3d Cir. 2000). Here, the court concludes that by permitting cooperative farming at Prime Hook without first making a written compatibility determination, and by allowing farmers to grow genetically modified crops at Prime Hook without first preparing either an environmental assessment or an environmental impact statement, the defendants' conduct was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Particularly, with respect to the defendants' decision to allow farmers to grow genetically modified crops at Prime Hook, the court notes that the defendants permitted this activity in contravention of (and in spite of) their own "GMO Policy" at the time against such, and in view of their own biologists' findings that these activities posed several significant risks to Prime Hook. The court is not convinced that the defendants carefully considered and analyzed the environmental impacts of these activities as required by the law. The court must, therefore, grant the plaintiffs' motion in this regard.

### C.    **Whether the Plaintiffs Are Entitled to Injunctive Relief**

The plaintiffs seek a permanent injunction that prohibits the defendants from allowing: any cooperative farming at Prime Hook, until a written compatibility determination is completed; and any cultivation or farming with genetically modified crops at Prime Hook, until either an environmental assessment or environmental impact statement is completed.

In general, injunctive relief is appropriate when there is irreparable injury and where other

legal remedies would be inadequate. *See, e.g., Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). In determining whether to grant permanent injunctive relief, the court must consider (1) actual success on the merits, (2) irreparable harm to the plaintiffs as the moving party, (3) harm to other interested persons, including the non-movant, and (4) the public interest. *See Natural Resources Defense Council v. Texaco*, 906 F.2d 934, 941 (3d Cir. 1990). That is, a court may issue an injunction "only after a showing both of irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." *Id.* at 941. In view of these considerations, and the undisputed facts of this case, the court is satisfied that the plaintiffs have made the requisite showings.

### 1. *Success on the Merits*

First, the plaintiffs have succeeded on the merits on their claims that the defendants violated the NWRSAA, the NEPA, and the APA, and that the defendants' conduct was arbitrary, capricious, and not in accordance with existing law.

### 2. *Irreparable Harm and Inadequacy of Legal Remedies*

Second, the plaintiffs have demonstrated irreparable harm and inadequacy of legal remedies. Indeed, it is undisputed that farming with genetically modified crops at Prime Hook poses significant environmental risks. What's more, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co.*, 480 U.S. at 545. This consideration, therefore, weighs in favor of issuing an injunction.

### 3. *Harm to Others*

Third, the court is persuaded that an injunction in this case will not harm the defendants.

For one thing, the defendants have already stated that they do not intend to allow any cooperative farming or farming with genetically modified crops at Prime Hook, until the necessary compatibility determinations, environmental assessments, and environmental impact statements are completed. Therefore, an injunction in this case will be in line with the plaintiffs' stated intentions in this regard, especially since the defendants have already "voluntarily ceased" those farming practices at issue. The defendants also have not alleged any adverse consequences that will result from the court granting the plaintiffs' request for injunctive relief. Conversely, if an injunction is not granted, the plaintiffs (and Prime Hook) will likely suffer additional environmental, recreational, and aesthetic injuries. Also without an injunction, there is no legal impediment to the defendants resuming the farming practices at issue again at some later time. This consideration, therefore, favors issuing an injunction.

### 4.     *The Public Interest*

Finally, the public interest would also be benefitted by an injunction. Specifically, the public would likely benefit from the defendants' compliance with the environmental laws and regulations in connection with Prime Hook. These laws require the defendants to: (1) carefully consider the environmental impacts of their projects before taking action, and to (2) provide information about those impacts to the public. The public also has an interest in the defendants' continued habitat preservation and wildlife conservation at Prime Hook in compliance with federal law.

Given the plaintiffs' success on the merits, the risk of irreparable harm and the inadequacy of legal remedies, and the public interest in protection of the nation's wildlife refuges, the court finds that these factors all weigh in favor of granting the plaintiffs' request for

injunctive relief. Accordingly, the court orders the defendants to be enjoined from: (1) allowing cooperative farming at Prime Hook, until they make written compatibility determinations; and (2) permitting genetically modified crops to be cultivated or farmed at Prime Hook, until they complete either an environmental assessment and/or an environmental impact statement as required by law.

## V.  CONCLUSION

For the foregoing reasons, the court will grant the plaintiffs' motion for summary judgment, and their request for injunctive relief.

Dated: March 24, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELAWARE AUDUBON SOCIETY, INC., CENTER FOR FOOD SAFETY, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,<br><br>   Plaintiffs,<br><br>   v.<br><br>Secretary of the U.S. Department of Interior, DALE HALL, Director of U.S. Fish and Wildlife Service, and U.S. FISH AND WILDLIFE SERVICE, an administrative agency of the U.S. Department of Interior,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 06-223-GMS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED THAT:

1. The plaintiffs' motion for summary judgment (D.I. 35) is GRANTED; and

2. The defendants are enjoined from:

   (a) Allowing any cooperative farming at Prime Hook, until a written compatibility determination is completed; and

   (b) Allowing any cultivation or farming with genetically modified crops at Prime Hook, until an environmental assessment and/or environmental impact statement is completed.

Dated: March 24, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE